UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHERYL JAMES and SANDRA DENTON,
p/k/a SALT-N-PEPA,

                Plaintiffs,

        v.

UMG RECORDINGS, INC., a Delaware
corporation doing business as Universal
Music Group,

                Defendant.

No. 1:25-cv-4182-DLC

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
UMG RECORDINGS, INC.'S MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................2

I.    Termination of Grants of Copyright Rights Under 17 U.S.C. § 203 ...................................2

II.   Plaintiffs' Claims .....................................................................................4

III.  The Relevant Agreements ...............................................................................5

      A.   The Next Plateau Distribution Agreement..........................................................6

      B.   The NITA Personal Services-Production Agreement..................................................7

      C.   The 1992 Agreements .............................................................................8

ARGUMENT .........................................................................................................9

I.    There Is No Grant of Copyright Rights Executed by Plaintiffs with
      Respect to the Sound Recordings .......................................................................10

II.   The Remixed Sound Recordings Are Derivative Works Not Subject
      to Termination.........................................................................................15

III.  Plaintiffs' Conversion Claim Is Preempted by the Copyright Act
      and In Any Event Fails to State a Claim Under New York Law ............................................17

      A.   Plaintiffs' Conversion Claim Is Preempted .......................................................17

      B.   Plaintiffs' Conversion Claim Fails to State a Claim Under
           New York Law....................................................................................18

IV.   The Court Should Stay Discovery Pending Disposition of the
      Motion to Dismiss......................................................................................19

CONCLUSION........................................................................................................21

30057/033/5150007.4

# TABLE OF AUTHORITIES

**Cases**

*Affymetrix, Inc. v. Illumina, Inc.*,
446 F. Supp. 2d 292 (D. Del. 2006)...................................................................... 12

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
No. 94-2120, 1996 U.S. Dist. LEXIS 2684 (S.D.N.Y. Mar. 7, 1996) .................... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................... 9

*Ass'n of Am. Med. Colls. v. Carey*,
728 F. Supp. 873 (N.D.N.Y. 1990) ...................................................................... 13

*Austin v. Gould*,
93 N.Y.S.3d 33 (1st Dep't 2019) .......................................................................... 18

*Baiul v. NBC Sports*,
No. 15-9920, 2016 U.S. Dist. LEXIS 52291 (S.D.N.Y. Apr. 19, 2016) ................ 18

*Bartsch v. Metro-Goldwyn-Mayer, Inc.*,
391 F.2d 150 (2d Cir. 1968) ................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................... 9

*Boelter v. Hearst Communs., Inc.*,
No. 15-3934, 2016 U.S. Dist. LEXIS 12322 (S.D.N.Y. Jan. 28, 2016) ................ 19

*Brad H. v. City of N.Y.*,
17 N.Y.3d 180 (2011) .......................................................................................... 12

*Briarpatch Ltd. v. Phoenix Pictures*,
373 F.3d 296 (2d Cir. 2004) ......................................................................... 17, 18

*Caffey v. Cook*,
409 F. Supp. 2d 484 (S.D.N.Y. 2006) .................................................................. 14

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................................. 9

*Close-Up Int'l, Inc. v. Berov*,
382 F. App'x 113, 115 (2d Cir. 2010) .................................................................. 11

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)............................................................................................. 10

*Crook v. Rindskopf*,
105 N.Y. 476 (1887) ............................................................................................ 11

*Deutsche Bank Nat'l Tr. Co. v. Romano*,
48 N.Y.S.3d 237 (2d Dep't 2017)........................................................................ 12

*DiFolco v. MSNBC Cable LLC*,
622 F.3d 104 (2d Cir. 2010) .................................................................................. 9

*Estate Examinations Co. v. ECG Enters.*,
  No. 06-3024, 2006 U.S. Dist. LEXIS 81478 (E.D.N.Y. Nov. 7, 2006) .................................. 11

*Gandler v. Nazarov*,
  No. 94-2272, 1994 U.S. Dist. LEXIS 17885 (S.D.N.Y. Dec. 14, 1994) ................................ 20

*Greenfield v. Philles Records*,
  98 N.Y.2d 562 (2002) ............................................................................................................ 11

*Harley v. Nesby*,
  No. 08-5791, 2012 U.S. Dist. LEXIS 62237 (S.D.N.Y. Apr. 30, 2012) ................................ 19

*Hong Leong Fin. Ltd. (Sing.) v. Pinnacle Performance, Ltd.*,
  297 F.R.D. 69 (S.D.N.Y. 2013) ...................................................................................... 19, 21

*Kass v. Kass*,
  91 N.Y.2d 554 (1998) ............................................................................................................ 12

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................................................... 9

*Litecubes, LLC v. N. Light Prods.*,
  523 F.3d 1353 (Fed. Cir. 2008) ............................................................................................ 13

*MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*,
  No. 03-8103, 2004 U.S. Dist. LEXIS 29562 (C.D. Cal. Feb. 11, 2004) ................................ 14

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) .............................................................................................. 10

*Niss v. Columbia Pictures*,
  No. 97-4636, 2000 U.S. Dist. LEXIS 18328 (S.D.N.Y. Dec. 20, 2000) ................................ 14

*Omni MedSci, Inc. v. Apple Inc.*,
  7 F.4th 1148 (Fed. Cir. 2021) ............................................................................................... 12

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) .................................................................................................... 2

*Playboy Enters. v. Dumas*,
  831 F. Supp. 295 (S.D.N.Y. 1993) ....................................................................................... 12

