**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHERYL JAMES and SANDRA DENTON, p/k/a SALT-N-PEPA,<br><br>Plaintiffs,<br><br>v.<br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group,<br><br>Defendant. | Case No. 1:25-cv-04182-DLC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF**<br>**(2) CONVERSION**<br><br>**DEMAND FOR TRIAL BY JURY** |

**NATURE OF THE ACTION**

1.       Plaintiffs Cheryl James ("James") and Sandra Denton ("Denton"), professionally known as the rap and hip-hop group Salt-N-Pepa (together, "Plaintiffs") are worldwide music icons from Queens, New York who among their many accolades and achievements: were the first females to be certified platinum by the Recording Industry Association of America ("RIAA"); have an average of 5,000,000 monthly streams on Spotify; have over 1,000,000,000 streams worldwide; have sold more than 15,000,000 physical copies of albums in the US according to the RIAA; were the first female rap group to ever win a Grammy; were the first female rap group to be awarded a Grammy lifetime achievement award; were given a star on the Hollywood Walk of Fame; and, later this year, will become the second female hip-hop artists in history to be inducted into the Rock & Roll Hall of Fame.

2.       During the course of their nearly four decades' long careers in the music industry, Plaintiffs not only transformed the genre but created, recorded, and performed some of the most famous hits of the twentieth century. As the "First Females of Rap," Plaintiffs dared to take on modesty-critics and address taboo topics as one of the first all-female rap acts, paving the way for

subsequent generations of powerful and commercially successful female rap and hip-hop artists. Each year, their music is licensed in countless television shows and movies and is ubiquitous at weddings and other celebrations. The cross-generational appeal and depth of love for their music is evidenced by the fact that their chart topping single "Push It" which first charted in 1987 has not only been streamed more than 200,000,000 times but recently charted *again* in the United Kingdom. Plaintiffs' global appeal is further underscored by the fact that they have toured and performed all over the world, including in places like Moscow, Russia, which historically has welcomed few American musicians.

3.      Unsurprisingly, Plaintiffs' musical catalog is not only extensive; it is highly valuable. The royalties generated by their sound recordings are significant, generating approximately $1,000,000 in the past five months in synchronization licenses alone, and generating tens of millions of dollars annually through all forms of exploitation, despite the fact that decades have passed since the release of their major hits and that there have been little to no recent marketing efforts.

4.      Since 1986, Defendant UMG Recordings, Inc.[1] has held a copyright grant from Plaintiffs. This grant has given UMG the right to exploit Plaintiffs' sound recordings and retain a portion of all monies earned by Plaintiffs from the commercial exploitation of their work. Critically, however, Section 203 of the Copyright Act of 1976 gives Plaintiffs the right to take back their rights in connection with certain sound recordings after a certain amount of time has lapsed since the original grant. In 2022, eager to retake full ownership of their art and legacy, Plaintiffs sought to exercise their rights under Section 203 and served timely Notices of

---

[1]      UMG Recordings, Inc., is referred to herein as "UMG", "UMG/Universal Music" or "Defendant."

Termination upon UMG.

5.     Inexplicably, UMG has refused to honor Plaintiffs' Notices of Termination. To the contrary, UMG has indicated that it will hold Plaintiffs' rights hostage even if it means tanking the value of Plaintiffs' music catalogue and depriving their fans of access to their work. To this end, UMG has removed Plaintiffs' music from streaming platforms and otherwise made it unavailable for commercial exploitation in the U.S.

6.     UMG also has failed to return the physical copies of the master sound recordings – the two-inch master tapes embodying the master sound recordings (the "Master Tapes").

7.     Plaintiffs' Master Tapes hold significant value and are incredibly rare. They are the original, highest quality, physical source material of Plaintiffs' sound recordings. They are the best embodiment of the works and are the physical source for all other physical and digital copies of the sound recordings.

8.     The value of the Master Tapes is further evidenced by the fact that, upon information and belief, UMG currently pays to insure the Master Tapes and stores the Master Tapes in a secure facility.

9.     UMG's self-interested and heavy-handed tactics may be effective when deployed against lesser known or less commercially successful artists. Plaintiffs, however, will not tolerate disrespect from UMG who has benefitted greatly from Plaintiffs' enormous and immeasurable contributions to the industry as artists, rappers, icons, and women—often in the face of immense odds and despite enormous industry pressure. Plaintiffs are not willing to bend to pressure from a record label that, upon information and belief, has already profited by an amount of more than one hundred million dollars from their work. Nor will Plaintiffs be easily intimidated by UMG's misguided attempt to gain leverage by demonetizing their catalogue.

10.     Defendant's behavior is not only improper but evidences a complete disregard for the history of Section 203 of the Copyright Act and the rights that it grants to Plaintiffs with respect to the sound recordings at issue.

11.     As a result, Plaintiffs are filing this action in an effort to obtain what Section 203 of the Copyright Act entitles them to receive: unfettered rights to their own sound recordings. Plaintiffs also have brought this action in order to regain possession of the Master Tapes and to recover damages for Defendant's wrongful conduct.

12.     Since the first Copyright Act was enacted in 1790, that Act, and the several successive copyright statutes, have always provided a second chance for authors (or their heirs) to reclaim copyrights from grants made by authors around the time that they originally created the works. While some of the details of those laws, including the length of the terms and statutory scheme of the terminations involved, have changed and evolved, the strong "second chance" concept has remained. In fact, the very first act, the Copyright Act of 1790, borrowed that concept from the first copyright law—the English Statute of Anne which was enacted in England in 1709. The theme continued in the Copyright Acts of 1831, 1870, and 1909.

13.     This is also true of the Copyright Act of 1976. Although Section 203 of the Copyright Act of 1976 substantially modified the Act of 1909, Congress ensured that the "second chance" policy embedded in the Act of 1909 remained in full force.

14.     Specifically, Section 203 allows authors (a term that includes both songwriters and recording artists) to terminate grants of copyright ownership thirty-five (35) years after the initial grant, generally computed from the date of the publication of those works subject to the grant.

15.     In enacting Section 203, Congress was clear that it intended to protect authors and their heirs from "the unequal bargaining position of authors" in dealing with unpublished works,

because of "the impossibility of [an author] determining [his or her] work's prior value until it has been exploited." H.R.Rep. No. 94-1476, at 124 (1976).

