UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHERYL JAMES and SANDRA DENTON, p/k/a SALT-N-PEPA,<br><br>      Plaintiffs,<br><br>     v.<br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group,<br><br>      Defendant. | No. 1:25-cv-4182-DLC |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT UMG RECORDINGS, INC.'S
<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .................................................................................................................2

I.      Termination of Transfers of Copyright Rights Under 17 U.S.C. § 203.....................2

II.     Plaintiffs' Claims ......................................................................................................4

III.    The Relevant Agreements .........................................................................................5

        A.    The Next Plateau Distribution Agreement...................................................6

        B.    The NITA Personal Services-Production Agreement....................................8

        C.    The 1992 Agreements .................................................................................9

ARGUMENT .....................................................................................................................9

I.      There Was No Grant of Copyright Rights Executed by Plaintiffs with Respect to the
        Sound Recordings ...................................................................................................10

II.     The Remixed Sound Recordings Are Derivative Works Not Subject to Termination ......18

III.    Plaintiffs Fail to State a Conversion Claim Under New York Law................................21

        A.    Plaintiffs Fail to Show Ownership or Right to Possession of the Master Tapes .......23

        B.    Plaintiffs' Termination Notices Do Not Extend to the Physical Master Tapes .........25

        C.    Plaintiffs' Conversion Claim Further Fails Because They Never Demanded the
              Master Tapes from UMG...............................................................................26

IV.     The Court Should Stay Discovery Pending Disposition of the Motion to Dismiss..........27

CONCLUSION...................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                              **Page(s)**

*ABS Entm't v. CBS Corp.*,
  908 F.3d 405 (9th Cir. 2018) .................................................................................................19

*Advanced Knowledge Tech., LLC v. Fleitas*,
  No. 21-992, 2021 U.S. Dist. LEXIS 247723 (S.D.N.Y. Dec. 28, 2021) ......................23, 25, 26

*Affymetrix, Inc. v. Illumina, Inc.*,
  446 F. Supp. 2d 292 (D. Del. 2006) ......................................................................................12

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
  No. 94-2120, 1996 U.S. Dist. LEXIS 2684 (S.D.N.Y. Mar. 7, 1996) ................................28, 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................................9

*Ass'n of Am. Med. Colls. v. Carey*,
  728 F. Supp. 873 (N.D.N.Y. 1990) ........................................................................................13

*Bartsch v. Metro-Goldwyn-Mayer, Inc.*,
  391 F.2d 150 (2d Cir. 1968) ..................................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................................9

*Boelter v. Hearst Communs., Inc.*,
  No. 15-3934, 2016 U.S. Dist. LEXIS 12322 (S.D.N.Y. Jan. 28, 2016) .............................27, 28

*Brad H. v. City of N.Y.*,
  17 N.Y.3d 180 (2011) ............................................................................................................12

*Caffey v. Cook*,
  409 F. Supp. 2d 484 (S.D.N.Y. 2006) ...................................................................................14

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ..................................................................................................10

*Citizens United v. Schneiderman*,
  882 F.3d 374 (2d Cir. 2018) ..................................................................................................20

*Close-Up Int'l, Inc. v. Berov*,
  382 F. App'x 113 (2d Cir. 2010) ...........................................................................................11

*Cmty. for Creative Non-Violence v. Reid*,
  846 F.2d 1485 (D.C. Cir. 1988) ............................................................................................25

ii

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) .........................................................................................................10

*Crook v. Rindskopf*,
    105 N.Y. 476 (1887) .........................................................................................................12

*Deutsche Bank Nat'l Tr. Co. v. Romano*,
    147 A.D.3d 1021, 48 N.Y.S.3d 237 (2d Dep't 2017) ......................................................12

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010) .............................................................................................10

*D'Amico v. First Union Nat'l Bank*,
    728 N.Y.S.2d 146 (1st Dep't 2001) ..................................................................................26

*Estate Examinations Co. v. ECG Enters.*,
    No. 06-3024, 2006 U.S. Dist. LEXIS 81478 (E.D.N.Y. Nov. 7, 2006) ...........................11

*Fonar Corp. v. Domenick*,
    105 F.3d 99 (2d Cir. 1997) ...............................................................................................20

*Gandler v. Nazarov*,
    No. 94-2272, 1994 U.S. Dist. LEXIS 17885 (S.D.N.Y. Dec. 14, 1994) ..........................28

*Greenfield v. Philles Records*,
    98 N.Y.2d 562 (2002) .......................................................................................................12

*Hong Leong Fin. Ltd. (Sing.) v. Pinnacle Performance, Ltd.*,
    297 F.R.D. 69 (S.D.N.Y. 2013) ..................................................................................28, 29

*Kass v. Kass*,
    91 N.Y.2d 554 (1998) .......................................................................................................12

*Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.*,
    No. 87-5775, 1989 U.S. Dist. LEXIS 11588 (S.D.N.Y. Oct. 2, 1989) ............................25

*Langman Fabrics v. Graff Californiawear*,
    160 F.3d 106 (2d Cir. 1998) .............................................................................................20

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) .............................................................................................10

*Litecubes, LLC v. N. Light Prods.*,
    523 F.3d 1353 (Fed. Cir. 2008) ........................................................................................13

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) .............................................................................................17

*MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*,
    No. 03-8103, 2004 U.S. Dist. LEXIS 29562 (C.D. Cal. Feb. 11, 2004) ..........................14

iii

*Milne v. Stephen Slesinger, Inc.*,
430 F.3d 1036 (9th Cir. 2005) ............................................................. 10

*Niss v. Columbia Pictures*,
No. 97-4636, 2000 U.S. Dist. LEXIS 18328 (S.D.N.Y. Dec. 20, 2000) ................................... 14

*Omni MedSci, Inc. v. Apple Inc.*,
7 F.4th 1148 (Fed. Cir. 2021) ............................................................. 13

*Penguin Group (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ............................................................. 2

*Peters Gallery of N.Y., Inc. v. Weiant*,
No. 23-3181, 2025 U.S. Dist. LEXIS 148385 (S.D.N.Y. Aug. 1, 2025) ................................... 26

*Playboy Enters. v. Dumas*,
831 F. Supp. 295 (S.D.N.Y. 1993) ............................................................. 12

*Radio Today, Inc. v. Westwood One, Inc.*,
684 F. Supp. 68 (S.D.N.Y. 1988) ............................................................. 24

*Scorpio Music S.A. v. Willis*,
No. 11-1557, 2012 U.S. Dist. LEXIS 63858 (S.D. Cal. May 7, 2012) ................................... 6

*Shiro v. Drew*,
174 F. Supp. 495 (D. Me. 1959) ............................................................. 13

*Silvers v. Sony Pictures Entm't, Inc.*,
402 F.3d 881 (9th Cir. 2005) ............................................................. 13

*Songbyrd, Inc. v. Estate of Grossman*,
206 F.3d 172 (2d Cir. 2000) ............................................................. 26

*Sony Corp. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................. 13

*Spencer Trask Software & Info. Servs. v. RPost Int'l*,
206 F.R.D. 367 (S.D.N.Y. 2002) ............................................................. 28, 29

*Spinelli v. NFL*,
No. 13-7398, 2015 U.S. Dist. LEXIS 155816 (S.D.N.Y. 2015) ................................... 28

*United States v. Am. Soc'y of Composers (In re Cellco)*,
663 F. Supp. 2d 363 (S.D.N.Y. 2009) ............................................................. 6

*Vassilkioti v. CCS Int'l, Ltd.*,
No. 98-4090, 2000 U.S. Dist. LEXIS 17776 (S.D.N.Y. Dec. 7, 2000) ................................... 12