*Scorpio Music S.A. v. Willis*,
  No. 11-1557, 2012 U.S. Dist. LEXIS 63858 (S.D. Cal. May 7, 2012) ..................................... 5

*Shiro v. Drew*,
  174 F. Supp. 495 (D. Me. 1959) ........................................................................................... 12

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005) ................................................................................................ 13

*Sony Corp. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) .............................................................................................................. 13

*Spencer Trask Software & Info. Servs. v. RPost Int'l*,
  206 F.R.D. 367 (S.D.N.Y. 2002) ..................................................................................... 20, 21

iii

*Spinelli v. NFL*,
   No. 13-7398, 2015 U.S. Dist. LEXIS 155816 (S.D.N.Y. 2015)............................................. 20

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006) ................................................................................................. 19

*United States v. Am. Soc'y of Composers (In re Cellco)*,
   663 F. Supp. 2d 363 (S.D.N.Y. 2009) ..................................................................................... 5

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
   924 F.3d 32 (2d Cir. 2019) ................................................................................................... 17

*Vassilkioti v. CCS Int'l, Ltd.*,
   No. 98-4090, 2000 U.S. Dist. LEXIS 17776 (N.Y. Dec. 7, 2000) ......................................... 12

*Waite v. UMG Recordings, Inc.*,
   450 F. Supp. 3d 430 (S.D.N.Y. 2020) ................................................................... 3, 10, 15, 21

*Waite v. UMG Recordings, Inc.*,
   477 F. Supp. 3d 265 (S.D.N.Y. 2020) ................................................................................... 10

**Statutes**

17 U.S.C. § 101 ............................................................................................................................. 3

17 U.S.C. § 106 ........................................................................................................................... 18

17 U.S.C. § 114(b) ...................................................................................................................... 15

17 U.S.C. § 201 ............................................................................................................................. 3

17 U.S.C. § 203 ............................................................................................................................. 2

17 U.S.C. § 203(a) ............................................................................................................. 2, 3, 5, 11

17 U.S.C. § 203(b)(1) .......................................................................................................... 3, 15, 16

17 U.S.C. § 204(a) ................................................................................................................. 11, 12

17 U.S.C. § 304(c) ........................................................................................................................ 2

**Rules**

Fed. R. Civ. P. 26(c) ..................................................................................................................... 1

**Treatises**

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2025) ........................................................... 18

30057/033/5150007.4

Defendant UMG Recordings, Inc. ("UMG") respectfully submits this memorandum in support of its motion to dismiss the Complaint brought by Plaintiffs Cheryl James and Sandra Denton, p/k/a Salt-N-Pepa (collectively, "Plaintiffs" or, as the context requires, "Artist"), pursuant to Federal Rule of Civil Procedure 12(b)(6), and for a stay of discovery pending disposition of the motion to dismiss, pursuant to Fed. R. Civ. P. 26(c).

## PRELIMINARY STATEMENT

Plaintiffs bring this action seeking a declaration as to the validity of a copyright termination notice (the "Notice") served on UMG concerning certain sound recordings created during the 1980's and 1990's, as well as a claim for conversion under New York state law. The Complaint should be dismissed in its entirety because it fails to state a valid claim.

UMG properly disputed the validity of the Notice because the relevant agreements pursuant to which the sound recordings were created contain no grant of copyright rights from Plaintiffs, a fundamental requirement of the Copyright Act's termination provisions. In a class action lawsuit in which the plaintiffs were represented by the same counsel representing Plaintiffs here, this Court dismissed various claims challenging UMG's rejection of copyright termination notices for precisely the same reason raised on this motion – the absence of any operative grant from the purported authors. As the Court explained in that lawsuit, where third parties enter into contracts on behalf of the artist, such as is the case here, there is no right of termination. On that basis alone, Plaintiffs' claim for declaratory relief must be dismissed.

In addition, the Copyright Act provides that parties may continue to exploit derivative works notwithstanding a right of termination. Several of the most valuable sound recordings involved here are remixes, which constitute derivative works excluded from the scope of possible termination under the applicable law. Accordingly, as to those works, Plaintiffs have no

1

right of termination even if they could somehow get past the absence of an operative grant to terminate.

Finally, the conversion claim is subject to dismissal both because it is preempted by the Copyright Act and because New York law does not recognize a claim for conversion of intangible property such as a copyright. Because all the claims fail, the Court should dismiss the Complaint in its entirety and should stay discovery pending resolution of the motion to dismiss.

## <u>BACKGROUND</u>

### I.    Termination of Grants of Copyright Rights Under 17 U.S.C. § 203

Under the Copyright Act of 1909, "authors were entitled to a copyright in their works for an initial twenty-eight year period," and "[a]fter this period expired, the author had the right to renew the copyright for a second twenty-eight year term." *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). "The 1976 amendments to the Copyright Act, which took effect in 1978, abandoned this framework," and "replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration, and it created for authors … [a] right to terminate the grant of a transfer or license." *Id.* at 197-98 (citation omitted).

Congress established two separate termination regimes, one as to grants executed by authors on or after January 1, 1978, and the other as to certain grants executed before that date. *See* 17 U.S.C. §§ 203, 304(c). Section 203, at issue here, provides:

> In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination [under certain specified conditions].