16.    In other words, Section 203 reflects an acknowledgment by Congress that many artists—like Plaintiffs—will naturally have less bargaining power at the beginning of their careers than they might otherwise have after achieving commercial success. The termination right embedded in Section 203 seeks to account for this and to prevent record labels or publishers from unfairly benefiting from the initial power imbalance between the contracting parties.

17.    Despite Congress' clearly articulated purpose for enacting Section 203, recording artists like Plaintiffs have faced stubborn and unfounded disregard of their federal legal rights by recording companies like Defendant.

18.    Here, Plaintiffs served timely Notices of Termination upon Defendant pursuant to Section 203 of the Copyright Act. To date, however, Defendant has refused to honor the Notices of Termination. Defendant also has failed to return the Master Tapes to Plaintiffs.

19.    Defendant's refusal to acknowledge the effective dates of termination for Plaintiffs' sound recordings and failure to return the Master Tapes effectively stymies Plaintiffs' ability to enter into a new agreement with a third party regarding these sound recordings. It also prevents Plaintiffs from exploiting the sound recordings or Master Tapes themselves, as is their right under the law.

20.    Moreover, as of the filing of this Complaint, UMG has "taken down" the sound recordings from all commercial platforms and ceased commercial exploitation in the United States. In other words, UMG is effectively punishing Plaintiffs for daring to exercise their rights by preventing Plaintiffs from reaping *any* commercial benefit from and/or otherwise exploiting the sound recordings after the effective date of termination set forth on the Notices of Termination.

UMG's actions also have unfairly prevented Plaintiffs' fans from being able to access Plaintiffs' sound recordings; the insult to Plaintiffs' fan base is particularly offensive given that Plaintiffs are going to be inducted into the Rock & Roll Hall of Fame later this year in no small part due to their large and loyal fanbase.

21.     Upon information and belief, Defendant's actions are designed to negatively impact and/or effectively destroy the very salability and commercial value to Plaintiffs of the post-termination rights in the recordings that the Copyright Act expressly guarantees.

22.     On account of Defendant's repeated, methodical, and willful interference with Plaintiffs' rights, and Defendant's effective conversion, Plaintiffs seek recovery of actual and punitive damages, as well as injunctive and declaratory relief to establish their rights in and to the sound recordings.

## THE PARTIES

23.     Plaintiff Cheryl James (professionally known as "Salt") is a critically-acclaimed rapper, songwriter, and performer who is best known for her work as a member of the platinum-selling female hip-hop group Salt-N-Pepa.

24.     Plaintiff Sandra Denton (professionally known as "Pepa") is also a critically-acclaimed rapper, songwriter, and performer who is best known for her work as a member of the platinum-selling female hip-hop group Salt-N-Pepa. In addition to working as a recording artist, Denton also entertains audiences as a published author and actress, appearing in television shows and films such as "Let's Talk About Pep" and "Growing Up Hip Hop."

25.     James and Denton constitute a majority of the authors of the sound recordings at issue and have standing to assert their claims pursuant to 17 U.S.C. § 203(b)(3).

26.     Defendant UMG Recordings, Inc. is an American global music corporation

organized under Delaware law. It is also known as and does business interchangeably as "UMG" and "Universal Music Group." Its principal place of business and global corporate headquarters is located at 2220 Colorado Avenue, Santa Monica, California. UMG also maintains U.S. headquarters at 1755 Broadway, New York City, New York offices, where Island Records, Def Jam Recordings, Geffen Records, and other of UMG's labels are headquartered.

27.     In corporate filings with the State of California, where it is registered as a foreign corporation, UMG describes its business as "manag[ing] recorded music assets."

28.     UMG is a record label, as well as a global music conglomerate, and has released music under the Universal and Mercury imprints. It is also the successor-in-interest to several other companies and/or brands within the Universal Music Group, including, but not limited to, London Records, MCA Records, PolyGram Records, and Next Plateau Records, and all of the companies to which UMG/Universal Music Group succeeded by merger, acquisition, business combination, restructuring, or operation of law.

29.     UMG is the world's largest record label by market share and is considered one of the "Big Three" record labels, along with Sony Music and Warner Music Group.

30.     UMG's website terms and conditions states that "all notices not related to these Site Terms and Conditions should be sent to: UMG Recordings, Inc., 2220 Colorado Ave., Santa Monica, CA 90404." UMG's website further provided that notice "must be in writing" and "shall be given by . . . . certified mail[.]" Defendant provided these instructions and directives with respect to all the labels and brands identified on the Universal Music Group website, including the other labels and brands under the Universal Music Group "umbrella" and within the UMG/Universal Music conglomerate.

31.     Consistent with UMG's instructions, Plaintiffs sent written Notices of Termination

via certified mail to UMG at 2220 Colorado Avenue in Santa Monica, California.

32.     Upon information and belief, UMG stores the Master Tapes in a secure vault located inside of its global corporate headquarters in Santa Monica, California. Upon information and belief, not only is this vault secured against damage and/or theft of the Master Tapes but the Master Tapes are insured by UMG for a significant amount of money.

33.     UMG received the Notices of Termination as evidenced by their response thereto, which is detailed herein.

34.     The legal and business affairs staff of UMG has full and complete access to all relevant and pertinent documents and information relating to UMG, including decades-old recording agreements, correspondence, royalty statements, financial analysis, sales information, catalogue database information, so-called "metadata" for all releases (including various identification codes utilized in the music industry for tracking digital performances and sales), release dates and dates of publication, and revenue information of all kinds and nature.

35.     This access to documents and information extends not only to UMG, but the corporations and entities that have been subsumed or merged into UMG, including, but not limited to, London Records, MCA Records, PolyGram Records, and Next Plateau Records.

## JURISDICTION AND VENUE

36.     This is a civil action seeking declaratory and injunctive relief under the Copyright Act, 17 U.S.C. § 101 *et seq.*

37.     This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

38.     This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the New York state law claim arises directly from the common nucleus of operative

facts set forth in the claim arising in federal question jurisdiction.

39.    The Court is empowered to issue a declaratory judgment and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202.

40.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) both because UMG is subject to personal jurisdiction in this District and because a substantial part of the events or omissions by UMG giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

41.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 40 above, as though fully set forth herein.