*Waite v. UMG Recordings, Inc.*,
450 F. Supp. 3d 430 (S.D.N.Y. 2020) ............................................................. *passim*

iv

*Waite v. UMG Recordings, Inc.*,
   477 F. Supp. 3d 265 (S.D.N.Y. 2020) ................................................................ *passim*

*World Ambulette Transp. v. Kwan Haeng Lee*,
   161 A.D.3d 1028, 78 N.Y.S.3d 137 (2d Dep't 2018) ............................................23

*WSP United States Corp. v. Marinello*,
   2013 U.S. Dist. LEXIS 178419 (S.D.N.Y. Dec. 18, 2013) .....................................26

**Statutes**

17 U.S.C. § 101 ................................................................................................................3

17 U.S.C. § 106 ..............................................................................................................16

17 U.S.C. § 114 ..............................................................................................................18

17 U.S.C. § 201 ................................................................................................................3

17 U.S.C. § 202 ..............................................................................................................25

17 U.S.C. § 203 ...................................................................................................... *passim*

17 U.S.C. § 204 ........................................................................................................11, 12

17 U.S.C. § 410 ..............................................................................................................20

**Rules**

Fed. R. Civ. P. 12 .............................................................................................................1

Fed. R. Civ. P. 26 .........................................................................................................1, 27

30057/033/5189660.3

Defendant UMG Recordings, Inc. ("UMG") respectfully submits this memorandum in support of its motion to dismiss the First Amended Complaint ("FAC") brought by Plaintiffs Cheryl James and Sandra Denton, p/k/a Salt-N-Pepa (collectively, "Plaintiffs" or, as the context requires, "Artist"), pursuant to Fed. R. Civ. P. 12(b)(6), and for a stay of discovery pending disposition of the motion to dismiss, pursuant to Fed. R. Civ. P. 26(c).

## PRELIMINARY STATEMENT

Plaintiffs bring this action seeking a declaration as to the validity of a copyright termination notice (the "Notice") served on UMG concerning certain sound recordings created during the 1980's and 1990's, as well as a claim for conversion under New York state law.  The FAC should be dismissed in its entirety because it fails to state a valid claim.

UMG properly disputed the validity of the Notice because, among other things, the relevant agreements pursuant to which the sound recordings were created contain no grant of copyright rights executed by Plaintiffs, a fundamental requirement of the Copyright Act's termination provisions.  In a class action lawsuit in which the plaintiffs were represented by the same counsel representing Plaintiffs here, this Court dismissed various claims challenging UMG's rejection of copyright termination notices for precisely the same reason raised on this motion – the absence of any operative grant executed by the purported authors.  As the Court explained in that lawsuit, where third parties enter into contracts on behalf of the artist, such as is the case here, there is no right of termination.  On that basis alone, Plaintiffs' claim for declaratory relief must be dismissed.

In addition, the Copyright Act provides that derivative works prepared under authority of a grant may continue to be exploited by the grantee notwithstanding a right of termination. Several of the most valuable sound recordings involved here are remixes, which constitute

derivative works excluded from the scope of possible termination under the applicable law. Accordingly, as to those works, Plaintiffs would have no right of termination even if they could somehow get past the absence of an operative grant to terminate.

Finally, the conversion claim is subject to dismissal because Plaintiffs fail to state a claim for conversion under New York law. The FAC seeks to recast their conversion claim as dealing with the physical tapes of their recordings, rather than the intangible rights in such recordings, to avoid UMG's arguments in its motion to dismiss the initial Complaint that the claim is preempted by federal law and unrecognized by New York law. However, Plaintiffs have simply substituted one set of defects for another, because, among other things, they cannot plead ownership of, or an immediate right to possess, the physical tapes. Because all the claims fail, the Court should dismiss the FAC in its entirety and should stay discovery pending resolution of the motion to dismiss.

## **BACKGROUND**

### I.    **Termination of Transfers of Copyright Rights Under 17 U.S.C. § 203**

Under the Copyright Act of 1909, "authors were entitled to a copyright in their works for an initial twenty-eight year period," and "[a]fter this period expired, the author had the right to renew the copyright for a second twenty-eight year term." *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). "The 1976 amendments to the Copyright Act, which took effect in 1978, abandoned this framework," and "replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration, and it created for authors … [a] right to terminate the grant of a transfer or license." *Id.* at 197-98 (citation omitted).

Congress established two separate termination regimes, one as to grants executed by authors on or after January 1, 1978, and the other as to certain grants executed before that date. *See* 17 U.S.C. §§ 203, 304(c).  Section 203, at issue here, provides:

> In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination [under certain specified conditions].

17 U.S.C. § 203(a).

The termination right under Section 203 excludes from its scope "work[s] made for hire."

17 U.S.C. § 203(a).  The Copyright Act defines "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.  Under Sections 201(a) and (b) of the Copyright Act, copyright vests initially in the "author" of a work; "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author."  17 U.S.C. §§ 201(a) & (b).  Although UMG contends in this lawsuit that the works at issue are works made for hire under each of the above alternative formulations in section 101, the Court need not reach that issue for purposes of the present motion because the absence of any operative grant renders termination unavailable in any event.  *See Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 435 (S.D.N.Y. 2020) (finding it unnecessary to resolve the work for hire status of recordings while granting motion to dismiss claims for declaratory relief based on absence of any grant).

3

The Copyright Act provides further that, notwithstanding termination of a grant,

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 203(b)(1).  Thus, the Notice, even if it were valid, would not prevent UMG's continued use of any derivative works referenced in the Notice, such as those sound recordings that are remixes.

## II.    Plaintiffs' Claims

Plaintiffs are musical performers who were two-thirds of the group professionally known as "Salt-N-Pepa" that recorded albums released by Next Plateau Records, Inc. and London Records, Inc., predecessors of UMG, in the 1980s and 1990s.  *See* FAC ¶¶ 42-74.  On May 13, 2022, the Notice was served on UMG on Plaintiffs' behalf.  FAC Ex. E.  Referencing a grant allegedly made by Plaintiffs to UMG's predecessors "on or about May 15, 1986," the Notice purported to terminate that grant as to various sound recordings named therein.  *Id.*

UMG served a counter-notice on Plaintiffs on June 27, 2022 disputing the validity of the Notice.  FAC Ex. F.  As to four of the albums identified in the Notice (*Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic* and *Very Necessary*), the counter-notice explained, among other things, that the agreement referenced in the Notice did not contain a grant of copyright that could be subject to termination.  *Id.*  The counter-notice also set forth that an additional album referenced in the Notice (*Brand New*) was governed by a different agreement, entered into in 1995, which also did not contain a grant of copyright.  *Id.*  In addition, the counter-notice indicated that any remixed sound recordings, including but not limited to those on the album *A Blitz of Salt-n-Pepa Hits: The Hits Remixed*, were derivative works and thus not

subject to termination even if there were a terminable grant otherwise applicable to the underlying works. *Id.*

On September 12, 2024, Plaintiffs responded to UMG's counter-notice (FAC Ex. H), contending that UMG's counter-notice "was based on incomplete information concerning" the sound recordings contained on the first group of four albums addressed in the counter-notice. FAC ¶ 89.[1] Plaintiffs' response letter did not address UMG's arguments concerning the other album, *Brand New*, covered by a separate 1995 agreement, and the FAC explicitly states that the *Brand New* album is "not at issue in this case." FAC ¶ 73 n.5. Plaintiffs also did not address the derivative work status of the remixed sound recordings in their letter.