17 U.S.C. § 203(a).

The termination right under Section 203 is not available for all transfers of copyright

2

rights; the statute excludes from its scope "work[s] made for hire."  17 U.S.C. § 203(a).  The Copyright Act defines "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.  Under Sections 201(a) and (b) of the Copyright Act, copyright vests initially in the author of a work; "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author."  17 U.S.C. §§ 201(a) & (b).  Although UMG contends in this lawsuit that the works at issue are works made for hire under each of the above alternative formulations in section 101, the Court need not reach that issue for purposes of the present motion because the absence of any operative grant renders termination unavailable in any event.  *See Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 435 (S.D.N.Y. 2020) (finding it unnecessary to resolve the work for hire status of recordings while granting motion to dismiss claims for declaratory relief based on absence of any grant).

> The Copyright Act provides further that, notwithstanding termination of a grant,

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 203(b)(1).  Thus, the Notice does not prevent UMG's continued use of any derivative works referenced in the Notice, such as those sound recordings that are remixes.

## II.     Plaintiffs' Claims

Plaintiffs are musical performers who were members of the group professionally known as "Salt-N-Pepa" that recorded albums released by Next Plateau Records, Inc. and London Records, Inc., predecessors of UMG, in the 1980s and 1990s. *See* Complaint ¶¶ 37-66. On May 13, 2022, the Notice was served on UMG on Plaintiffs' behalf. Complaint Ex. E. Referencing a grant allegedly made "on or about May 15, 1986," the Notice purported to terminate a copyright grant purportedly made by Plaintiffs to UMG's predecessors as to various sound recordings named therein. *Id*.

UMG served a counter-notice on Plaintiffs on June 27, 2022 disputing the validity of the Notice. Complaint Ex. F. As to four of the albums (*Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic* and *Very Necessary*), the counter-notice explained, among other things, that the agreement referenced in the Notice did not contain a grant that could be subject to termination. *Id*. The counter-notice also set forth that an additional album referenced in the Notice (*Brand New*) was governed by a different agreement, entered into in 1995, which also did not contain a grant of copyright. *Id*. In addition, the counter-notice indicated that any remixes, including those on the album *A Blitz of Salt-n-Pepa Hits: The Hits Remixed*, were derivative works and thus not subject to termination even if there were a terminable grant otherwise applicable to the underlying works. *Id*.

On September 12, 2024, Plaintiffs responded to UMG's counter-notice (Complaint Ex. H), contending that UMG's counter-notice "was based on incomplete information concerning" the sound recordings contained on the first group of four albums addressed in the counter-notice.

Complaint ¶ 89.[1]  Plaintiffs' response letter did not address UMG's arguments concerning the other album, *Brand New*, covered by a separate 1995 agreement, and the Complaint explicitly states that the *Brand New* album is "not at issue in this case."  Complaint ¶ 65 n. 4.  Plaintiffs also did not address the derivative work status of the remixes in their letter.

Although the parties attempted to resolve their dispute concerning the validity of the Notice, they were unable to do so.  Complaint ¶¶ 87, 96.  Plaintiffs filed this action seeking declaratory relief as to the validity of the Notice and also alleging a claim for conversion.

### III.    The Relevant Agreements

Plaintiffs' contributions to the albums *Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic*, and *Very Necessary*, and the sound recordings "Let's Talk About AIDS," "Emphatically No," and "Start Me Up" (collectively, the "Sound Recordings") were created pursuant to two interrelated agreements executed as of May 15, 1986 (collectively, the "1986 Agreements").[2]  Complaint ¶¶ 41-55.  As discussed below, neither agreement contains a grant of copyright, or of rights under a copyright, executed by Plaintiffs.

---

[1] UMG responded to the September 12, 2024 letter explaining why the additional agreement referenced in Plaintiffs' letter also did not contain a grant of copyright, but Plaintiffs did not attach such letter to the Complaint.  Regardless, UMG's argument in this respect is set forth fully below at pp. 10-15 *infra*.

[2] Other individuals in addition to Plaintiffs, including Diedra Roper p/k/a Spinderella (the third member of Salt-N-Pepa) and Herb Azor (a producer and musician), contributed protectible authorship to the Sound Recordings.  Ms. Roper and Mr. Azor made their contributions within the scope of their employment by Noise In The Attic Productions, Inc.  *See* Complaint Ex. C ¶ 1; *see*, *e.g.*, *United States v. Am. Soc'y of Composers (In re Cellco)*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) (authors of sound recordings include "the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both.").  UMG's copyright ownership of Ms. Roper's and Mr. Azor's contributions to the Sound Recordings is not at issue in this matter, and ownership of the copyright in those contributions will remain with UMG regardless of the outcome here.  *See* 17 U.S.C. § 203(a)(1); *Scorpio Music S.A. v. Willis*, No. 11-1557, 2012 U.S. Dist. LEXIS 63858, at *13-14 (S.D. Cal. May 7, 2012) (if one or more joint authors of copyrighted work executed grant with respect to their

A.        **The Next Plateau Distribution Agreement**

In the May 15, 1986 agreement between Next Plateau Records, Inc. ("Next Plateau") and

Herb Azor ("Producer")[3] (the "Next Plateau Distribution Agreement"), Next Plateau "engages

Producer to produce and deliver to [Next Plateau] Sides embodying the performances of Artist,

and Producer hereby accepts such engagement and agrees to deliver Sides embodying the

performances of Artist exclusively to [Next Plateau]."  Complaint Ex. B ¶ 2.  Plaintiffs are not

parties to or signatories of the Next Plateau Distribution Agreement, in which Producer

represents and warrants to Next Plateau that "[t]here is in existence between the Producer and

[Plaintiffs] a valid and enforceable agreement under the terms of which [Plaintiffs] shall perform

exclusively for Producer as a recording artist during the Term of this agreement as extended."