42.    James and Denton began their storied careers as recording artists in 1985, when they started recording rhymes while working together at Sears and both were attending nursing school at Queensborough Community College in Queens, New York.

43.    James and Denton first released a sound recording called "The Showstopper" under the group name Super Nature. "The Showstopper" was an answer rap to artist Doug E. Fresh's hit "The Show," which was frequently being aired on the radio at the time.

44.    James' and Denton's "The Showstopper" was a modest success. Fans called into radio stations asking for "The Showstopper" by Salt And Pepper because of the song lyrics "right now I'm gonna show you how it's supposed to be 'cause we, the salt and pepper MCs." James' then-boyfriend and later-producer, Herb Azor (professionally known as Hurby/Hurvy Luv Bug Azor) ("Azor"), suggested changing the duo's name. The group Salt-N-Pepa was born.

45.     On May 15, 1986, James and Denton, acting together as Salt-N-Pepa, entered into a recording agreement with Azor's company, Noise In the Attic Productions, Inc. ("NITA") (referred to herein as the "1986 NITA Recording Agreement").

46.     The 1986 NITA Recording Agreement covered Salt-N-Pepa's exclusive recording services to record more sound recordings and release possible albums to the public.

47.     The 1986 NITA Recording Agreement includes a personal grant from James and Denton of the rights to Salt-N-Pepa's sound recordings: "As between Company [NITA] and Artist, Company [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereto." **Ex. A**, 1986 NITA Recording Agreement at ¶ H.

48.     Importantly, the 1986 NITA Recording Agreement contains no language whatsoever to the effect that the sound recordings are "works made for hire" as that term is defined under the Copyright Act of 1976. Moreover, the sound recordings at issue were not "works made for hire" when James and Denton created and authored them.

49.     That same day, on May 15, 1986, Salt-N-Pepa's producer, Azor, entered into a distribution agreement with Next Plateau Records, Inc. ("Next Plateau Records" or "NPR") (referred to herein as the "1986 NPR Agreement").

50.     The 1986 NPR Agreement covered the distribution and promotion of Salt-N-Pepa's sound recordings (as described in the 1986 NITA Recording Agreement) to be released alone and/or with upcoming albums. As part of the 1986 NPR Agreement, James and Denton personally signed an inducement letter attached to the 1986 NPR Agreement in which they personally granted

to Next Plateau Records all of the same rights and remedies granted to NITA in the 1986 NPR Agreement (the "1986 Inducement Letter").

51.     Specifically, the 1986 Inducement Letter states that both James and Denton each individually "hereby specifically guarantee the performance by Producer [Azor] of all the warranties and representations and covenants made in said agreement [the 1986 NITA Recording Agreement]. I hereby make all of the warranties and representations made to you [Next Plateau Records] in said agreement [the 1986 NITA Recording Agreement], ***grant you [Next Plateau Records] all of the rights and remedies therein granted to you [Next Plateau Records] and agree to perform all of the obligations therein undertaken to be performed for you [Next Plateau Records] and undertake to be bound thereby as though [each] was a party to said agreement*.**" **Ex. B**, 1986 NPR Agreement at pg. 23 ¶ 1 (emphasis added).

52.     Through the 1986 Inducement Letter, James and Denton personally and individually granted to Next Plateau Records the sound recording copyrights at issue. These grants by the authors James and Denton are subject to termination under Section 203 of the Copyright Act.

53.     Importantly, the 1986 NPR Agreement also contains no language whatsoever to the effect that the sound recordings to be distributed thereunder are "works made for hire" as that term is defined under the Copyright Act of 1976. Rather, the 1986 NPR Agreement states in relevant part: "All Sides recorded during the Term shall be recorded by Producer [Azor] on [Next Plateau Records]'s behalf and all records made therefrom, together with the performances embodied therein, shall, from the inception of their creation, be entirely the property of [Next Plateau Records] in perpetuity, throughout the Territory, free of any claim whatsoever by Producer [Azor],

Artist [James and Denton] or by any persons deriving any rights or interests from Producer [Azor] or Artist [James and Denton] and [Next Plateau Records] shall have the right to secure the sound recording (P) copyright in and to the Sides in [Next Plateau Records]'s name as the owner and author thereof and to secure any and all renewals of such copyright." **Ex. B**, 1986 NPR Agreement at pg. 4 ¶ 5.

54.     The 1986 NPR Agreement is coterminous with the 1986 NITA Recording Agreement.

55.     James and Denton quickly made a name for themselves with their unique, female-driven blend of rap and hip-hop music.

56.     James and Denton went about recording the Master Tapes to their debut album, *Hot, Cool & Vicious* (1986), which sold over one million copies in the United States, making them the first female rap act to achieve gold and platinum status by the RIAA. The album originally included the sound recordings: (i) "Beauty and the Beat," (ii) "Tramp," (iii) "I'll Take Your Man," (iv) "It's All Right," (v) "Chick on the Side," (vi) "I Desire," (vii) "The Showstopper," and (viii) "My Mike Sounds Nice."

57.     In 1987, the sound recording "Tramp" was rereleased as a single with a B-side sound recording called "Push It." "Push It" was authored by James and Denton.

58.     Upon information and belief, "Push It" was subsequently given radio play time by a San Francisco DJ named Cameron Paul. Plaintiffs also began to perform "Push It" it for fans to great effect. Upon information and belief, UMG sought to capitalize on the song's growing popularity by adding what it called a "remix" of "Push It" to a 1987 rerelease of the album *Hot, Cool & Vicious*, along with "remixes" of "Tramp" and "Chick on the Side[.]" Upon information and belief, re-releasing sound recordings characterized as "remixes" in order to drive additional

sales was a standard marketing practice for recording labels during the relevant time period. Critically, upon information and belief, the "remixes" of Plaintiffs' sound recordings and, in particular, of "Push It" are not original, independently copyrightable works and the "remixes" do not contain substantive copyrightable variations—*i.e.*, there is no original, substantial variation between the versions of these sound recordings that Plaintiffs originally authored, released and/or performed and the versions that were re-released characterized as "remixes."

59.    The Master Tapes to all of these sound recordings – and to "Push It" in particular – are incredibly valuable.

60.    "Push It" quickly became a global phenomenon achieving unprecedented commercial success. Among other things, it was nominated for a Grammy Award and became Salt-N-Pepa's first platinum single in the United States.