Although the parties attempted to resolve their dispute concerning the validity of the Notice, they were unable to do so. FAC ¶¶ 95, 104. Plaintiffs filed this action seeking declaratory relief as to the validity of the Notice and also alleging a claim for conversion.

## III. The Relevant Agreements

Plaintiffs' contributions to the albums *Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic*, and *Very Necessary*, and the sound recordings "Let's Talk About AIDS," "Emphatically No," and "Start Me Up" (collectively, the "Sound Recordings") were created pursuant to two interrelated agreements executed as of May 15, 1986 (collectively, the "1986 Agreements").[2] FAC ¶¶ 45-63. As discussed below, neither agreement contains a grant of copyright, or of rights under a copyright, executed by Plaintiffs.

---

[1] UMG responded to the September 12, 2024 letter explaining why the additional agreement referenced in Plaintiffs' letter also did not contain a grant of copyright, but Plaintiffs did not attach such letter to the FAC. Regardless, UMG's argument in this respect is set forth fully below at pp. 10-14 *infra*.

[2] Other individuals in addition to Plaintiffs, including but not limited to Diedra Roper p/k/a Spinderella (the third member of Salt-N-Pepa) and Herb Azor p/k/a Hurby "Luv Bug" Azor

A.    **The Next Plateau Distribution Agreement**

In the May 15, 1986 agreement between Next Plateau Records, Inc. ("Next Plateau") and Herb Azor and Hugh Azor ("Producer")[3] (the "Next Plateau Distribution Agreement"), Next Plateau "engages Producer to produce and deliver to [Next Plateau] Sides embodying the performances of Artist, and Producer hereby accepts such engagement and agrees to deliver Sides embodying the performances of Artist exclusively to [Next Plateau]."  FAC Ex. B ¶ 2. Plaintiffs are not parties to or signatories of the Next Plateau Distribution Agreement, in which Producer represents and warrants to Next Plateau that "[t]here is in existence between the Producer and [Plaintiffs] a valid and enforceable agreement under the terms of which [Plaintiffs] shall perform exclusively for Producer as a recording artist during the Term of this agreement as extended."  *Id.* ¶ 13(g).

The Next Plateau Distribution Agreement contains a straightforward transfer of copyright rights in the already-existing LPs *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* from

---

(Salt-N-Pepa's initial producer), contributed protectible authorship to the Sound Recordings. Ms. Roper and Mr. Azor made their contributions within the scope of their employment by Noise In The Attic Productions, Inc.  *See* FAC Ex. C ¶ 1; *see, e.g.*, *United States v. Am. Soc'y of Composers (In re Cellco)*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) (authors of sound recordings include "the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both.").  UMG's copyright ownership of Ms. Roper's and Mr. Azor's contributions to the Sound Recordings is not at issue in this matter, and ownership of the copyright in those contributions will remain with UMG regardless of the outcome here.  *See* 17 U.S.C. § 203(a)(1); *Scorpio Music S.A. v. Willis*, No. 11-1557, 2012 U.S. Dist. LEXIS 63858, at *13-14 (S.D. Cal. May 7, 2012) (if one or more joint authors of copyrighted work executed a grant with respect to their contributions, those authors may be able to effect termination only as to their ownership share of copyrighted work).

[3] "[S]ubsequent to the complete execution of the [Next Plateau Distribution] Agreement, Herb Azor and Hugh Azor assigned all of their rights and obligations under the [Next Plateau Distribution Agreement] to [Noise In The Attic Productions, Inc.]."  *See* FAC ¶ 64 and Ex. C.

Producer – not Plaintiffs – to Next Plateau.[4]  *Id*. ¶ 3(c) ("Producer hereby sells, transfers and assigns to [Next Plateau], for the world, all of the aforesaid right, title and interest in and to such Sides including without limitation the sound recording copyright and the performances embodied thereon…").  In that same provision, Producer warrants and represents that he "is the sole and exclusive owner" of the recordings and "all right, title and interest therein."  *Id*.

As to future Sound Recordings, Producer undertakes that:

> All Sides recorded during the Term shall be recorded by Producer on [Next Plateau]'s behalf and all records made therefrom, together with the performances embodied therein, shall, from the inception of their creation, be entirely the property of [Next Plateau] in perpetuity, throughout the Territory, free of any claim whatsoever by Producer, Artist or by any persons deriving any rights or interests from Producer or Artist and [Next Plateau] shall have the right to secure the sound recording (P) copyright in and to the Sides in [Next Plateau]'s name as the owner and author thereof and to secure any and all renewals of such copyright.

*Id*. ¶ 5 (emphasis added).

Plaintiffs signed a customary inducement letter annexed to the Next Plateau Distribution Agreement.  *See* FAC Ex. B (ECF No. 30-2 at pp. 23-25).  The inducement letter does not contain or refer to a grant of copyright rights.  Instead, in the inducement letter, Plaintiffs in their individual capacities made, confirmed and guaranteed all of Producer's warranties, representations and undertakings in the Next Plateau Distribution Agreement, which would necessarily include Producer's warranty and representation that Plaintiffs were employed by Producer under a valid and enforceable agreement (¶ 13(g)), and that Next Plateau would be the legal author and copyright owner of all Sound Recordings created pursuant to the Next Plateau

---

[4] The preexisting sound recordings are purportedly listed on a missing Schedule A to the Next Plateau Distribution Agreement, but there is no dispute that the sound recordings on the *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums were covered by such grant from Producer.  *See* FAC Ex. B ¶ 3(c); Ex. A ¶ C.

Distribution Agreement from the inception of their creation, free of any claims whatsoever by Plaintiffs or Producer (¶ 5).  *See* FAC Ex. B (ECF No. 30-2 at p.24).

### B.    The NITA Personal Services-Production Agreement

Plaintiffs and Noise In The Attic Productions, Inc. ("NITA") entered into an agreement dated as of May 15, 1986 (the "NITA Personal Services-Production Agreement") "with respect to [NITA] providing [Plaintiffs] with production services as well as with respect to [Plaintiffs] rendering [Plaintiffs'] exclusive personal services to [NITA] as a recording artist, as well as granting [NITA] certain exclusive rights with respect to [Plaintiffs] pertaining to audio-visual exploitation."  FAC Ex. A p.1.  The NITA Personal Services-Production Agreement is coterminous with the Next Plateau Distribution Agreement.  S*ee* FAC ¶ 54 & Ex. A ¶ B.

The relevant provision in the NITA Personal Services-Production Agreement concerning copyright ownership contains no reference to any grant of copyright rights in sound recordings:

> As between [NITA] and [Plaintiffs], [NITA] shall be the sole and
> exclusive owner of any and all rights, title and/or interest in and to master
> recordings recorded hereunder, including but not limited to the worldwide
> sound copyrights therein and the renewal rights thereto.

FAC Ex. A ¶ H.  Significantly, the parties to the NITA Personal Services-Production Agreement used express rights transfer language elsewhere when they so intended.  The preamble references Plaintiffs' grant to NITA of "certain exclusive rights with respect to Artist pertaining to audio-visual exploitation," FAC Ex. A p.1, and the NITA Personal Services-Production Agreement contains express present grants by Plaintiffs to NITA of "the worldwide right in perpetuity to use Artist's name and, subject to Artist's prior approval, Artist's likeness, biography and other identification (all of the foregoing referred to as 'Artist's Identification')," *id*. ¶ K; and of "the sole and exclusive worldwide right to use Artist's Identification for general trade purposes."  *Id*.

Had the parties intended to effectuate a transfer of exclusive copyright rights in sound recordings from Plaintiffs to NITA, they knew how to do so.  But they did not.