*Id*. ¶ 13(g).

The Next Plateau Distribution Agreement contains a straightforward transfer of copyright

rights in the already-existing LPs *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* from

Producer – not Plaintiffs – to Next Plateau.[4]  *Id*. ¶ 3(c) ("Producer hereby sells, transfers and

assigns to [Next Plateau], for the world, all of the aforesaid right, title and interest in and to such

Sides including without limitation the sound recording copyright and the performances embodied

---

contributions, those authors may be able to effect termination only as to their ownership share of
copyrighted work).

[3] "[S]ubsequent to the complete execution of the [Next Plateau Distribution] Agreement,
Herb Azor and Hugh Azor assigned all of their rights and obligations under the [Next Plateau
Distribution Agreement] to [Noise In The Attic Productions, Inc.]."  *See* Complaint ¶ 56 and Ex.
C.

[4] The preexisting sound recordings are purportedly listed on a missing Schedule A to the
Next Plateau Distribution Agreement, but there is no dispute that the sound recordings on the
*Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums were covered by such grant from
Producer.  *See* Complaint Ex. B ¶ 3(c); Ex. A ¶ C.

6

thereon….").  In that same provision, Producer warrants and represents that it "is the sole and exclusive owner" of the recordings and "all right, title and interest therein."  *Id*.

As to future sound recordings, Producer undertakes that:

> All Sides recorded during the Term shall be recorded by Producer on [Next Plateau]'s behalf and all records made therefrom, together with the performances embodied therein, shall, <u>from the inception of their creation</u>, be entirely the property of [Next Plateau] in perpetuity, throughout the Territory, <u>free of any claim whatsoever by Producer, Artist or by any persons deriving any rights or interests from Producer or Artist</u> and [Next Plateau] shall have the right to secure the sound recording (P) copyright in and to the Sides in [Next Plateau]'s name <u>as the owner and author</u> thereof and to secure any and all renewals of such copyright.

*Id*. ¶ 5 (emphasis added).

Plaintiffs signed an inducement letter annexed to the Next Plateau Distribution Agreement.  *See* Complaint Ex. B (ECF No. 1-2 at pp. 24-26).  The inducement letter contains no grant of copyright rights.  In the inducement letter, Plaintiffs in their individual capacities made, confirmed and guaranteed all of Producer's warranties, representations and undertakings, which would necessarily include that they were employed by Producer under a valid and enforceable agreement, and that Next Plateau would be the legal author and copyright owner of all sound recordings created pursuant to the Next Plateau Distribution Agreement.  *See id*. at p.24.

**B.    The NITA Personal Services-Production Agreement**

Plaintiffs and Noise In The Attic Productions, Inc. ("NITA") entered into an agreement dated as of May 15, 1986 (the "NITA Personal Services-Production Agreement") "with respect to [NITA] providing [Plaintiffs] with production services as well as with respect to [Plaintiffs] rendering [Plaintiffs'] exclusive personal services to [NITA] as a recording artist, as well as granting [NITA] certain exclusive rights with respect to [Plaintiffs] pertaining to audio-visual

exploitation." Complaint Ex. A p.1. The NITA Personal Services-Production Agreement is coterminous with the Next Plateau Distribution Agreement. S*ee* Complaint ¶ 48 & Ex. A ¶ B.

The relevant provision in the NITA Personal Services-Production Agreement concerning copyright ownership contains no reference to any grant of copyright rights in sound recordings:

> As between [NITA] and [Plaintiffs], [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereto.

Complaint Ex. A ¶ H. Significantly, the parties to the NITA Personal Services-Production Agreement used express rights transfer language elsewhere when they so intended. The preamble references Plaintiffs' grant to NITA of "certain exclusive rights with respect to Artist pertaining to audio-visual exploitation," Complaint Ex. A p.1, and the NITA Personal Services-Production Agreement contains express present grants by Plaintiffs to NITA of "the worldwide right in perpetuity to use Artist's name and, subject to Artist's prior approval, Artist's likeness, biography and other identification (all of the foregoing referred to as 'Artist's Identification')," *id*. ¶ K; and of "the sole and exclusive worldwide right to use Artist's Identification for general trade purposes." *Id*. Had the parties intended to effectuate a transfer of exclusive copyright rights in sound recordings from Plaintiffs to NITA, they knew how to do so. But they did not.

### C.     The 1992 Agreements

The Complaint also references two agreements entered into in 1992 by which London Records ("London") stepped into the shoes of Next Plateau. *See* Complaint ¶¶ 56-59 & Ex. C, D. However, those agreements have no impact on the applicable termination analysis, as they simply carried forward the terms of the 1986 Agreements (except with respect to financial terms

not at issue here).[5]  *See* Complaint Ex. C ¶¶ 1(a)(iv), 1(b) (acknowledging that all of Next

Plateau's rights and obligations under the Next Plateau Distribution Agreement, excluding any

music publishing rights, have been assigned from Next Plateau to London, with Producer and

Plaintiffs approving and ratifying the assignment and agreeing to be bound to London under the

Next Plateau Distribution Agreement); Ex. D ¶ 1 (acknowledging that two albums remain to be

recorded under the NITA-Personal Services Production Agreement).