61.    It remains popular to this day. Indeed, as of the date of filing of this Complaint, "Push It" has been streamed more than 210,000,000 times on Spotify alone, despite Spotify launching to the public over twenty years following the initial commercial release of "Push It".

62.    Ultimately, Salt-N-Pepa created Master Tapes for their sound recordings and released several immensely successful albums pursuant to the terms of the 1986 NPR Agreement and 1986 NITA Recording Agreement:

   a.  *Hot, Cool & Vicious* (1986 & 1987[2]), which includes the sound recordings: (i) "Beauty and the Beat," (ii) "Tramp," (iii) "I'll Take Your Man," (iv) "It's All Right," (v) "Chick on the Side," (vi) "I Desire," (vii) "The Showstopper," (viii) "My Mike Sounds Nice," and (ix) "Push It."

   b.  *A Salt With a Deadly Pepa* (1988), which includes the sound recordings: (i) "Intro Jam," (ii) "A Salt With a Deadly Pepa,"

---

[2]    As noted *supra*, "Tramp" was released in 1987 with "Push-It" on the B-side; the entire album was subsequently re-released in 1987.

     (iii) "I Like It Like That," (iv) "Solo Power (Let's Get Paid)," (v) "Shake Your Thang," (vi) "I Gotcha," (vii) "Let the Rhythm Rum," (viii) "Get Up Everybody (Get Up)," (ix) "Spinderella's Not a Fella (But a Girl D.J.)," (x) "Solo Power (Syncopated Soul)," (xi) "Twist and Shout," and (xii) "Hyped on the Mic."

    c.  *Blacks' Magic* (1990), which includes the sound recordings: (i) "Expression," (ii) "Doper than Dope," (iii) "Negro wit' an Ego," (iv) "You Showed Me," (v) "Do You Want Me," (vi) "Swift," (vii) "I Like to Party," (viii) "Blacks' Magic," (ix) "Start the Party," (x) "Let's Talk About Sex," (xi) "I Don't Know," (xii) "Live and Let Die," and (xiii) "Independent."

    d.  *A Blitz of Salt-N-Pepa Hits* (1990), which includes the sound recordings: (i) "Push It (U.K. Remix)," (ii) "Expression (Brixton Remix)," (iii) "Independent (Brixton Remix)," (iv) "Shake Your Thang (Hurvy Luv Bug Re-Edit)," (v) "Get Up Everybody (Get Up) (Steevee-O Re-Edit)," (vi) "Tramp (Hurvy Luv Bug Remix)," (vii) "My Mic Sounds Nice (D.J. Mark The 45 King Remix)," (viii) "I Gotcha (Once Again) (Steevee-O Remix)," (ix) "I'll Take Your Man (Quicksilver Re-Edit)," and (x) "It's Alright (Hurvy Luv Bug Remix)."[3]

    e.  *The Greatest Hits* (1991), which includes re-releases of some of their most popular sound recordings: (i) "Push It," (ii) Expression (Brixton Bass Edit)," (iii) "Independent (Independent Funk Vocal)," (iv) "Shake Your Thang (It's Your Thing)," (v) "Twist And Shout," (vi) "Let's Talk About Sex," (vii) "I Like It Like That," (viii) "Tramp," (ix) "Do You Want Me (Remix)," (x) "My Mic Sounds Nice," (xi) "I'll Take Your Man," (xii) "I Gotcha," (xiii) "I Am Down," and (xiv) "You Showed Me (The Born Again Mix)."

    63.  Plaintiffs' third album, *Blacks' Magic* (1990), featured several hit sound recordings, such as "Expression" (certified platinum), "Do You Want Me" (certified gold), and "Let's Talk about Sex" (also certified gold). Upon information at belief, the Master Tapes for these

---

[3]    Upon information and belief, while certain sound recordings on this album were characterized as "remixes," they lack any substantive copyrightable variations—*i.e.*, there is no original, substantial variation between the versions of these sound recordings that Plaintiffs originally authored, released and/or performed and the versions that were re-released characterized as "remixes."

sound recordings are insured and stored in UMG's vault. Since its initial release, the album sold approximately one million copies in the United States and further solidified Salt-N-Pepa's place in music history.

64.     After releasing several incredibly popular albums and dozens of critically-acclaimed sound recordings, on July 1, 1992, James, Denton, and NITA entered into an agreement with London Records (referred to herein as the "1992 London Agreement"). The 1992 London Agreement was for the exclusive recording services of Plaintiffs. It is acknowledged by NITA to London Records that subsequent to the complete execution of the 1986 NPR Agreement, Herb Azor and Hugh Azor assigned all of their rights and obligations under the 1986 NPR Agreement to NITA. It also acknowledged that, as of July 1, 1992, all of Next Plateau Records' rights in the 1986 NPR Agreement (excluding any music publishing rights), were to be assigned to London Records. James and Denton approved the assignment and ratified the terms of the 1986 NPR Agreement and agreed to be bound to London Records in the same manner as they were bound to Next Plateau Records prior to the assignment to London Records. **Ex. C**, 1992 London Agreement at ¶ 1(b).

65.     Importantly, the 1992 London Agreement contains no language whatsoever to the effect that the sound recordings to be distributed thereunder are "works made for hire" as that term is defined under the Copyright Act of 1976.

66.     That same day, July 1, 1992, James and Denton entered into a letter agreement with Noise In the Attic Productions, Inc. (hereinafter referred to as the "1992 NITA Agreement"). The 1992 NITA Agreement acknowledged that there were two albums left to be recorded under the

1986 NITA Recording Agreement and 1986 NPR Agreement. **Ex. D**, 1992 NITA Agreement at ¶ 1.[4]

67.    The 1992 NITA Agreement also does not contain any language whatsoever to the effect that the sound recordings to be produced thereunder are "works made for hire" as that term is defined under the Copyright Act of 1976.

68.    The 1992 NITA Agreement is coterminous with the 1992 London Agreement.

69.    Around the same time, James and Denton reprised the lyrics of their hit-song "Let's Talk About Sex" and made a music video called "Let's Talk About AIDS" (1992) which was used in connection with a special hosted by Peter Jennings on ABC called "Growing Up in the Age of Aids."