### C.    The 1992 Agreements

The FAC also references two agreements entered into in 1992 by which London Records ("London") stepped into the shoes of Next Plateau.  *See* FAC ¶¶ 64-67 & Ex. C, D.  However, those agreements have no impact on the applicable termination analysis, as they simply carried forward the terms of the 1986 Agreements (except with respect to financial terms not at issue here).[5]  *See* FAC Ex. C ¶¶ 1(a)(iv), 1(b) (acknowledging that all of Next Plateau's rights and obligations under the Next Plateau Distribution Agreement, excluding any music publishing rights, have been assigned from Next Plateau to London, with Producer and Plaintiffs approving and ratifying the assignment and agreeing to be bound to London under the Next Plateau Distribution Agreement); Ex. D ¶ 1 (acknowledging that two albums remain to be recorded under the NITA Personal Services-Production Agreement).

## ARGUMENT

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must plead factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court may properly consider "the complaint, documents attached to the complaint as

---

[5] Plaintiffs' allegations that the 1992 agreements contained no work for hire language (*see* FAC ¶¶ 65, 67) are a *non sequitur*.  The 1992 agreements do not address copyright ownership at all because the 1986 Agreements continued to govern as to that issue.  In this respect, it could equally be said that the 1992 agreements contained no grant of copyrights that could be terminated, nor did Plaintiffs ever seek any termination under such agreements.

9

exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (noting that recording contracts are integral to a copyright claim and thus were properly incorporated by reference on a motion to dismiss). "Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss on the pleadings, conclusions of law or unwarranted deductions of fact are not admitted." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-75 (2d Cir. 2005) (internal quotation omitted).

As demonstrated below, the FAC fails to state a claim and should be dismissed.

## I.    There Was No Grant of Copyright Rights Executed by Plaintiffs with Respect to the Sound Recordings

"In a copyright case, as in most cases, the language of the statute provides the starting point for [the Court's] analysis." *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005) (citations omitted); *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Section 203 of the Copyright Act explicitly limits the termination right to grants "executed by the author," and only an author who executed the grant, or the statutorily designated heirs of a deceased author-grantor, may terminate the grant. *See Waite*, 450 F. Supp. 3d at 441; *see also Waite v. UMG Recordings, Inc.*, 477 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) ("*Waite II*"). Thus, as Judge Kaplan explained in *Waite*, "third parties to a contract and loan-out companies, which 'loan' out an artist's services to employers, and enter into contracts on behalf of the artist do not have a termination right under the statute." *Waite*, 450 F. Supp.3d at 441; *see also Waite II*, 477 F. Supp. 3d at 271 (quoting same).

This lawsuit involves the precise situation presented by *Waite* in that none of the relevant agreements contain grants of copyright by Plaintiffs. While Plaintiffs, represented by the same

counsel that represented the plaintiffs in *Waite*, have apparently chosen to ignore that decision, there is no basis for any different result here.  As in *Waite*, the declaratory relief claim should be dismissed for failure to state a claim because there was no copyright grant executed by an author that could be subject to termination.

Plaintiffs allege that the NITA Personal Services-Production Agreement "includes a personal grant from [Plaintiffs] of the rights to Salt-N-Pepa's sound recordings."  FAC ¶ 47.  To support that allegation, Plaintiffs rely on the following contractual language:  "As between Company [NITA] and Artist, Company [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereof."  *Id*. (quoting FAC Ex. A, ¶ H).  Plaintiffs' reliance is not well taken.  The quoted language does not constitute a "grant of a transfer or license of copyright or of any right under a copyright" under 17 U.S.C. § 203(a) and New York law.

Section 204(a) of the Copyright Act provides that a transfer of copyright ownership must be in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.  17 U.S.C. § 204(a).  However, while "[a]n alleged transfer of copyright is subject to requirements for a valid transfer under copyright law[,] [it] is also governed by state contract law."  *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 115 (2d Cir. 2010); *see also Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir. 1968) (applying state law to a contract dispute involving the assignment of rights under federal copyright law); *Estate Examinations Co. v. ECG Enters.*, No. 06-3024, 2006 U.S. Dist. LEXIS 81478, at *11 (E.D.N.Y. Nov. 7, 2006) ("Where disputes arise under an agreement between parties, resolution depends on state contract law, not the Copyright Act.").

The NITA Personal Services-Production Agreement is governed by New York law.  FAC Ex. A ¶ M.  Under New York law, courts construe purported assignments using the "same rules which obtain in the interpretation of other contracts."  *Crook v. Rindskopf*, 105 N.Y. 476, 485 (1887).  "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent," *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002), and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Id.*  Resort to extrinsic evidence is permitted only if ambiguity exists within the four corners of the agreement.  *See Brad H. v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011).  Absent ambiguity, a court should construe the agreement to "carry out the plain purpose and object" of the written contract.  *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998).

The fundamental requirement of an assignment is that "the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee."  *Deutsche Bank Nat'l Tr. Co. v. Romano*, 147 A.D.3d 1021, 48 N.Y.S.3d 237, 240 (2d Dep't 2017) (citation omitted; emphasis in original).  The relevant provision here is entirely lacking in language manifesting an intention by Plaintiffs to make a present transfer of rights to NITA.

That absence is fatal to Plaintiffs' claim of a grant: "in the cases in which the agreement at issue was found to be a present assignment of a future interest, the agreement contained express language of present conveyance."  *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 296 (D. Del. 2006).  *See*, *e.g.*, *Vassilkioti v. CCS Int'l, Ltd.*, No. 98-4090, 2000 U.S. Dist. LEXIS 17776, at *7 (S.D.N.Y. Dec. 7, 2000) ("the Release on its face … does not contain language which can be read as a present transfer of Ross' copyright interest."); *Playboy Enters. v. Dumas*, 831 F. Supp. 295, 309 (S.D.N.Y. 1993) (in finding a check legend insufficient to meet the requirements of 17 U.S.C. § 204(a), "[t]he court also notes that there is no language of present

transfer in Legend A."); *Shiro v. Drew*, 174 F. Supp. 495, 498 (D. Me. 1959) ("There is nothing in its terms indicative of that manifestation of present surrender of control essential to an assignment.  Language of present transfer is wholly lacking.").

*Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148 (Fed. Cir. 2021), is instructive.  The issue before the Federal Circuit in *Omni MedSci* [6] was whether an agreement between a University of Michigan professor and the University "automatically and presently assigned legal title of [the professor's] inventions to [the University]."  *Id*. at 1151-1152.  The agreement read in relevant part:

> Patents and copyrights issued or acquired as a result of or in connection with administration, research, or other educational activities conducted by members of the University staff and supported directly or indirectly (e.g., through the use of University resources or facilities) by funds administered by the University regardless of the source of such funds, and all royalties or other revenues derived therefrom <u>shall be the property of the University</u>."

*Id*. at 1150 (emphasis added).  The Court found that the agreement did not constitute an assignment of the patent.  *Id*. (quotation marks omitted).  The Court reasoned that (1) the agreement did not "purport to effectuate the present transfer of a present or future right," *id*.; (2) the language "shall be the property of," read in context, must be understood as "a statement of an intended outcome rather than a present assignment," *id*.; and (3) the agreement did not "use present tense words of execution.  <u>Each case in which this court found a present automatic</u>

---

[6] *Omni MedSci* is a patent case.  However, "[i]t is 'appropriate to refer' to patent cases when conducting an analysis under the Copyright Act due to 'the historic kinship between patent law and copyright law.'"  *Ass'n of Am. Med. Colls. v. Carey*, 728 F. Supp. 873, 880 n.6 (N.D.N.Y. 1990) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984)).  *See, e.g.*, *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1371 (Fed. Cir. 2008) ("the term 'sale' should be interpreted consistently in copyright and patent law."); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 888 (9th Cir. 2005) ("We should interpret the Copyright Act consistently with the requirements of the Patent Act.").