## ARGUMENT

To survive a motion to dismiss for failure to state a claim, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  To meet this standard, a plaintiff must plead factual content "that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The Court may properly consider "the complaint, documents attached to the complaint as

exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable

LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153 (2d Cir. 2002) (noting that recording contracts are integral to a copyright claim and thus

were properly incorporated by reference on a motion to dismiss).  "Though all reasonable

inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, conclusions

of law or unwarranted deductions of fact are not admitted."  *Lentell v. Merrill Lynch & Co., Inc.*,

396 F.3d 161, 174-75 (2d Cir. 2005) (internal quotation omitted).

---

[5] Plaintiffs' allegations that the 1992 agreements contained no work for hire language (*see* Complaint ¶¶ 57, 59) is a *non sequitur*.  The 1992 agreements do not address copyright ownership at all because the 1986 Agreements continued to govern as to that issue.  In this respect, it could equally be said that the 1992 agreements contained no grant of copyrights that could be terminated, nor did Plaintiffs ever seek any termination under such agreements.

As demonstrated below, the Complaint fails to state a claim and should be dismissed.

## I. There Is No Grant of Copyright Rights Executed by Plaintiffs with Respect to the Sound Recordings

"In a copyright case, as in most cases, the language of the statute provides the starting point for [the Court's] analysis." *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005) (citations omitted); *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Section 203 of the Copyright Act explicitly limits the termination right to grants "executed by the author," and only an author who executed the grant, or the statutorily designated heirs of a deceased author-grantor, may terminate the grant. *See Waite*, 450 F. Supp. 3d at 441; *see also Waite v. UMG Recordings, Inc.*, 477 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) ("*Waite II*"). Thus, as Judge Kaplan explained in *Waite*, "third parties to a contract and loan-out companies, which 'loan' out an artist's services to employers, and enter into contracts on behalf of the artist do not have a termination right under the statute." *Waite*, 450 F. Supp.3d at 441; *see also Waite II*, 477 F. Supp. 3d at 271 (quoting same).

This lawsuit involves the precise situation presented by *Waite* in that none of the relevant agreements contain grants of copyright by Plaintiffs. While Plaintiffs, represented by the same counsel that represented the plaintiffs in *Waite*, have apparently chosen to ignore that decision, there is no basis for any different result here. As in *Waite*, the declaratory relief claim should be dismissed for failure to state a claim because there is no copyright grant executed by an author subject to termination.

Plaintiffs allege that the NITA Personal Services-Production Agreement "includes a grant of the rights to Salt-N-Pepa's sound recordings." Complaint ¶ 43. To support that allegation Plaintiffs rely on the following contractual language: "As between Company [NITA] and Artist,

Company [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereof." *Id*. (quoting Complaint Ex. A, ¶ H). Plaintiffs' reliance is not well taken. The quoted language does not constitute a "grant of a transfer or license of copyright or of any right under a copyright" under 17 U.S.C. § 203(a) and New York law.

Section 204(a) of the Copyright Act provides that a transfer of copyright ownership must be in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent. 17 U.S.C. § 204(a). However, while "[a]n alleged transfer of copyright is subject to requirements for a valid transfer under copyright law [it] is also governed by state contract law." *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 115 (2d Cir. 2010); *see also Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir. 1968) (applying state law to a contract dispute involving the assignment of rights under federal copyright law); *Estate Examinations Co. v. ECG Enters.*, No. 06-3024, 2006 U.S. Dist. LEXIS 81478, at *11 (E.D.N.Y. Nov. 7, 2006) ("Where disputes arise under an agreement between parties, resolution depends on state contract law, not the Copyright Act.").

The NITA Personal Services-Production Agreement is governed by New York law. Complaint Ex. A ¶ M. Under New York law, courts construe purported assignments using the "same rules which obtain in the interpretation of other contracts." *Crook v. Rindskopf*, 105 N.Y. 476, 485 (1887). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002), and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id*. Resort to extrinsic evidence is permitted only if ambiguity exists within

11

the four corners of the agreement.  *See Brad H. v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011).

Absent ambiguity, a court should construe the agreement to "carry out the plain purpose and

object" of the written contract.  *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998).

The fundamental requirement of an assignment is that "the assignor has, in some fashion,

<u>manifested an intention to make a present transfer of his rights to the assignee</u>."  *Deutsche Bank*

*Nat'l Tr. Co. v. Romano*, 48 N.Y.S.3d 237, 240 (2d Dep't 2017) (citation omitted; emphasis in

original).  The relevant provision here is entirely lacking in language of present transfer or

conveyance.

That absence is fatal to Plaintiffs' claim of a grant: "in the cases in which the agreement

at issue was found to be a present assignment of a future interest, the agreement contained

express language of present conveyance."  *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292,

296 (D. Del. 2006).  *See*, *e.g.*, *Vassilkioti v. CCS Int'l, Ltd.*, No. 98-4090, 2000 U.S. Dist. LEXIS

17776, at *7 (S.D.N.Y. Dec. 7, 2000) ("the Release on its face … does not contain language

which can be read as a present transfer of Ross' copyright interest."); *Playboy Enters. v. Dumas*,

831 F. Supp. 295, 309 (S.D.N.Y. 1993) (in finding a check legend insufficient to meet the

requirements of 17 U.S.C. § 204(a), "[t]he court also notes that there is no language of present

transfer in Legend A."); *Shiro v. Drew*, 174 F. Supp. 495, 498 (D. Me. 1959) ("There is nothing

in its terms indicative of that manifestation of present surrender of control essential to an

assignment.  Language of present transfer is wholly lacking.").

*Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148 (Fed. Cir. 2021), is instructive.  The issue

before the Federal Circuit in *Omni MedSci* [6] was whether an agreement between a University of

---

[6] *Omni MedSci* is a patent case.  However, "[i]t is 'appropriate to refer' to patent cases when
conducting an analysis under the Copyright Act due to 'the historic kinship between patent law

Michigan professor and the University "automatically and presently assigned legal title of [the professor's] inventions to [the University]." *Id*. at 1151-1152.  The agreement read in relevant part:

> Patents and copyrights issued or acquired as a result of or in connection with administration, research, or other educational activities conducted by members of the University staff and supported directly or indirectly (e.g., through the use of University resources or facilities) by funds administered by the University regardless of the source of such funds, and all royalties or other revenues derived therefrom <u>shall be the property of the University</u>."

*Id*. at 1150 (emphasis added).  The Court found that the agreement did not constitute an assignment of the patent.  *Id*. (quotation marks omitted).  The Court reasoned that (1) the agreement did not "purport to effectuate the present transfer of a present or future right," *id*.; (2) the language "shall be the property of," read in context, must be understood as "a statement of an intended outcome rather than a present assignment," *id*.; and (3) the agreement did not "use present tense words of execution.  <u>Each case in which this court found a present automatic assignment examined contractual language with a present tense executing verb.</u>"  *Id*. at 1153 (emphasis added).  Accordingly, "[t]he absence [of such a verb] is a substantive indication that a present automatic assignment was not intended."  *Id*. at 1156.

The language here ("As between [NITA] and Artist, [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein") is

---

and copyright law.'"  *Ass'n of Am. Med. Colls. v. Carey*, 728 F. Supp. 873, 880 n.6 (N.D.N.Y. 1990) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984)).  *See, e.g.*, *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1371 (Fed. Cir. 2008) ("the term 'sale' should be interpreted consistently in copyright and patent law."); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 888 (9th Cir. 2005) ("We should interpret the Copyright Act consistently with the requirements of the Patent Act.").

similarly lacking a present tense executing verb, or any active verbal expression of present execution or language of present transfer.  Indeed, while the Court need not resolve on this motion the issue of whether the Sound Recordings are works made for hire, the language "shall be the sole and exclusive owner" and language of similar import is almost invariably found where the parties' intent is to create a work made for hire.  *See*, *e.g.*, *Caffey v. Cook*, 409 F. Supp. 2d 484, 490 (S.D.N.Y. 2006) (defendants have no rights to their creative contributions where agreement provides "Producer shall be the sole and exclusive owner of all results and proceeds of Artist's performance services hereunder … as a work-made-for-hire"); *MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*, No. 03-8103, 2004 U.S. Dist. LEXIS 29562, at *3-4 (C.D. Cal. Feb. 11, 2004) ("the Agreement acknowledges that MGM is and shall be the sole and exclusive owner of all rights of every kind and nature in and to and with respect to the Barbershop screenplay and motion picture."); *Niss v. Columbia Pictures*, No. 97-4636, 2000 U.S. Dist. LEXIS 18328, at *9 (S.D.N.Y. Dec. 20, 2000) ("The ownership of work clause provided, among other things, that MGM, 'as employer of the writer, shall be the sole and exclusive owner of the work'").  Accordingly, nothing in the NITA Personal Services-Production Agreement manifests an intention by Plaintiffs to make a present transfer of copyright rights to NITA.

Indeed, in the inducement letter attached to the Next Plateau Distribution Agreement, Plaintiffs effectively represented and warranted that there was no such grant by them as the "authors" of future sound recordings, and that Next Plateau was the legal author of such sound recordings.  *See* Complaint Ex. B ¶ 5 (providing that Next Plateau shall have the right to secure the copyright in its name "as the owner and author" of the recordings); *id.*, ECF No. 1-2 at p. 24 (guaranteeing Producer's performance of all warranties, representations and covenants made in

agreement).  The relevant contractual language in both the NITA Personal Services-Production Agreement and the Next Plateau Distribution Agreement provides conclusive evidence that there was never an intention to effectuate a copyright transfer from Plaintiffs.  The only transfer is made by Producer as the copyright owner to Next Plateau.  *See* Complaint Ex. B ¶ 3(c).  Because that is not a grant subject to termination by Plaintiffs, Plaintiff's declaratory judgment claim as to the validity of their termination of purported grants concerning the Sound Recordings should be dismissed.  *See Waite*, 450 F. Supp. 3d at 441-42.

## II.    The Remixed Sound Recordings Are Derivative Works Not Subject to Termination

The Copyright Act provides that the owner of copyright in a sound recording has the exclusive right to prepare derivative works "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality."  17 U.S.C. § 114(b).  The Copyright Act provides further that, notwithstanding termination of a grant, derivative works prepared under authority of the grant before termination may continue to be utilized under the terms of the grant after termination.  17 U.S.C. § 203(b)(1).