70.    Plaintiffs' decision to create the Master Tape for "Let's Talk About AIDS", as well as write and release this sound recording, speaks to their desire as artists to not only to be commercially successful but culturally impactful as they sought to use their platform to educate the public about a sexually transmitted disease and lessen the stigma experienced by those suffering from it.

71.    Thereafter, James and Denton went on to create the Master Tapes for the album *Very Necessary* (1993), which includes the sound recordings: (i) "Groove Me," (ii) "No One Does It Better," (iii) "Somebody's Getting' On My Nerves," (iv) "Whatta Man," (v) "None of Your Business," (vi) "Step," (vii) "Shoop" (viii) "Heaven or Hell," (ix) "Big Shot," (x) "Sexy Noises Turn Me On," (xi) "Somma Time Man," (xii) "Break of Dawn," and (xiii) "I've Got AIDS."

72.    The album sold more than seven million copies worldwide (including five million in the United States) and was the highest-selling rap album by a female act (solo or group) in

---

[4]    Idol Makers, Inc., Azor's management company, is also referred to in this Agreement.

history at the time. In addition, "None of Your Business" earned them the 1995 Grammy Award for Best Rap Performance by a Duo or Group, making them one of the first female rap acts to win a Grammy Award (along with Queen Latifah who also won an award during the same ceremony).

73.    James and Denton also created Master Tapes and released several sound recordings as singles or EPs, including, without limitation, "Emphatically No" (1994).[5]

74.    Dubbed "The First Females of Rap," James and Denton greatly influenced the future of rap and hip-hop by being one of the first all-female rap acts. At the time of Salt-N-Pepa's beginnings, media outlets denigrated sexist lyrics and videos that objectified women in popular rap and hip-hop music. Many feminists derided the genres of rap and hip-hop because of their male-dominated focus, misogynistic connotations, and negative portrayal of women. But Salt-N-Pepa boldly changed the look of rap and hip-hop. They were not afraid to talk about sex and to share their thoughts about men. Their sound recordings "Let's Talk About Sex" and "None of Your Business," for example, were huge hits. They talked candidly about women's sexuality and empowerment when such topics were frowned upon, heavily criticized, and called taboo. They were at times classified as promiscuous or a bad influence; but, in reality, James and Denton were changing the music industry and, through their music, were giving women around the world a way to celebrate women's empowerment and liberation. Reflecting on their legacy, James sums it up: "Like so many women before us we have an anointing of breaking down barriers for women in hip-hop. And I think it's important that we have represented women in an inspirational way — as bosses, as women who have persevered through adversity and misogyny in this business, as mothers, as real women who've gone through real-life situations and kept it pushing."

---

[5]    James and Denton went on to create, author and release additional sound recordings in the albums *Brand New* (1997), *The Best of Salt-N-Pepa* (1999), *20th Century Masters: The Millennium Collection* (2008) and *Icon* (2011), which are not at issue in this case.

75.    Salt-N-Pepa's sound recordings are immensely popular, critically acclaimed, and award-winning. Their music is praised for its creative, bold, and empowering lyrics. As noted above, they have also never shied away from addressing issues previously considered forbidden in the male-dominated hip-hop industry.

76.    James and Denton are one of the best-selling rap acts of all time and they continue to receive and gain recognition for their work decades after releasing some of their best-known hits.

77.    Upon information and belief, Plaintiffs are also one of the best and most widely known rap acts of all time. Both the sound recordings at issue, and Plaintiffs' Master Tapes, therefore, hold significant value.

78.    The industry has recognized their success. James and Denton have been nominated for and are recipients of several coveted awards. In addition to winning the Grammy Award in 1995, their work has been nominated for a Grammy Award on four other occasions.

79.    In 2021, James and Denton won the Grammy Lifetime Achievement Award for their lifetime "creative contributions of outstanding artistic significance to the field of recording."[6]

80.    James and Denton have also been nominated for and recipients of awards from the American Music Awards, the MTV Video Music Awards, the VH1 Hip Hop Honors Awards, the Soul Train Music Awards, the Soul Train Lady of Soul Awards, and the Nickelodeon Kids' Choice Awards.

81.    In 2022, Plaintiffs were honored with a star on the Hollywood Walk of Fame in recognition not only of their success but of how they paved the way for future female rap artists.

---

[6]    https://web.archive.org/web/20150328225623/http://www.grammy.org/recording-academy/awards/lifetime-awards.

82.     Further underscoring both their popularity and their enduring impact on the music industry, it was recently announced that James and Denton are going to be inducted into the Rock & Roll Hall of Fame in November 2025. This news also highlights their unique position as female, minority artists since, to date, induction is an honor that has been granted to only 80 women out of more than 900 inductees. In addition, their induction will mark only the second time in history that a female hip-hop artist has received this honor and will *double* the number of black women who have received the honor.

83.     Pursuant to Section 203 of the Copyright Act, James and Denton have the right to serve a Notice of Termination to terminate the grant of rights made to a record label, generally thirty-five (35) years after the publication of those sound recordings.

84.     UMG is the current grantee of Plaintiffs' sound recordings as successor-in-interest to Next Plateau Records and London Records.

85.     As a result, on March 22, 2022, James and Denton served their Notice of Termination pursuant to Section 203 of the Copyright Act to UMG.

86.     That same day, on March 22, 2022, James and Denton submitted the Notice of Termination to be recorded with the United States Copyright Office.

87.     On May 10, 2022, a United States Copyright Office recordation specialist requested that the Notice of Termination be amended to specify effective dates of termination for each sound recording based on the date of grant or date of publication.

88.     In response, on May 13, 2022, James and Denton submitted an Amended Notice of Termination with the additional requested information and served their Amended Notice of Termination pursuant to Section 203 of the Copyright Act to UMG. **Ex. E**, Notices of Termination.

89.     Thus, the Notices of Termination have been duly and correctly served upon the UMG as the current grantee.

90.     The Notices of Termination advised UMG of Plaintiffs' exercise of their statutory rights and the effective termination dates of the copyrights in their sound recordings.

91.     Upon information and belief, UMG did not acknowledge Plaintiffs' rights after receipt of the Notices of Termination.