13

assignment <u>examined contractual language with a present tense executing verb</u>."  *Id*. at 1153 (emphasis added).  Accordingly, "[t]he absence [of such a verb] is a substantive indication that a present automatic assignment was not intended."  *Id*. at 1156.

The language here – "As between [NITA] and Artist, [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein" – is similarly lacking a present tense executing verb, or any active verbal expression of present execution or language of present transfer.  Indeed, while the Court need not resolve on this motion the issue of whether the Sound Recordings are works made for hire, the language "shall be the sole and exclusive owner" and language of similar import is almost invariably found where the parties' intent is to create a work made for hire.  *See*, *e.g.*, *Caffey v. Cook*, 409 F. Supp. 2d 484, 490 (S.D.N.Y. 2006) (defendants have no rights to their creative contributions where agreement provides "Producer shall be the sole and exclusive owner of all results and proceeds of Artist's performance services hereunder … as a work-made-for-hire"); *MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*, No. 03-8103, 2004 U.S. Dist. LEXIS 29562, at *3-4 (C.D. Cal. Feb. 11, 2004) ("the Agreement acknowledges that MGM is and shall be the sole and exclusive owner of all rights of every kind and nature in and to and with respect to the Barbershop screenplay and motion picture."); *Niss v. Columbia Pictures*, No. 97-4636, 2000 U.S. Dist. LEXIS 18328, at *9 (S.D.N.Y. Dec. 20, 2000) ("The ownership of work clause provided, among other things, that MGM, 'as employer of the writer, shall be the sole and exclusive owner of the work'").  Accordingly, nothing in the NITA Personal Services-Production Agreement manifests an intention by the parties to effect a present transfer of copyright rights from Plaintiffs to NITA.

In a desperate attempt to rectify this obvious deficiency, the FAC now also alleges that the inducement letter attached to the Next Plateau Distribution Agreement constituted a grant of copyright rights from Plaintiffs to Next Plateau. *See* FAC ¶¶ 50-52 ("Through the 1986 Inducement Letter, [Plaintiffs] personally and individually granted to Next Plateau Records the sound recording copyrights at issue."). However, this newfound alleged grant never references any copyright rights and simply contains "belt-and-suspenders" language in which Plaintiffs guaranteed the performance of Producer, the signatory to the agreement:

> I hereby specifically guarantee the performance by Producer of all the warranties and representations and covenants made in [the Next Plateau Distribution Agreement]. I hereby make all of the warranties and representations made to [Next Plateau] in [the Next Plateau Distribution Agreement], grant [Next Plateau] all of the rights and remedies therein granted to [Next Plateau][7] and agree to perform all of the obligations therein undertaken to be performed for [Next Plateau] and undertake to be bound thereby as though [each] was a party to said agreement.

FAC Ex. B (ECF No. 30-2 at p. 23).

Plaintiffs' counsel attempted this same tactic on behalf of the plaintiffs in *Waite II*, seeking to amend the complaint following the original dismissal of their declaratory judgment claim to allege "direct, personal grants of copyright" contained in inducement letters and declarations attached to third-party contracts. 477 F. Supp. 3d at 271. The Court squarely rejected the proposed amendment as futile: "[T]he agreements at issue were between the recording company and the third party. And therefore it was the third party, not the artist, that

---

[7] The only grant of copyright rights by Producer in the Next Plateau Distribution Agreement is to the preexisting recordings. Given that Producer owned those rights and conveyed them to Next Plateau in the agreement, the inducement letter only served to confirm that conveyance and did not (and could not) itself constitute a conveyance.

granted the transfer of copyright." *Id.* at 272 (emphasis in original).[8]

The same result follows here. The relevant agreement here is also between the record company and a third party, Plaintiffs' producer (*i.e.*, the "Producer" under that agreement), and all the rights acquired by the record company flow from its contractual arrangement with that third party Producer. Indeed, if anything, Plaintiffs' arguments here are even weaker than in *Waite II*, because the supposed "grant" on which Plaintiffs rely does not even specifically reference copyright rights. Instead, it refers in general terms to any "rights and remedies" granted by Producer, with Plaintiffs simply joining in such grant as part of a provision guaranteeing Producer's performance and Producer's representations and warranties.

Perhaps most significantly, those very representations and warranties in which Plaintiffs join as part of the same clause at issue confirm that Plaintiffs are <u>not</u> the copyright owners of any sound recordings. Thus, as to the sound recordings on the pre-existing *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums, the Next Plateau Distribution Agreement contains a warranty and representation from the Producer that he "is the sole and exclusive owner" of the recordings and "all right, title and interest therein." FAC Ex. B ¶ 3(c). Plaintiffs having guaranteed that representation and warranty, they necessarily acknowledged that they had no rights in such

---

[8] The *Waite* plaintiffs "cite[d] to provisions of the letters in which Ely and Waite agreed to ensure that the recording companies maintained the privileges and benefits as set forth in the original agreements in the event that the loan-out [or production] companies … were no longer entitled to the artists' services." *Waite II*, 477 F. Supp. 3d at 272. The Court held that "[e]ven viewed in the light most favorable to plaintiffs, this is not an allegation that Waite or Ely made any direct grant of their copyrights at the time the inducement letters were signed. Rather, it was a promise of future actions if certain contingencies came to pass." *Id.* In addition, the Court was not swayed that there was a copyright grant where one of the *Waite* plaintiffs relied on an exhibit to the relevant contracts in which he agreed that "to the extent, if any, that [he] may be deemed an 'author' of any Work, [he] grant[s] and assign[s] to [the recording company] all exclusive right, title and interest in and to such Work throughout the universe, including, but not limited to, all rights of the owner of copyright specified in 17 U.S.C. § 106." *Id.* at 272 (alterations in original).

sound recordings to grant.  Accordingly, their belt-and-suspenders "grant" of "all rights granted" to Next Plateau by Producer as part of the inducement letter was not a terminable grant of copyright rights.  *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013) (rejecting reliance on "belt and suspenders" assignment language as putative support for a termination claim while noting that the "assignments … were redundancies insisted upon by Marvel to protect its rights" and "declin[ing] to infer from Marvel's suspenders that it had agreed to give Kirby its belt."); *Waite II*, 477 F. Supp. 3d at 272 ("Even viewed in the light most favorable to plaintiffs," their reliance on inducement letters did not allege any "direct grant of their copyrights at the time the inducement letters were signed.").

And as to future recordings to be created pursuant to the Next Plateau Distribution Agreement, the representations, warranties and covenants made by Producer, and underlined(guaranteed by Plaintiffs) in the inducement letter, include that Next Plateau, and not Plaintiffs, would be the legal author of the Sound Recordings, and as such would own the copyright in the Sound Recordings from the moment they were created.  FAC Ex. B ¶ 5.  Having represented and warranted that Next Plateau was the author and initial copyright owner of the Sound Recordings, Plaintiffs could not in that very same provision be granting copyright rights by virtue of their generic "grant" of "all rights" granted to Next Plateau under the Next Plateau Distribution Agreement.

The relevant contractual language in both the NITA Personal Services-Production Agreement and the Next Plateau Distribution Agreement provides conclusive evidence that there was never an intention to effectuate a copyright transfer from Plaintiffs to NITA or Next Plateau. The only transfer to be found is made by Producer, as the copyright owner of the Sound Recordings on the *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums, to Next Plateau.