As Plaintiffs acknowledge, a substantial number of the Sound Recordings are remixes.  Complaint ¶ 51 ("'Push It' was subsequently remixed by a San Francisco DJ named Cameron Paul. This remix of 'Push It' was ultimately added to a 1987 rerelease of the album *Hot, Cool & Vicious*, along with remixes of 'Tramp' and 'Chick on the Side' which replaced those sound recordings on the original 1986 album"); ¶ 54(d) (listing remixes contained on the album *A Blitz of Salt-N-Pepa Hits*: (i) "Push It (U.K. Remix)," (ii) "Expression (Brixton Remix)," (iii) "Independent (Brixton Remix)," (iv) "Shake Your Thang (Hurvy Luv Bug Re-Edit)," (v) "Get Up Everybody (Get Up) (Steevee-O Re-Edit)," (vi) "Tramp (Hurvy Luv Bug Remix)," (vii) "My Mic Sounds Nice (D.J. Mark The 45 King Remix)," (viii) "I Gotcha (Once Again) (Steevee-O

Remix)," (ix) "I'll Take Your Man (Quicksilver Re-Edit)," and (x) "It's Alright (Hurvy Luv Bug Remix).").

With respect to the above-referenced Sound Recordings (and any other Sound Recordings that are remixes), the Notice is invalid and ineffective for the additional reason that those remixed sound recordings are derivative works of preexisting sound recordings. As the U.S. Copyright Office instructs:

> A derivative sound recording is one that incorporates some preexisting sounds that were previously registered or published …. The preexisting recorded sounds must have been rearranged, remixed, or otherwise altered in sequence or character, or there must be some additional new sounds. Further, the new or revised sounds must contain at least a minimum amount of original sound recording authorship. This new authorship is the basis for the copyright claim.

U.S. Copyright Office Circular 56. "Examples of derivative sound recordings that generally can be registered include … a remix from multitrack sources." *Id.*

Under section 203(b)(1) of the Copyright Act, "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 203(b)(1). Accordingly, even if Plaintiffs had executed grants of copyright rights in the Sound Recordings that are the subject of the Notice, and even assuming that the Notice were otherwise valid, UMG's ownership interest in the derivative "remixed" sound recordings would not be subject to termination. Under § 203(b)(1), UMG would retain the right to continue to utilize the remixed sound recordings, as derivative works prepared under the authority of the grant, for the entire term of copyright. Accordingly, the Court should dismiss Plaintiffs' declaratory relief claim to the extent that it seeks termination of any remixed sound recordings.

16

III.    **Plaintiffs' Conversion Claim Is Preempted by the Copyright Act and In Any Event Fails to State a Claim Under New York Law**

The Complaint alleges a claim for conversion under New York law, stating that "Defendant has intentionally and substantially interfered with Plaintiffs' possession and enforcement of the copyrights in their sound recordings," and that "Defendant has knowingly prevented Plaintiffs from having access to the copyrights in their sound recordings." Complaint ¶¶ 133-34. That claim fails both because it is preempted by the Copyright Act and because New York law does not recognize a conversion claim for intangible property rights.

A.    **Plaintiffs' Conversion Claim Is Preempted**

A state common law or statutory claim is preempted by the Copyright Act if:

> (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act … and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law.

*Briarpatch Ltd. v. Phoenix Pictures*, 373 F.3d 296, 305 (2d Cir. 2004). "The first prong of this test is called the 'subject matter requirement' and the second prong is called the 'general scope requirement.'" *Id*. "Preemption, therefore, turns on what the plaintiff seeks to protect, the theories on which the matter is thought to be protected and the rights sought to be enforced." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 48 (2d Cir. 2019) (internal quotation marks and alteration omitted).

Both requirements for preemption are met here. As to the first prong, the Sound Recordings are plainly the "type of works protected by the Copyright Act." *See* 17 U.S.C. § 102(a)(7) (listing "sound recordings" as one of categories of works of authorship subject to copyright protection).

As to the second prong, a claim is preempted when "the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal

17

copyright law"; a state law claim involving "acts of reproduction, adaptation, performance, distribution or display" meets the general scope requirement. *Id.*; 17 U.S.C. § 106 (delineating exclusive rights under the Copyright Act). While a state law claim that alleges an "extra element" that makes it "qualitatively different from a copyright infringement claim may not be preempted," *Briarpatch*, 373 F.3d at 305-06, courts have taken "a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Id.* at 306.

Plaintiffs' conversion claim falls within the general scope of copyright and contains no "extra element" that would avoid preemption. While a conversion claim might survive if it were "based on defendant's possession of a specific tangible object (rather than based on copying, displaying, or distributing the item)," *Baiul v. NBC Sports*, No. 15-9920, 2016 U.S. Dist. LEXIS 52291, at *32 (S.D.N.Y. Apr. 19, 2016), Plaintiffs' conversion claim is not based on possession of a tangible object. Plaintiffs' claim is that Defendant has "interfered with Plaintiffs' possession and enforcement of," and "prevented Plaintiffs from having access to," the *copyrights* in the sound recordings (*i.e.*, intangible property). It is, accordingly, preempted. *See* M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 1.15 (2025) ("[A]n action for conversion will lie only for wrongful possession of the tangible embodiment of a work, whereas a copyright action must be brought for wrongful use of the intangible artistic property contained therein. … The same distinction applies to a … *master tape* versus a *sound recording*.") (emphasis in original).

### B.    Plaintiffs' Conversion Claim Fails to State a Claim Under New York Law

Even if Plaintiffs' conversion claim were not preempted, the Complaint would fail to state a claim because "the conversion of intangible property is not actionable" under New York law. *Austin v. Gould*, 93 N.Y.S.3d 33, 34 (1st Dep't 2019). Thus, "a claim for conversion of a

18

copyrighted work may not stand as a matter of law because such a work constitutes intangible property." *Harley v. Nesby*, No. 08-5791, 2012 U.S. Dist. LEXIS 62237, at *17 (S.D.N.Y. Apr. 30, 2012) (citing *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006).