92.     Rather, on June 27, 2022, UMG sent a letter to Plaintiffs informing them that UMG was taking the position that the Notices of Termination were "invalid and ineffective" because, in UMG's opinion, Plaintiffs' had not made a grant or transfer of the sound recordings to UMG's predecessors, and in the alternative, the sound recordings should be considered "works made for hire" as that term is defined under the Copyright Act of 1976. **Ex. F**, UMG's June 27, 2022 Response to Plaintiffs' Notices of Termination. UMG also alleged that the Notices of Termination were ineffective because UMG's predecessors – Next Plateau Records and London Records – had indicated on the copyright registrations for the works that they were the respective authors and owners as the "employers for hire." *See id*. UMG additionally alleged that Plaintiffs were time-barred from exercising their termination rights. *See id*.

93.     On May 15, 2024—*i.e.*, the first date on which Plaintiffs contend UMG's copyrights to certain sound recordings terminated as a result of the Notices of Termination—Defendant halted commercial exploitation of dozens of Plaintiffs' sound recordings by "taking down" the sound recordings from streaming platforms and distribution channels. Upon information and belief, UMG took this action to gain financial leverage over Plaintiffs and to avoid incurring copyright infringement liability under the Copyright Act.

94.     UMG's punitive measure of "taking down" the sound recordings (which, ironically, can be viewed as an acknowledgment by UMG that it no longer had exploitation rights) rather than relinquishing control of them to the rightful owners, means that Plaintiffs were not only denied their rights to the sound recordings but that substantial royalties that would have otherwise been collected from the sound recordings were also lost.

95.     On July 12, 2024, the parties entered into a Section 203 Exploitation Agreement whereby UMG agreed to continue exploitation of the sound recordings appearing on the albums *Hot, Cool & Vicious* (1986 & 1987) and *A Salt With a Deadly Pepa* (1988) while the parties attempted to resolve their dispute concerning Plaintiffs' termination rights. **Ex. G**, § 203 Exploitation Agreement.

96.     As noted above, ironically, UMG's decision to remove the sound recordings from distribution prior to execution of the Section 203 Exploitation Agreement appears to be an implicit recognition by UMG of the legitimacy/effectiveness of the Notices of Termination. In other words, despite UMG's ongoing refusal to publicly recognize Plaintiffs' rights to exploit the sound recordings themselves, UMG appears to be concerned (at least internally) that it may not actually have the right to exploit the sound recordings anymore because of Plaintiffs' Notices of Termination. Yet, despite apparently recognizing that it can no longer legally profit from the sound recordings absent Plaintiffs' permission, UMG continues to claim ownership of the sound recordings that the Copyright Act clearly states must be returned to their authors, Plaintiffs, upon each sound recordings' effective date of termination.

97.     On September 12, 2024, Plaintiffs advised UMG that it appeared that at the time of UMG's letter dated June 27, 2022, UMG did not possess and/or had not reviewed all of the information necessary to make a determination on Plaintiffs' termination rights. **Ex. H**, Plaintiff's

September 12, 2024 Reply Letter re Notices of Termination. Specifically, Plaintiffs pointed out that UMG did not reference and, as a result, appeared to have failed to consider the implications of the 1986 NITA Recording Agreement, which contained a grant or transfer of rights from Plaintiffs to NITA in and to the sound recordings. *Id*. Plaintiffs also pointed out that the 1986 NITA Recording Agreement does not include language stating that the sound recordings are "works made for hire." *Id*.

98.     As evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing on the albums *Hot, Cool & Vicious* (1986 & 1987) and *A Salt With a Deadly Pepa* (1988) were on or around May 15, 2024. **Ex. E**, Notices of Termination.

99.     As a result, on or around May 15, 2024, the rights to those sound recordings should have automatically been reverted back to Plaintiffs. Notably, this was effectively acknowledged as such by UMG, as this is the very same day that UMG "took down" the sound recordings appearing on those albums. In addition, the Master Tapes should have been returned to Plaintiffs as the true owners of those physical materials. However, to date, Plaintiffs have not received any of their Master Tapes from UMG.

100.    In addition, the effective dates of termination for the sound recordings appearing on the album *Blacks' Magic* (1990) were on or around November 13, 2024 (in the case of one sound recording on the album) and March 19, 2025 (with respect to the remaining sound recordings on the album). **Ex. E**, Notices of Termination. The rights to those sound recordings should have automatically been reverted back to Plaintiffs as of the effective date of termination, together with the accompanying Master Tapes.

101.    Additionally, as evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing on the album *A Blitz of Salt-N-Pepa Hits* (1990)

are upcoming on or around November 20, 2025. **Ex. E**, Notices of Termination. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination. In addition, the accompanying Master Tapes should be returned to Plaintiffs.

102.    Furthermore, as evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing on the albums *Very Necessary* (1993) and *The Greatest Hits* (1991) are upcoming on or around May 15, 2026. **Ex. E**, Notices of Termination. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination. In addition, the accompanying Master Tapes should be returned to Plaintiffs.

103.    Finally, as evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing as singles and EPs – (i) "Let's Talk About AIDS" (1994), and (ii) "Emphatically No" (1994) – are upcoming on or around May 15, 2026. **Ex. E**, Notices of Termination. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination. In addition, the accompanying Master Tapes should be returned to Plaintiffs.

104.    Unfortunately, the parties have not been able to resolve their differences with respect to the Notices of Termination, and UMG has proven unable or unwilling to make a meaningful monetary offer in exchange for continued rights to Plaintiffs' sound recordings.

105.    Additionally, UMG has continued to hold the Master Tapes and has failed to return them to Plaintiffs.

106.    UMG makes no legitimate argument against the effectiveness of the Notices of Termination or the failure to return the Master Tapes.

107.    Instead, UMG appears to take the position that it can unilaterally decide when and/or if a recording artist is entitled to termination. This is not the law, and UMG does not have this power. Rather, the Copyright Act expressly states that "[u]pon the effective date of termination, all rights under the title that were covered by the terminated grants revert to the author." 17 U.S.C. § 203(b). This reversion is obligatory, **not** discretionary.

108.    As a result, on April 1, 2025, Plaintiffs were compelled to terminate the Section 203 Exploitation Agreement in writing. **Ex. I**, Letter to UMG.

109.    On April 10, 2025, UMG responded stating, among other things, that it "continu[es] to dispute the validity and effectiveness of the [Notices of Termination]." **Ex. J**, UMG Response to Termination of Exploitation Agreement.