*See* FAC Ex. B ¶ 3(c).  Because that is not a grant subject to termination by Plaintiffs, Plaintiff's declaratory judgment claim as to the validity of their termination of purported grants concerning the Sound Recordings should be dismissed.  *See Waite*, 450 F. Supp. 3d at 441-42.

## II.    The Remixed Sound Recordings Are Derivative Works Not Subject to Termination

The Copyright Act provides that the owner of copyright in a sound recording has the exclusive right to prepare derivative works "in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality."  17 U.S.C. § 114(b).  The Copyright Act provides further that, notwithstanding termination of a grant, derivative works prepared under authority of the grant before termination may continue to be utilized under the terms of the grant after termination.  17 U.S.C. § 203(b)(1).

With respect to any Sound Recordings that are remixes, the Notice is invalid and ineffective for the additional reason that those remixed Sound Recordings are derivative works of preexisting sound recordings.  As the U.S. Copyright Office instructs:

> A derivative sound recording is one that incorporates some preexisting sounds that were previously registered or published …. The preexisting recorded sounds must have been rearranged, remixed, or otherwise altered in sequence or character, or there must be some additional new sounds. Further, the new or revised sounds must contain at least a minimum amount of original sound recording authorship.  This new authorship is the basis for the copyright claim.

U.S. Copyright Office Circular 56.  "Examples of derivative sound recordings that generally can be registered include … a remix from multitrack sources."  *Id.*

The Ninth Circuit adopted the reasoning of Circular 56 in drawing a distinction between *remastered* recordings, which it found ineligible for copyright protection, and *remixed* recordings, which alter the sounds and thus qualify as derivative works:

> If an allegedly derivative sound recording does not add or remove any sounds
> from the underlying sound recording, does not change the sequence of the
> sounds, and does not remix or otherwise alter the sounds in sequence or
> character, the recording is likely to be nothing more than a copy of the
> underlying sound recording and is presumptively devoid of the original
> sound recording authorship required for copyright protection.

*ABS Entm't v. CBS Corp.*, 908 F.3d 405, 417-18 (9th Cir. 2018).

In their initial Complaint Plaintiffs freely acknowledged that a substantial number of the

Sound Recordings at issue, including the most successful and valuable Sound Recording, are

remixes:

> "Push It" was subsequently remixed by a San Francisco DJ named
> Cameron Paul. This remix of "Push It" was ultimately added to a 1987
> rerelease of the album *Hot, Cool & Vicious*, along with remixes of
> "Tramp" and "Chick on the Side" which replaced those sound recordings
> on the original 1986 album. … "Push It" quickly became a global
> phenomenon achieving unprecedented commercial success. Among other
> things, it was nominated for a Grammy Award and became Salt-N-Pepa's
> first platinum single in the United States.

Complaint (ECF No. 1) ¶¶ 51-52; *see id.* at ¶ 54(d) (listing remixes contained on the album *A*

*Blitz of Salt-N-Pepa Hits*: (i) "Push It (U.K. Remix)," (ii) "Expression (Brixton Remix)," (iii)

"Independent (Brixton Remix)," (iv) "Shake Your Thang (Hurvy Luv Bug Re-Edit)," (v) "Get

Up Everybody (Get Up) (Steevee-O Re-Edit)," (vi) "Tramp (Hurvy Luv Bug Remix)," (vii) "My

Mic Sounds Nice (D.J. Mark The 45 King Remix)," (viii) "I Gotcha (Once Again) (Steevee-O

Remix)," (ix) "I'll Take Your Man (Quicksilver Re-Edit)," and (x) "It's Alright (Hurvy Luv Bug

Remix).").

While the FAC continues to acknowledge the existence of remixes (FAC ¶ 62(d)), it now

clumsily attempts to evade the effect of the derivative works exception raised in UMG's first

motion to dismiss with new allegations made "on information and belief":

> Upon information and belief, "Push It" was subsequently <u>given radio play</u>
> <u>time</u> by a San Francisco DJ named Cameron Paul. Plaintiffs also began to

perform 'Push It' it (*sic*) for fans to great effect.  Upon information and belief, UMG (*sic*) sought to capitalize on the song's growing popularity by adding <u>what it called a 'remix'</u> of "Push It" to a 1987 rerelease of the album *Hot, Cool & Vicious*, along with 'remixes' of 'Tramp' and 'Chick on the Side'….  Critically, upon information and belief, the 'remixes' of Plaintiffs' sound recordings and, in particular, of 'Push It' are not original, independently copyrightable works and the 'remixes' do not contain substantive copyrightable variations – i.e., there is no original, substantial variation between the versions of these sound recordings that Plaintiffs originally authored, released and/or performed and the versions that were re-released characterized as 'remixes.'

FAC ¶ 58. (emphases added); *see also id*. ¶ 62(d) n. 3.  Leaving aside the incongruity and dishonesty of Plaintiffs' eleventh-hour assertion that the registered copyrights in some of the most valuable Sound Recordings are invalid, Plaintiffs' newfound "information and belief" allegations, unsupported by any plausible facts, are not sufficient to overcome the presumption of copyright validity afforded by the U.S. copyright registrations for the Sound Recordings, all of which are listed in the Notice.  FAC Ex. C pp. 8-9.

The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright."  17 U.S.C. § 410(c); *Langman Fabrics v. Graff Californiawear*, 160 F.3d 106 (2d Cir. 1998).  A registration certificate "creates a rebuttable presumption that the work in question is copyrightable."  *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997).

Plaintiffs' transparently self-serving and conclusory allegations made "on information and belief" without any plausible basis cannot rebut the presumption of copyright validity based on the certificates of registration relied upon by Plaintiffs in their own Notice.  "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."  *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).  But

20

that is precisely what Plaintiffs have done.  They use formulaic labels and conclusions in pleading that the remixes "are not original, independently copyrightable works" and "do not contain substantive, copyrightable variations."  However, they notably fail to allege that the remixes do not alter the sounds of the original recordings, which is all that is necessary to create a copyrightable derivative work.  This omission (as well as the reliance on "information and belief" pleading) is particularly telling, because the relevant information is clearly within Plaintiffs' own knowledge.  Plaintiffs obviously know whether and how their most iconic recording, "Push It," differs from the original version, and their "information and belief" allegations tracking the relevant legal language rather than any actual facts speaks volumes.

Under the Copyright Act, "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."  17 U.S.C. § 203(b)(1).  Accordingly, even if Plaintiffs had executed grants of copyright rights in the Sound Recordings that are the subject of the Notice, and even assuming that the Notice were otherwise valid, UMG's ownership interest in the derivative remixed Sound Recordings would not be subject to termination.  Under § 203(b)(1), UMG would retain the right to continue to utilize the remixed Sound Recordings, as derivative works prepared under the authority of the grant, for the entire term of copyright.  Accordingly, the Court should dismiss Plaintiffs' declaratory relief claim to the extent that it seeks termination with respect to any remixed Sound Recordings.

## III.    Plaintiffs Fail to State a Conversion Claim Under New York Law

Plaintiffs' rejiggered conversion claim fares no better than their withdrawn claim of conversion of intangible property.  Recognizing the latter was clearly preempted and contrary to New York law, Plaintiffs seek somehow to preserve a basis for damages and a jury trial by now

21

claiming that UMG converted the "two-inch master tapes embodying the master sound recordings," FAC ¶ 6 (the "Master Tapes"), as to three albums, namely, *Hot, Cool & Vicious*, *A Salt With a Deadly Pepa*, and *Blacks' Magic*.[9]  Plaintiffs' theory appears to be that, when a termination notice becomes effective, the terminating party is entitled not only to the reversion of the U.S. copyright rights, but also to ownership and possession of physical media in which the copyrighted work is embodied.  *See, e.g.*, FAC ¶ 100 ("The rights to those sound recordings [in the album *Blacks' Magic*] should have automatically been reverted back to Plaintiffs as of the effective date of termination, together with the accompanying Master Tapes."); ¶ 101 ("The rights to those sound recordings should automatically revert back to Plaintiffs upon those effective dates of termination.  In addition, the accompanying Master Tapes should be returned to Plaintiffs.").