## IV.    The Court Should Stay Discovery Pending Disposition of the Motion to Dismiss

"Under Federal Rule of Civil Procedure 26(c), a court has discretion to stay discovery 'for good cause.' 'Good cause may be shown where a party has filed a dispositive motion, the stay is for a short period of time, and the opposing party will not be prejudiced by the stay.'" *Boelter v. Hearst Communs., Inc.*, No. 15-3934, 2016 U.S. Dist. LEXIS 12322, at *13 (S.D.N.Y. Jan. 28, 2016) (citation omitted). In determining whether a stay of discovery is appropriate, "a court should consider the breadth of discovery sought and the burden of responding to it, as well as the strength of the underlying motion." *Id.* (internal quotation marks omitted). The relevant factors here weigh in favor of granting a stay.

First, the discovery here will require significant effort because the relevant events trace back many decades, including various contractual arrangements dating back almost forty years. Simply determining whether relevant documents still exist and locating potential witnesses with firsthand knowledge of the facts will require considerable time and resources, as the individuals who were involved in the transactions are not employed by UMG. In addition, Plaintiffs' conversion claim, which is clearly preempted and is in any event not cognizable under New York law, would open up additional discovery into UMG's exploitation of the works in question and related financial discovery. Given these burdens, a stay of discovery is appropriate. *See id.* at *14 (granting stay motion given broad discovery and time period covered); *see also Hong Leong Fin. Ltd. (Sing.) v. Pinnacle Performance, Ltd.*, 297 F.R.D. 69, 75 (S.D.N.Y. 2013) (engaging in discovery "would create a significant burden on defendants in the face of a seemingly strong

19

motion to dismiss"); *Gandler v. Nazarov*, No. 94-2272, 1994 U.S. Dist. LEXIS 17885, at *12 (S.D.N.Y. Dec. 14, 1994) ("[B]ecause the adjudication of the potential motion to dismiss might avoid the need for costly and time-consuming discovery, all discovery in this case is hereby stayed pending resolution of defendant's motion to dismiss.").

A stay will not cause prejudice. UMG's motion potentially disposes of the entire action. *See*, *e.g.*, *Spencer Trask Software & Info. Servs. v. RPost Int'l*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) ("A stay pending determination of a dispositive motion that potentially eliminates the entire action will neither substantially nor unduly delay the action, should it continue."). Moreover, the Court's rules contemplate speedy resolution of motions. *See* Judge Cote's Individual Practices in Civil Cases, 4G ("If a motion is not decided within 60 days of the time that it has become fully briefed, counsel for the movant shall send a letter to alert the Court."). Accordingly, the short delay required to permit the Court to determine whether Plaintiffs' claims have any merit will not unduly prejudice the parties.[7]

Finally, in analyzing the appropriateness of a stay, "courts examine … the strength of the dispositive motion that is the basis for the discovery stay application." *Anti-Monopoly, Inc. v. Hasbro, Inc.*, No. 94-2120, 1996 U.S. Dist. LEXIS 2684, at *10 (S.D.N.Y. Mar. 7, 1996). Here, UMG has submitted a well-grounded dispositive motion on Plaintiffs' declaratory relief claim supported by a recent decision from this Court dismissing similar claims under similar facts. *See Waite*, 450 F. Supp. 3d at 441. Moreover, UMG has presented Plaintiffs' counsel with

---

[7] And even if the Court only dismisses the conversion claim, that will simplify and shorten discovery by eliminating any discovery into UMG's exploitation of the works and related financial issues. *See*, *e.g.*, *Spinelli v. NFL*, No. 13-7398, 2015 U.S. Dist. LEXIS 155816, at *5 (S.D.N.Y. 2015) ("A stay may also have the advantage of simplifying and shortening discovery in the event that some of Plaintiffs' claims are dismissed and others survive, by limiting the scope of the parties' inquiry to claims that have been established as potentially viable.").

controlling authority demonstrating the futility of Plaintiffs' conversion claim, but despite citing

no contrary authority in response, Plaintiffs have indicated their unwillingness to dismiss the

claim at this stage.  Because UMG's motion provides "substantial arguments for dismissal," the

Court should grant the motion to stay while it considers such arguments.  *Pinnacle*, 297 F.R.D. at

72; *Spencer Trask Software*, 206 F.R.D. at 368 ("[B]ased on the papers submitted and upon oral

argument from counsel, the Court notes at this preliminary stage that defendants do appear to

have substantial arguments for dismissal of many, if not all, of the claims asserted in this

lawsuit.").

## CONCLUSION

For the forgoing reasons, UMG respectfully requests that the Court dismiss the

Complaint with prejudice and stay discovery pending resolution of the motion to dismiss.

Dated: New York, New York
       July 17, 2025

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.

By:  _____
         Richard S. Mandel (rsm@cll.com)
         Thomas Kjellberg (txk@cll.com)
     114 West 47th Street
     New York, New York 10036-1525
     (212) 790-9200

*Attorneys for Defendant UMG Recordings, Inc.*

21

## **<u>CERTIFICATE OF WORD COUNT</u>**

Richard S. Mandel, a member of the bar of this Court, hereby certifies pursuant to Local Civil Rule 7.1(c) that the  Memorandum of Law in Support of Defendant UMG Recordings, Inc.'s Motion to Dismiss the Complaint complies with the word count limitations in Local Civil Rule 7.1(c) and has a final word count of 6,722 words.

_____
RICHARD S. MANDEL