110.    UMG further informed Plaintiffs that it was "ceasing all U.S. exploitation of the Sound Recordings at this time." *Id*.

111.    Upon information and belief, UMG has, in fact, halted exploitation of the relevant sound recordings in the United States, thereby effectively demonetizing Plaintiffs' catalogue—months before Plaintiffs' are set to be inducted into the Hall of Fame.

112.    Upon information and belief, this is an effort by UMG to pressure Plaintiffs into giving up on their effort to recoup their rights to their sound recordings. Plaintiffs are not willing to do so.

113.    For all of these reasons, Plaintiffs are compelled to initiate this lawsuit and seek relief from the Court.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Relief)**

114.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 113 above, as though fully set forth herein.

115.    Pursuant to Section 203 of the Copyright Act, Plaintiffs have the right to serve Notices of Termination to terminate the grant of rights made to a record label, generally thirty-five (35) years after the publication of those recordings.

116.    The Notices of Termination have been duly and correctly recorded in the United States Copyright Office and served upon UMG as the current grantee. **Ex. E**, Notices of Termination.

117.    Pursuant to the Notice of Termination, Plaintiffs are the authors and current owners of the United States copyrights in and to the sound recordings.

118.    The effective dates of termination for the sound recordings appearing on the albums *Hot, Cool & Vicious* (1986 & 1987) and *A Salt With a Deadly Pepa* (1988) have passed. **Ex. E**, Notices of Termination. The effective dates of termination of those sound recordings was on or around May 15, 2024, and the rights to those sound recordings should have automatically been reverted back to Plaintiffs.

119.    In addition, the effective dates of termination for the sound recordings appearing on the album *Blacks' Magic* (1990) have also passed. **Ex. E**, Notices of Termination.  The effective dates of termination of those sounds recordings were on or around November 13, 2024 (in the case of one sound recording on the album) and March 19, 2025 (with respect to the remaining sound recordings on the album), and the rights to those sound recordings should have automatically been reverted back to Plaintiffs.

120.    As evidenced in the Notices of Termination, the effective dates of termination for

the sound recordings appearing on the album *A Blitz of Salt-N-Pepa Hits* (1990), is upcoming on or around November 20, 2025. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination.

121.    As evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing on the albums *Very Necessary* (1993) and *The Greatest Hits* (1991) are upcoming on or around May 15, 2026. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination.

122.    As evidenced in the Notices of Termination, the effective dates of termination for the sound recordings appearing as singles and EPs – (i) "Let's Talk About AIDS" (1994), and (ii) "Emphatically No" (1994) – are upcoming on or around May 15, 2026. The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination.

123.    Under Section 106 of the Copyright Act, the copyright owner of a sound recording has the exclusive right to reproduce and distribute the sound recordings, including, but not limited to, in phonorecords, and to exploit or authorize the exploitation of interactive streams and digital downloads of the sound recordings through subscription or non-subscription of online digital music services.

124.    Pursuant to the Notices of Termination, Plaintiffs are or will be the owners of the copyrights in and to the above-referenced sound recordings as of the upcoming effective dates of termination.

125.    On June 27, 2022, counsel for UMG sent Plaintiffs a letter setting forth UMG's legal positions for its claims that the Notices of Termination were invalid, and, in addition, demanded that Plaintiffs "refrain from attempting to exploit the sound recordings, or taking any other actions interfering with UMG's continuing rights in the sound recordings." **Ex. F**, UMG

Response to Notices of Termination. In doing so, UMG confirmed that it had no intention of reverting the sound recordings with upcoming effective dates of termination to Plaintiffs.

126.    Upon information and belief, on or around May 15, 2024, Defendant halted commercial exploitation of Plaintiffs' sound recordings appearing on the albums *Hot, Cool & Vicious* (1986 & 1987) and *A Salt With a Deadly Pepa* (1988). Defendant's punitive measure of "taking down" the sound recordings rather than continuing to exploit them means that Plaintiffs were not only denied their rights to the sound recordings but that substantial royalties that would have otherwise been collected from the sound recordings were also lost.

127.    As discussed *supra*, ironically, UMG's choice to remove the sound recordings from distribution appears to be an implicit recognition by UMG of the legitimacy/effectiveness of the Notices of Termination. Regardless, UMG continues to claim ownership of the sound recordings that the Copyright Act clearly states have returned to their authors, Plaintiffs, upon each sound recordings' effective date of termination.

128.    On July 12, 2024, the parties entered into a Section 203 Exploitation Agreement whereby the parties agreed that Defendant could continue exploitation of the sound recordings appearing on the albums *Hot, Cool & Vicious* (1986 & 1987) and *A Salt With a Deadly Pepa* (1988) while the parties attempted to resolve their dispute concerning Plaintiffs' termination rights. **Ex. G**, § 203 Exploitation Agreement.

129.    In light of UMG's apparent unwillingness to acknowledge Plaintiff's reclaimed rights, upon information and belief, UMG used the Section 203 Exploitation Agreement to delay Plaintiffs ability to recoup their rights and, as a result, has failed to negotiate in good faith and/or make any meaningful offer to Plaintiffs in an attempt to resolve the dispute with Plaintiffs.

130.    In light of UMG's apparent unwillingness to reach a resolution, on April 1, 2025,

Plaintiffs terminated the Section 203 Exploitation Agreement in order to reclaim the rights to their sound recordings. **Ex. I**, Letter to UMG.

131.    On April 10, 2025, UMG responded, stating that it "continu[es] to dispute the validity and effectiveness of the [Notices of Termination]." **Ex. J**, UMG Response to Termination of Exploitation Agreement.

132.    UMG also informed Plaintiffs that it was "ceasing all U.S. exploitation of the Sound Recordings at this time." *Id*. Upon information and belief, this has occurred.