Plaintiffs' conversion claim fails for multiple reasons.  First, Plaintiffs have failed to allege that they own, or have a right to possess, the Master Tapes.  As shown below, UMG's chain of title to the Master Tapes is clear.  Second, Plaintiffs have failed to allege any intervening action that would vest ownership of the Master Tapes in Plaintiffs.  Third, Plaintiffs' conversion claim further fails because Plaintiffs have never demanded the return of the Master Tapes from UMG and, indeed, never even asserted a right to the Master Tapes until the FAC.

---

[9] Although Plaintiffs do not specify which Master Tapes have been allegedly converted by UMG, they acknowledge that their conversion claim has not accrued as to *all* the Master Tapes by noting that "Plaintiffs' claims for conversion will only expand … [a]s each effective date of termination passes."  FAC ¶ 146.  Thus, Plaintiffs admit that their putative conversion claim has accrued only as to the Master Tapes for the three albums whose purported termination dates have passed.  In any event, since the fundamental deficiencies dooming the conversion claim apply to the Master Tapes for all the Sound Recordings, all the Master Tapes may be treated together for purposes of this motion.

### A.    Plaintiffs Fail to Show Ownership or Right to Possession of the Master Tapes

"Under New York law, '[i]n order to establish a cause of action to recover damages for conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights.'" *Advanced Knowledge Tech., LLC v. Fleitas*, No. 21-992, 2021 U.S. Dist. LEXIS 247723, at *16 (S.D.N.Y. Dec. 28, 2021) (quoting *World Ambulette Transp. v. Kwan Haeng Lee*, 161 A.D.3d 1028, 1030-31, 78 N.Y.S.3d 137 (2d Dep't 2018)).

Here, Plaintiffs fail to plead that they have legal ownership or even a superior right of possession to any of the Master Tapes. The relevant agreements could not be clearer that Producer agreed to deliver the Master Tapes to Next Plateau, which would own such Master Tapes, and that Plaintiffs guaranteed Producer's performance of those obligations and covenants. Paragraph 9(a) of the Next Plateau Distribution Agreement specified Producer's obligation with respect to delivery of the Master Tapes to Next Plateau:

> Producer shall deliver to [Next Plateau] a monaural tape and two-track stereo tape for each Side produced hereunder, which tapes shall be fully edited, mixed and leadered prior to delivery to [Next Plateau], so that they are in a proper form for the production of parts necessary for the manufacture of commercial phonograph records. Each and every original session tape and part thereof, and each and every mother, Side, acetate copy or other derivative shall also be delivered to [Next Plateau] or kept available for [Next Plateau] and subject to [Next Plateau's] control at the recording studio.

FAC Ex. B ¶ 9(a).

Beyond this express acknowledgement of Next Plateau's right of possession and "control" over the Master Tapes, paragraph 5 of the Next Plateau Distribution Agreement further confirms Next Plateau's ownership of the Master Tapes:

23

> All Sides recorded during the Term shall be recorded by Producer on [Next Plateau's] behalf and <u>all records made therefrom</u>, together with the performances embodied therein, <u>shall, from the inception of their creation, be entirely the property of [Next Plateau] in perpetuity, throughout the [world]</u>, free of any claim whatsoever by Producer, Artist or by any persons deriving any rights or interests from Producer or Artist… <u>[Next Plateau] (and its Licensees) shall have the sole and exclusive right to use the Sides throughout the [world]</u> or any part thereof <u>in any manner it sees fit</u> ….

*Id*. ¶ 5 (emphasis added); *see also id*. ¶ 3(c) (transferring "all … right, title and interest" to the pre-existing recordings and deeming them to have been recorded in accordance with the Next Plateau Distribution Agreement).  The contractual definition of "Side" specifically identifies them as the physical material embodying the recordings which are used to manufacture records. *Id*. ¶ 1 (a) ("'Side' means the equivalent of a 7 inch, 45 rpm single-sided recording embodying the recorded performances of the Artist and intended for use in the manufacture and sale of phonograph records.").  Because Next Plateau controlled and owned the Master Tapes, and Plaintiffs guaranteed Producer's performance of such arrangements in the inducement letter, Plaintiffs are not the owner of the Master Tapes.[10]

Plaintiffs' conclusory allegation that they are the "true owners" of the Master Tapes (FAC ¶ 99) may be disregarded because they have pled no plausible facts to support such allegation, which is directly contradicted by the documents that they attach to their pleading. *See*, *e.g.*, *Radio Today, Inc. v. Westwood One, Inc.*, 684 F. Supp. 68, 69 n.1 (S.D.N.Y. 1988) (to the extent there may be any contradiction between the text of [a] Complaint and [an] agreement, the agreement controls.").  Plaintiffs' allegations that they "record[ed]" or "created" the Master

---

[10] It should also be noted that consistent with the Producer's obligation to deliver the Master Tapes to Next Plateau, the NITA Personal Services-Production Agreement also specifies that Producer is "the sole and exclusive owner of <u>any and all rights, title and/or interest</u> in and to the <u>master recordings</u> recorded hereunder."  FAC, Ex. A, § H (emphasis added).  The broad language, which includes, but is not limited to, the copyright, encompasses the Master Tapes.

24

Tapes (*see* FAC ¶¶ 56, 62, 71, 73), which seem to mean nothing more that they performed on the recordings, do not explain why that gives them any basis to own or have a right to possess the Master Tapes.  Because Plaintiffs do not own any right, title or interest in or to the Master Tapes, they fail to satisfy the first element of a conversion claim, namely "legal ownership or an immediate superior right of possession to" the Master Tapes.  *Advanced Knowledge Tech.*, 2021 U.S. Dist. LEXIS 247723, at *16 (quotations and citation omitted).

### B.    Plaintiffs' Termination Notices Do Not Extend to the Physical Master Tapes

Plaintiffs effectively argue that, as the termination notice for each Sound Recording allegedly becomes effective, Plaintiffs are entitled not only to the reversion of the U.S. copyright interest in the Sound Recordings, but to possession of the physical Master Tapes on which the Sound Recordings are embodied.  FAC ¶¶ 98-103.

Plaintiffs' claim has no basis in the Copyright Act, which states that "[o]wnership of a copyright … is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202; *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.*, No. 87-5775, 1989 U.S. Dist. LEXIS 11588, at *2 (S.D.N.Y. Oct. 2, 1989) (Section 202 "makes plain that the ownership of a copyright is distinct from ownership of any material object embodying the work…."); *see also Cmty. for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1495 (D.C. Cir. 1988) ("Because material object and copyright do not travel together unless the parties so arrange, Reid's transfer of the 'Third World America' figures to CCNV left copyright ownership of the work unaffected.").

The Copyright Act is clear that only the "grant of a transfer or license of *copyright* or of any right *under a copyright* … is subject to termination" under Section 203.  17 U.S.C. § 203(a) (emphases added).  *See also Waite*, 450 F. Supp. 3d at 432 ("Section 203 of the Copyright Act of

1976 established a limited opportunity for artists to terminate the *copyright ownership* that they had granted to commercializers decades earlier…. The idea was that termination of *these rights* would more fairly balance the allocation of the benefits derived from the artists' creativity.") (emphases added).