133.    Based upon the foregoing facts, pursuant to 28 U.S.C. § 2201 and 2022, a case of actual and present controversy within the jurisdiction of this court has arisen and now exists between Plaintiffs and Defendant, concerning their respective rights and duties concerning the Notices of Termination. Specifically, Plaintiffs contend that the sound recordings are not (and cannot) be treated as "works made for hire" since, among other things:

    a.    None of the operative agreements contain language to the effect that the sound recordings are "works made for hire" as that term is defined under the Copyright Act of 1976;

    b.    There are no facts that would establish that Plaintiffs were ever in an employer-employee relationship with Defendant, or any of their affiliated or related companies, at the time Plaintiffs entered into the recording agreements, or during the time that the sound recordings were created;

    c.    The release of sound recordings that were created by Plaintiffs in an "album" form, as is typical in the music industry, do not constitute a "contribution to a collective work," or a "compilation," as those terms are used in § 101 of the Copyright Act, and do not qualify the sound recordings as "works made for hire;"

    d.    Sound recordings created and delivered pursuant to a recording agreement are not "specially ordered" or "commissioned works," as such terms are used in § 101 of the Copyright Act, thereby disqualifying any sound

recording as a "work made for hire;"

e.    The exercise by Plaintiffs of their rights under § 203 of the Copyright Act to terminate the original grant, and to thereafter exploit the sound recordings after the effective dates of termination, does not constitute a breach of contract of the recording agreements;

f.    The assertion of rights by recording artists under § 203 of the Copyright Act are not "time-barred."

134.    Plaintiffs desire a judicial determination of their rights and duties, and a present declaration that their Notices of Termination are valid, the dates of termination are effective, their termination rights for the sound recordings have vested or will vest in the near future, any such vesting must be immediately acknowledged by Defendant through a prompt transfer of all rights in the sound recordings to Plaintiffs, and Defendant's disregard of the rights of Plaintiffs violates the Copyright Act.

135.    In the absence of prompt and immediate declaratory relief, Plaintiffs will continue to be damaged and to experience significant uncertainty with respect to their termination rights and they will be unable to accurately calculate the value of their rights given the future, indeterminate cloud hanging over their rights by UMG. They will be left to await the virtually certain future event of Defendant's infringement of their copyrights and then incur years of additional delay before gaining clarity and vindication of their rights. In addition, Defendant has effectively prevented Plaintiffs from exploiting their copyrights because no third party will want to transact with Plaintiffs given the uncertainty and cloud that Defendant has placed over the copyrights.

136.    In the absence of prompt and immediate declaratory relief, Defendant will be allowed to destroy the value and ultimate salability of the subject sound recordings, in direct

contradiction of the second chance of the Copyright Act.

137.    Defendant's actions have caused and will continue to cause irreparable harm to Plaintiffs, and will continue to harm Plaintiffs unless Defendant and its respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns and those acting in concert with them or at their direction, and each of them, are permanently enjoined and restrained under 17 U.S.C. § 502 from directly or indirectly infringing on Plaintiffs' rights under federal law in the copyrighted sound recordings, including without limitation by using the Internet or online media distribution system to reproduce (i.e., download), license, or stream any of the sound recordings, or to distribute (i.e., upload), license, or stream any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of Plaintiffs.

138.    Furthermore, there is no available remedy at law sufficient to make Plaintiffs whole.

### SECOND CLAIM FOR RELIEF
#### (Conversion)

139.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 138 above, as though fully set forth herein.

140.    Conversion is the wrongful exercise of dominion over the property of another.

141.    Under New York law, conversion occurs when a plaintiff has ownership or the right to possess property, a defendant, through a wrongful act of disposition of property rights, converts a plaintiff's ownership or right to possess their property, and the plaintiff suffers damages.

142.    Defendant has intentionally and substantially interfered with Plaintiffs' possession of their Master Tapes and other physical materials associated therewith.

143.    Defendant has knowingly prevented Plaintiffs' from having access to the Master Tapes.

144.    Defendant has maliciously sought to penalize Plaintiffs for seeking to enforce their statutory rights by removing the sound recordings from the market while also failing to allow Plaintiffs to possess the Master Tapes and exploit those Master Tapes themselves, thus maliciously depriving Plaintiffs of expected royalty income.

145.    Plaintiffs have been harmed as they are unable to exploit the Master Tapes in any way.

146.    As each effective date of termination passes, Plaintiffs' claims for conversion will only expand.

147.    As a result, Plaintiffs seek actual damages in an amount to be determined but believed to well exceed one million dollars ($1,000,000). In addition, as a result of the malice of Defendant in refusing to return the rights to the sound recordings, in halting and/or threatening to halt commercial exploitation, and refusal to work with Plaintiffs to reach a resolution, Plaintiffs seek punitive damages in an amount to be determined.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendant, as follows:

A.    Awarding Plaintiffs actual damages according to proof;

B.    Declaratory relief in Plaintiffs' favor and against UMG;

C.    A permanent injunction enjoining and restraining Defendant, and its respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliated companies, successors, assigns, and those acting in

concert with them or at their direction, and each of them, from directly or indirectly infringing on Plaintiffs' rights under federal law in the copyrighted recordings and any sound recording that is owned or controlled by Plaintiffs, including without limitation by using the internet or online media distribution system to reproduce (i.e., download) any of the sound recordings, or to distribute (i.e., upload) any of the sound recordings, or to make any of the sound recordings available for distribution to the public, except pursuant to a lawful license or with the express permission of Plaintiffs;

D.    Directing UMG to return the Master Tapes to Plaintiffs;

E.    Awarding Plaintiffs punitive damages;

F.    For pre- and post-judgment interest;

G.    For such fees and costs (including reasonable attorney's fees) incurred herein as permitted by law; and

H.    For such other and further relief as this Court deems just and proper.

**BLANK ROME LLP**

Dated: August 8, 2025                    By: */s/ Heidi G. Crikelair*

Heidi G. Crikelair
heidi.crikelair@blankrome.com
Roy W. Arnold (Pro Hac Vice)
roy.arnold@blankrome.com
David M. Perry (Pro Hac Vice)
david.perry@blankrome.com
Jillian M. Taylor (Pro Hac Vice)
jillian.taylor@blankrome.com
**BLANK ROME LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

*Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of the claims alleged in this First Amended Complaint.

**BLANK ROME LLP**

Dated:  August 8, 2025                    By: */s/ Heidi G. Crikelair*

Heidi G. Crikelair
heidi.crikelair@blankrome.com
Roy W. Arnold (Pro Hac Vice)
roy.arnold@blankrome.com
David M. Perry (Pro Hac Vice)
david.perry@blankrome.com
Jillian M. Taylor (Pro Hac Vice)
jillian.taylor@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing First Amended Complaint has been served upon counsel for Defendant via the Court's ECF system.

*s/ Heidi G. Crikelair*