Accordingly, and fatally for their conversion claim, Plaintiffs fail to plead any basis by which ownership of the Master Tapes somehow allegedly switched from UMG to Plaintiffs. As a result, Plaintiffs also cannot establish the second element of conversion, namely, that UMG "exercised an unauthorized dominion over" the Master Tapes "to the exclusion of [Plaintiffs'] rights." *Advanced Knowledge Tech.*, 2021 U.S. Dist. LEXIS 247723, at *16.

### C.    Plaintiffs' Conversion Claim Further Fails Because They Never Demanded the Master Tapes from UMG

Even if Plaintiffs could otherwise plead the required elements of a conversion claim, their claim would nevertheless fail because they never demanded the return of the Master Tapes. "'[I]t is well settled that, where the original possession is lawful, a conversion does not occur until after a demand and refusal to return the property.'" *WSP United States Corp. v. Marinello*, 2013 U.S. Dist. LEXIS 178419, at *18 (S.D.N.Y. Dec. 18, 2013) (quoting *D'Amico v. First Union Nat'l Bank*, 728 N.Y.S.2d 146 (1st Dep't 2001)) (alteration in original). *See also Peters Gallery of N.Y., Inc. v. Weiant*, No. 23-3181, 2025 U.S. Dist. LEXIS 148385, at *16 (S.D.N.Y. Aug. 1, 2025) ("Absent other wrongful conduct, it is only 'demand-and-refusal' that 'changes the character of a good-faith possession before an action for conversion or recovery of a chattel can be maintained.'") (quoting *Songbyrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 183 (2d Cir. 2000)).

Plaintiffs do not and cannot contest that UMG's original ownership of the Master Tapes was lawful. Plaintiffs were thus required to make a demand for the Master Tapes before

26

bringing a conversion claim.  Here, Plaintiffs do not allege that they made *any* demand for the

return of the Master Tapes.  At no point prior to the filing of the FAC did Plaintiffs even hint that

they wanted anything from UMG other than termination of their alleged copyright grants in the

Sound Recordings.  The Notice they sent certainly never mentioned the Master Tapes, nor did

their pre-litigation correspondence or their original Complaint.  Because Plaintiffs failed to

comply with the demand requirement of a conversion claim, the claim fails for this additional

reason.

### IV.    The Court Should Stay Discovery Pending Disposition of the Motion to Dismiss

"Under Federal Rule of Civil Procedure 26(c), a court has discretion to stay discovery

'for good cause.'  'Good cause may be shown where a party has filed a dispositive motion, the

stay is for a short period of time, and the opposing party will not be prejudiced by the stay.'"

*Boelter v. Hearst Communs., Inc.*, No. 15-3934, 2016 U.S. Dist. LEXIS 12322, at *13 (S.D.N.Y.

Jan. 28, 2016) (citation omitted).  In determining whether a stay of discovery is appropriate, "a

court should consider the breadth of discovery sought and the burden of responding to it, as well

as the strength of the underlying motion."  *Id*. (internal quotation marks omitted).  The relevant

factors here weigh in favor of granting a stay.

First, the discovery here will require significant effort because the relevant events trace

back many decades, including various contractual arrangements dating back almost forty years.

Simply determining whether relevant documents still exist and locating potential witnesses with

firsthand knowledge of the facts will require considerable time and resources, as the individuals

who were involved in the transactions are not employed by UMG.  In addition, Plaintiffs'

conversion claim, which fails under New York law, would open up additional discovery into

UMG's exploitation of the works in question and related financial discovery.  Given these

burdens, a stay of discovery is appropriate.  *See id*. at *14 (granting stay motion given broad discovery and time period covered); *see also Hong Leong Fin. Ltd. (Sing.) v. Pinnacle Performance, Ltd.*, 297 F.R.D. 69, 75 (S.D.N.Y. 2013) (engaging in discovery "would create a significant burden on defendants in the face of a seemingly strong motion to dismiss"); *Gandler v. Nazarov*, No. 94-2272, 1994 U.S. Dist. LEXIS 17885, at *12 (S.D.N.Y. Dec. 14, 1994) ("[B]ecause the adjudication of the potential motion to dismiss might avoid the need for costly and time-consuming discovery, all discovery in this case is hereby stayed pending resolution of defendant's motion to dismiss.").

A stay will not cause prejudice.  UMG's motion potentially disposes of the entire action. *See*, *e.g.*, *Spencer Trask Software & Info. Servs. v. RPost Int'l*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) ("A stay pending determination of a dispositive motion that potentially eliminates the entire action will neither substantially nor unduly delay the action, should it continue."). Moreover, the Court's rules contemplate speedy resolution of motions.  *See* Judge Cote's Individual Practices in Civil Cases, 4G ("If a motion is not decided within 60 days of the time that it has become fully briefed, counsel for the movant shall send a letter to alert the Court."). Accordingly, the short delay required to permit the Court to determine whether Plaintiffs' claims have any merit will not unduly prejudice the parties.[11]

Finally, in analyzing the appropriateness of a stay, "courts examine … the strength of the dispositive motion that is the basis for the discovery stay application."  *Anti-Monopoly, Inc. v.*

---

[11] And even if the Court only dismisses the conversion claim, that will simplify and shorten discovery by eliminating any discovery into UMG's exploitation of the works and related financial issues.  *See*, *e.g.*, *Spinelli v. NFL*, No. 13-7398, 2015 U.S. Dist. LEXIS 155816, at *5 (S.D.N.Y. 2015) ("A stay may also have the advantage of simplifying and shortening discovery in the event that some of Plaintiffs' claims are dismissed and others survive, by limiting the scope of the parties' inquiry to claims that have been established as potentially viable.").

*Hasbro, Inc.*, No. 94-2120, 1996 U.S. Dist. LEXIS 2684, at *10 (S.D.N.Y. Mar. 7, 1996).  Here,

UMG has submitted a well-grounded dispositive motion on Plaintiffs' declaratory relief claim

supported by a recent decision from this Court dismissing similar claims under similar facts.  *See*

*Waite*, 450 F. Supp. 3d at 441.  Moreover, UMG has also cited controlling authority

demonstrating the futility of Plaintiffs' conversion claim.  Because UMG's motion provides

"substantial arguments for dismissal," the Court should grant the motion to stay while it

considers such arguments.  *Pinnacle*, 297 F.R.D. at 72; *Spencer Trask Software*, 206 F.R.D. at

368 ("[B]ased on the papers submitted and upon oral argument from counsel, the Court notes at

this preliminary stage that defendants do appear to have substantial arguments for dismissal of

many, if not all, of the claims asserted in this lawsuit.").

## **CONCLUSION**

For the forgoing reasons, UMG respectfully requests that the Court dismiss the FAC with

prejudice and stay discovery pending resolution of the motion to dismiss.

Dated:  New York, New York
       August 22, 2025

Respectfully submitted,

COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____
      Richard S. Mandel (rsm@cll.com)
      Thomas Kjellberg (txk@cll.com)
      Dasha Chestukhin (dxc@cll.com)
114 West 47th Street
New York, New York 10036-1525
(212) 790-9200

*Attorneys for Defendant UMG Recordings, Inc.*

## <u>CERTIFICATE OF WORD COUNT</u>

Richard S. Mandel, a member of the bar of this Court, hereby certifies pursuant to Local

Civil Rule 7.1(c) that the Memorandum of Law in Support of Defendant UMG Recordings,

Inc.'s Motion to Dismiss the FAC complies with the word count limitations in Local Civil Rule

7.1(c) and has a final word count of 8,518 words.

_____
RICHARD S. MANDEL