**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHERYL JAMES and SANDRA DENTON, p/k/a SALT-N-PEPA,<br><br>Plaintiffs,<br><br>v.<br><br>UMG RECORDINGS, INC., a Delaware corporation doing business as Universal Music Group,<br><br>Defendant. | Case No. 1:25-cv-04182-DLC |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT PURUSANT TO RULE 12(B)(6) AND FOR A STAY OF DISCOVERY PURUSANT TO RULE 26(C)**

Dated: September 12, 2025

**BLANK ROME LLP**

Heidi G. Crikelair
Roy W. Arnold (Pro Hac Vice)
David M. Perry (Pro Hac Vice)
Jillian M. Taylor (Pro Hac Vice)
1271 Avenue of the Americas
New York, NY 10020
Telephone (212) 885-5000

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     RELEVANT FACTS ..................................................................................... 2

        A.      Salt-N-Pepa ................................................................................... 2

        B.      Plaintiffs, as the Authors, Personally Grant the Copyrights ................................... 3

        C.      Section 203 of the Copyright Act ........................................................... 3

        D.      Plaintiffs Exercise Their Section 203 Rights. ........................................... 4

III.    LEGAL STANDARD .................................................................................. 5

IV.     PLAINTIFFS STATE A PLAUSIBLE CLAIM PURSUANT TO SECTION 203 ........... 6

        A.      Plaintiffs Personally Executed Terminable Grants. .............................. 6

        B.      Defendant Cannot Establish that the Sound Recordings Were
                "Works-Made-for-Hire" on this Motion to Dismiss. ............................... 14

        C.      Defendant Cannot Establish that Any of the Sound Recordings are
                "Derivative Works" on a Motion to Dismiss. ....................................... 17

V.      PLAINTIFFS STATE A PLAUSIBLE CLAIM FOR CONVERSION .......................... 22

VI.     CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Lab'ys v. Adelphia Supply USA*,
  No. CV20155826CBAMDG,
  2016 WL 4148323, at *1 (E.D.N.Y. Aug. 4, 2016)...............................................................25

*Affymetrix, Inc. v. Illumina, Inc.*,
  446 F. Supp. 2d 292 (D. Del. 2006).......................................................................................8

*Agee v. Paramount Commc'ns, Inc.*,
  59 F.3d 317 (2d Cir. 1995)....................................................................................................17

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)..................................................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................5

*Ballas v. Tedesco*,
  41 F. Supp. 2d 531 (D.N.J. 1999) .........................................................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................................5, 20

*Biro v. Conde Nast*,
  807 F.3d 541 (2d. Cir. 2015)...................................................................................................5

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
  342 F.3d 149 (2d Cir. 2003)..................................................................................................19

*Caffey v. Cook*,
  409 F. Supp. 2d 484 (S.D.N.Y. 2006)...................................................................................16

*Champlin v. Music Sales Corp.*,
  604 F. Supp. 3d 224 (S.D.N.Y. 2022).............................................................................23, 24

*Citizens United v. Schneiderman*,
  882 F.3d 374 (2d Cir. 2018)..................................................................................................20

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730, 737 (1989)................................................................................................14, 16

*Deutsche Bank Nat. Tr. Co. v. Romano*,
  147 A.D.3d 1021 (2d Dep't 2017) ..........................................................................................8

*Donaldson Pub. Co. v. Bregman, Vocco Conn, Inc.*,
  375 F.2d 639 (2d Cir. 1967)..................................................................................................15

*Douglas v. Abrams Child. Books*, No. 13-CV-2613 (VSB),
  2014 WL 12909009 (S.D.N.Y. Sept. 26, 2014) ...................................................................22

*Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*,
  936 F.3d 69 (2d Cir. 2019)....................................................................................12

*Erickson v. Pardus*,
  551 U.S. 89 (2007)................................................................................................5

*Feld v. Feld*,
  279 A.D.2d 393 (2001) .......................................................................................23

*Fonar Corporation v. Domenick*,
  105 F.3d 99 (2d Cir. 1997)..................................................................................20

*Horror Inc. v. Miller*,
  15 F.4th 232 (2d Cir. 2021) ................................................................................12

*Kass v. Kass*,
  91 N.Y. 2d 554 (1998) ..........................................................................................7

*Langman Fabrics v. Graff Californiawear, Inc.*,
  160 F. 3d 106 (2d Cir. 1998), *amended*, 169 F. 3d 782 (2d Cir. 1998) ................20

*Locus Techs. v. Honeywell Intl Inc.*,
  632 F. Supp. 3d 341, 353 (S.D.N.Y. 2022)..........................................................14

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
  Contemporary Dance, Inc.*,
  224 F.Supp. 2d 567, 586 (S.D.N.Y. 2002) *aff'd in part, vacated in part*,
  380 F.3d 624 (2d Cir. 2004)................................................................................19

*Marvel Characters, Inc. v. Kirby*,
  726 F.3d 119 (2d Cir. 2013)...........................................................................12, 13

*Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*,
  290 F.3d 98 (2d Cir. 2002)..................................................................................16

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................5

*MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*,
  No. CV 03-8103 SJO, 2004 US Dist LEXIS 29562 (C.D. Cal. Feb. 11, 2004) ......16

*Niss v. Columbia Pictures Indus., Inc.*,
  No. 97 CIV. 4636 (LAP), 2000 WL 1862814 (S.D.N.Y. Dec. 20, 2000), *aff'd*,
  25 F. App'x 76 (2d Cir. 2002) .............................................................................16

*Omni MedSci, Inc. v. Apple Inc.*,
  7 F.4th 1148 (Fed. Cir. 2021) ......................................................................8, 9, 10

*Papa's-June Music, Inc. v. McLean*,
  921 F. Supp. 1154 (S.D.N.Y. 1996).......................................................................7

*Playboy Enters., Inc. v. Dumas*,
  831 F. Supp. 295 (S.D.N.Y. 1993) ...................................................................9, 10

*Polanco v. NCO Portfolio Mgmt., Inc.*,
  132 F. Supp. 3d 567 (S.D.N.Y. 2015)..................................................................23

*Regions Bank v. Wieder & Mastroianni, P.C.*,
　526 F. Supp. 2d 411 (S.D.N.Y. 2007), *aff'd*,
　268 F. App'x 17 (2d Cir. 2008) ........................................................................22

*Riley v. Cnty. of Broome*,
　95 N.Y.2d 455 (2000) .........................................................................................6

*Shiro v. Drew*,
　174 F. Supp. 495 (D. Me. 1959) .......................................................................10

*Sporn v. MCA Recs., Inc.*,
　58 N.Y.2d 482 (1983) ........................................................................................22

*State v. Seventh Regiment Fund, Inc.*
　98 N.Y.2d 249, 260 (2002) ...............................................................................24

*Stern v. Lavender*,
　319 F. Supp. 3d 650 (S.D.N.Y. 2018).......................................................7, 11, 12

*Techniques, Inc. v. Rohn*,
　592 F. Supp 1195 (S.D.N.Y 1984) ....................................................................19

*Tempo Music, Inc. v. Famous Music Corp.*,
　838 F. Supp. 162 (S.D.N.Y. 1993) ....................................................................18

*Tomhannock, LLC v. Roustabout Res., LLC*,
　33 N.Y.3d 1080, 1082 (2019) ..............................................................................6

*Union v. Travelers Indem. Co.*,
　No. 89-CV-573, 1991 WL 64858, at *3, (N.D.N. Y Apr. 25, 1991) ....................25

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
　618 F.3d 417 (4th Cir. 2010), *as amended* (Aug. 24, 2010)....................................19

*Vargas v. Viacom Int'l, Inc.*,
　No. 18 CV. 474, 2018 WL 6920769 (S.D.N.Y. Nov. 30, 2018) ...........................8

*Vassilkioti v. CCS Int'l, Ltd.*
　No. 98-4090, 2000 U.S. Dist. LEXIS 17776 (S.D.N.Y. Dec. 7, 2000) ..................9

*Waite v. UMG Recordings, Inc.*,
　450 F. Supp. 3d 430 (S.D.N.Y. 2020).......................................................1, 6, 13

*Waite v. UMG Recordings, Inc.*,
　477 F. Supp. 3d 265 (S.D.N.Y. 2020)................................................1, 8, 11, 13

*We Shall Overcome Found. v. The Richmond Org.*,
　221 F. Supp. 3d 396 (S.D.N.Y. 2016)................................................................19

*We Shall Overcome Found. v. The Richmond Org.*,
　No. 16cv2725, 2017 WL 3981311 (S.D.N.Y. Sept. 8, 2017) .............17, 18, 19, 21

*Woods v. Bourne Co.*,
　60 F.3d 978 (2d Cir. 1995)................................................................................18

**Statutes**

17 U.S.C. § 101............................................................................................12, 14, 15, 16, 21

17 U.S.C. § 203.......................................................................................................... *passim*

17 U.S.C. § 204(a) ..................................................................................................................7, 8

**Other Authorities**

H.R.Rep. No. 94-1476 (1976).............................................................................................6

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 2, 5, 16

Fed. R. Civ. P. 26(c) ...................................................................................................1, 25

United States Copyright Office, *Notices of Termination*
    https://www.copyright.gov/recordation/termination.html (last accessed Sept.
    4, 2025) ................................................................................................................4

Plaintiffs Cheryl "Salt" James ("James") and Sandra "Pepa" Denton ("Denton") (together, "Plaintiffs" or "Salt-N-Pepa"), hereby oppose the Motion to Dismiss pursuant to Rule 12(b)(6) and for a Stay of Discovery pursuant to Rule 26(c)[1] filed by Defendant UMG Recordings, Inc. ("UMG").

## I.    <u>PRELIMINARY STATEMENT</u>

UMG does not dispute having made hundreds of millions of dollars on a deal its predecessor struck with Salt-N-Pepa before Plaintiffs had become cultural and musical icons. Nor does UMG dispute that Section 203 of the Copyright Act ("Section 203") was intended to provide a mechanism for artists, like Plaintiffs, who had unequal bargaining power with a record label, to regain the copyrights in their work by providing authors with an inalienable termination right. UMG also does not dispute that Plaintiffs served notices of termination pursuant to Section 203 for the Sound Recordings or that UMG has refused to honor them. Finally, UMG does not dispute that it has ceased all exploitation of Salt-N-Pepa's catalogue in the United States—months before Salt-N-Pepa are inducted into the Rock & Roll Hall of Fame.

Nevertheless, relying heavily on Judge Kaplan's decisions in *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430 (S.D.N.Y. 2020) and *Waite v. UMG Recordings, Inc.*, 477 F. Supp. 3d 265, 272 (S.D.N.Y. 2020) ("*Waite II*"), UMG contends Plaintiffs never granted copyrights in **any** of the Sound Recordings and, as a result, have **no rights** under Section 203. Alternatively, UMG argues Section 203 does not apply because: (i) some Sound Recordings are allegedly derivative works, and/or (ii) the Sound Recordings were "works-made-for-hire." UMG also maintains Plaintiffs have no right to possess the Master Tapes embodying these Sound Recordings, which UMG insures and stores in its vault. UMG's arguments fail.

---

[1]    This is referred to herein as the "Motion" while the accompanying Memorandum of Law is referred to as "MOL."

UMG's argument that there is "no grant of copyright rights executed by Plaintiffs" not only eviscerates Section 203, but defies the plain language of the relevant agreements, which were **_personally executed by James and Denton_**. UMG's position is also undermined by its own actions. After all, if Plaintiffs have no plausible claim, there would have been no reason for UMG to cease commercial exploitation. UMG's alternative arguments regarding Plaintiffs' Section 203 claim—*i.e.*, that the Sound Recordings are purportedly "derivative" works and/or "works-made-for-hire"—ignore Plaintiffs' allegations and seek the improper adjudication of disputed fact issues on a Rule 12(b)(6) Motion. UMG's argument regarding Plaintiffs' conversion claim similarly ignores New York law and the standard applicable on this Motion. This Court should not deprive Plaintiffs of a damages claim to compensate Plaintiffs for the financial harm caused by UMG's heavy-handed tactics.

For these reasons, and those set forth below, Plaintiffs state plausible claims for relief and any stay of discovery is not only unwarranted but would be damaging to the value of Plaintiffs' catalogue. UMG's Motion should be denied.

## II.    RELEVANT FACTS

### A.    Salt-N-Pepa

Plaintiffs first met in 1985. First Amended Complaint ("FAC") ¶ 42. They initially performed under the name "Super Nature" but soon changed their name to "Salt-N-Pepa" and began an explosive rise to fame—going on to record and release some of the biggest hits of the 1980's and 1990's. *Id*. ¶¶ 43-44.

Later this year, Salt-N-Pepa will become the second female hip-hop artist/group to be inducted into the Rock & Roll Hall of Fame. *Id.* ¶ 82. Given their tremendous success and enduring popularity, Plaintiffs' catalogue is not only popular—but valuable. *Id.* ¶ 3.

**B.**      **Plaintiffs, as the Authors, Personally Grant the Copyrights.**

On May 15, 1986, Plaintiffs entered into a recording agreement with James' then-boyfriend, Herb Azor's, company, Noise in the Attic Productions, Inc. ("NITA") ("1986 NITA Agreement"') FAC, ¶ 45, Ex. A. The 1986 NITA Agreement contains a grant or transfer of rights *from Plaintiffs to NITA*, stating:

> **As between Company [NITA] and Artist**, Company shall be the sole and exclusive owner of **any and all rights, title and/or interest in and to the master recordings recorded hereunder**, **including but not limited to the worldwide sound copyrights therein** and the renewal rights thereto.

FAC, Ex. A, ¶ H (emphasis added).

On the same day, Azor executed a distribution agreement with UMG's predecessor, Next Plateau Records, Inc. ("NPR") ("1986 NPR Agreement"). FAC ¶ 49 & Ex. B. Critically, Plaintiffs *personally executed* an inducement letter alongside the 1986 NPR Agreement in which they *personally and directly granted NPR all of the same rights and remedies granted to NPR in the 1986 NPR Agreement* ("1986 Inducement Letter"). *Id.* ¶ 50.[2] Specifically, the 1986 Inducement Letter states that both James and Denton each **individually** "**hereby . . . grant [NPR] all of the rights** and remedies therein granted to [NPR]" in the 1986 NPR Agreement. *Id.* ¶ 51, Ex. B at pg. 23 ¶ 1 (emphasis added).

**C.**      **Section 203 of the Copyright Act**

Section 203 gives authors the right to terminate grants of copyrights they made in the past, stating, in relevant part:

> **(a)** Conditions for Termination.—**In the case of any work other than a work made for hire**, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or

---

[2]    For the sake of clarity, it should be noted that Paragraphs 50 and 51 of the First Amended Complaint contain a scrivener's error and any references therein to "NITA" should have been to "NPR."

> after January 1, 1978, otherwise than by will, **is subject to termination under the following conditions**:
>
> > **(1) In the case of a grant executed by one author, termination of the grant may be effected by that author** . . .

17 U.S.C. § 203(a)(1) (emphasis added). Section 203's purpose is "to protect authors and their heirs against unremunerative agreements by giving them an opportunity to share in the later economic success of their works by allowing authors or their heirs, during particular periods of time long after the original grant, to regain previously granted copyright or copyright rights."[3] Importantly, the express statutory language of Section 203 makes grants terminable "**notwithstanding any agreement to the contrary**." *Id*. § 203(a)(5) (emphasis added).

### D.    Plaintiffs Exercise Their Section 203 Rights.

On March 22, 2022, Plaintiffs served UMG with a Notice of Termination and submitted the same to be recorded. *Id.* ¶¶ 85-86. On May 10, 2022, a recordation specialist requested that the Notice of Termination be amended to specify all the effective dates of termination. *Id.* ¶ 87. On May 13, 2022, Plaintiffs submitted an Amended Notice of Termination with the requested information and served it on UMG ("Termination Notices"). *Id.* ¶ 88, Ex. E. The Termination Notices advised UMG that Plaintiffs were exercising their statutory rights and listed the effective termination dates of the copyrights for various sound recordings ("Sound Recordings"). *Id*., Ex. E.

To date, UMG has refused to honor Plaintiffs' vested statutory rights. *Id.* ¶ 91. Instead, on June 27, 2022, UMG sent a letter claiming the Termination Notices were "invalid and ineffective[.]" *Id.* ¶ 92, Ex. F. Critically, however, on May 15, 2024, *i.e*., the effective date of termination for several Sound Recordings, UMG halted commercial exploitation of those Sound

---

[3]    United States Copyright Office, *Notices of Termination* https://www.copyright.gov/recordation/termination.html (last accessed Sept. 4, 2025).

Recordings. *Id.* ¶ 93. Approximately two months later, on July 12, 2024, the parties entered into a Section 203 Exploitation Agreement whereby UMG contracted ***with Plaintiffs*** (not NITA, Azor or anyone else) to continue to exploit certain Sound Recordings while the parties attempted to resolve their dispute. *Id.* ¶ 95, Ex. G.

On April 1, 2025, Plaintiffs ended the Section 203 Exploitation Agreement. *Id.* ¶ 108, Ex. I. On April 10, 2025, UMG responded stating, among other things, that UMG "continu[es] to dispute the validity and effectiveness of the [Termination Notices]" and was "**ceasing all U.S. exploitation of the sound recordings at this time**." FAC, ¶ 109, Ex. J (emphasis added).

## III.    LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d. Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

Under Rule 12(b)(6), this Court must "accept [] all factual allegations [in the complaint] as true and draw [] all reasonable inferences in favor of the plaintiff[s]." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014) (alterations in original). "[D]ismissal is appropriate ***only*** where [plaintiffs] can prove ***no set of facts*** consistent with the complaint that would entitle them to relief." *Id.* (emphasis added). In sum, under notice pleading, plaintiffs need only give a defendant fair notice of plaintiffs' claims and the grounds upon which the claims rest. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). Plaintiffs have satisfied this burden.

## IV.  <u>PLAINTIFFS STATE A PLAUSIBLE CLAIM PURSUANT TO SECTION 203.</u>

"The primary consideration of courts in interpreting a statute is to 'ascertain and give effect to the intention of the Legislature[.]'" *Riley v. Cnty. of Broome*, 95 N.Y.2d 455, 463 (2000). As Judge Kaplan explained in *Waite*, Congress intended Section 203 to provide "singers, [and] musicians . . . . [who] tend to have little bargaining power" with a way to "terminate the copyright ownership that they had granted to commercializers decades earlier" since "when an artistic work turns out to be a 'hit,' the lion's share of the economic returns often goes to those who commercialized the works rather than to the artist who created them." 450 F. Supp. 3d at 432.[4] "The idea [behind Section 203] was that termination . . . would more fairly balance the allocation of the benefits derived from the artists' creativity." *Id*. To achieve this end, "**[t]ermination under Section 203 is available for all works 'executed by the author[.]**" *Waite*, 450 F. Supp. 3d, 434 (emphasis added); 17 U.S.C. § 203(a)(1).

Here, Plaintiffs, as the authors of the Sound Recordings, executed two agreements—***both of which contain terminable grants of copyrights***. Confronted with the fact that it may no longer be able to profit off of Plaintiffs' creativity and work, UMG asks this Court to ignore the plain language of the agreements, thereby denying Plaintiffs the relief to which they are entitled pursuant to Section 203. This Court should reject UMG's arguments and deny its Motion.

### A.  <u>Plaintiffs Personally Executed Terminable Grants.</u>

"The best evidence of what parties to a written agreement intend is what they say in their writing." *Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082 (2019). "Where the

---

[4]  According to the Congressional Record, the purpose of Section 203 was to protect authors and their heirs from "the unequal bargaining position of authors" in dealing with unpublished works, because of "the impossibility of [an author] determining [his or her] work's prior value until it has been exploited." H. R. Rep. No. 94-1476, at 124 (1976).

document makes clear the parties' over-all intention, courts examining isolated provisions 'should [] choose that construction which will carry out the plain purpose and object of the [agreement]'[.]" *Kass v. Kass*, 91 N.Y. 2d 554, 567 (1998). Critically, "[a] 'transfer of copyright ownership' is defined by the Copyright Act as 'an assignment, ..., or any other conveyance, ... of a copyright or of any of the exclusive rights comprised in a copyright.'" *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1158 (S.D.N.Y. 1996). "**Section 204(a) does not mandate a particular form of transfer document**." *Id.* (emphasis added). As this Court has explained, "[a] valid transfer of copyright does not require a particular form of document, *or [even] the use of the word 'copyright,' where there is other clear evidence of the parties' intentions*." *Stern v. Lavender*, 319 F. Supp. 3d 650, 675 n.17 (S.D.N.Y. 2018) (emphasis added). Here, the language in the relevant agreements and the parties' intentions could not be clearer.

The 1986 NITA Agreement states: "*NITA shall be the sole and exclusive owner of any and all rights*, title and/or interest in and to the master recordings recorded hereunder, *including but not limited to the worldwide sound copyrights therein and the renewal rights thereof*." FAC, Ex. A, ¶ H. Looking at the 1986 NITA Agreement as a whole, its "plain purpose and object" was enabling exploitation of the Sound Recordings. In furtherance of this purpose, Plaintiffs explicitly agreed they were each transferring "any and all" of their rights in the Sound Recordings "*including but not limited to the worldwide sound copyrights*" to NITA. *Id*. This transfer "is in writing and signed by the owner of the rights conveyed[.]" 17 U.S.C. § 204(a). Thus, the grant is terminable pursuant to Section 203. *Id*. § 203(a)(5).

In response, UMG argues that under "state contract law" the grant language fails to "manifest an intention to make a present transfer" of Plaintiffs' copyrights. MOL,11-13. Specifically, UMG contends the lack of a "present tense executing verb" is fatal to Plaintiffs'

position that they intended to (and did) transfer their copyrights to NITA. *Id.*, 13-14. This hyper-technical argument fails. In the first instance, as a practical matter, it undermines the purpose of Section 203 and unfairly penalizes artists Congress recognized had limited bargaining power in connection with negotiating contracts. More importantly, as noted above and ***as cases cited by UMG explain***, under New York law, there are no "special form[s] or language" or "prescribed formalities" needed to effectuate a transfer or assignment of rights. *See, e.g.*, *Deutsche Bank Nat. Tr. Co. v. Romano*, 147 A.D.3d 1021, 1023 (2d Dep't 2017); *Vargas v. Viacom Int'l, Inc.*, No. 18 CV. 474 (LLS), 2018 WL 6920769, at *4 (S.D.N.Y. Nov. 30, 2018) ("Courts have explained that, in order to constitute a valid assignment of rights under 17 U.S.C. § 204(a) of the Copyright Act, a qualifying writing ... need not contain an elaborate explanation nor any particular magic words, but must simply show an agreement to transfer copyright."). Further, cases UMG relies upon, including *Waite II*, explain that agreements found not to constitute assignments "contained language indicating that . . . . ***some further act was required***[.]" *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 296 (D. Del. 2006)  (emphasis added); *see also Waite II*, 477 F. Supp. 3d 265, 272 (S.D.N.Y. 2020) (concluding that agreements merely contained a promise of future actions ***if certain contingencies*** came to pass).

Indeed, this was a key issue in *Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148 (Fed. Cir. 2021), a patent case UMG claims is "instructive." MOL,13. In *Omni* a professor's employment agreement provided he would "abide by [the University's] bylaws[.]" 7 F.4th at 1150. Those bylaws, in turn, provided that "[p]atents and copyrights issued or acquired. . . by . . .  University staff . . . . *shall be the property of* the University" ***as long as certain conditions were met*** relating to things like the use of resources or funding. *Id*. While on a leave of absence to start a "Biomedical Laser Company" he "filed multiple provisional patent applications" which were "issued as

patents" after he had returned to the University. *Id*. The professor "assigned the patent rights" to Omni MedSci, Inc. ("Omni") and Omni subsequently sued Apple, Inc. ("Apple"), for patent infringement. *Id*. at 1150-51. Apple argued the bylaws had transferred legal title to the patents to the University. *Id*. at 1151. However, the Eastern District of Texas declined to find the bylaws operated as a "present automatic assignment of title" in the patents. *Id*. at 1151-52.

In affirming this decision, the Federal Circuit explained "[a] patent assignment clause may presently assign a to-be-issued patent automatically—in which case no further acts to effectuate the assignment are necessary—or may merely promise to assign the patent in the future." *Id*. at 1152. The Court further explained "the general rule is that rights in an invention belong to the inventor" and that "[i]n most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights." *Id*.  In *Omni*, the Court began its analysis of the specific language at issue by emphasizing that "by [their] own terms" the bylaws "merely 'stipulate[d] the *conditions* governing the assignment of property rights'" and did not "purport to *effectuate* the present transfer of a present or future right." *Id*. (emphases in original).

Plainly, even setting aside that *Omni* involves patents (not copyrights or Section 203), the instant dispute is not remotely similar.[5] The grant language in the 1986 NITA Agreement does not

---

[5]    Other cases UMG cites to support its argument that a "lack of verb tense" should be outcome determinative are also readily distinguishable. For example, in *Vassilkioti v. CCS Int'l, Ltd*. No. 98-4090, 2000 U.S. Dist. LEXIS 17776 (S.D.N.Y. Dec. 7, 2000) a photographer executed a release regarding "photographic portrait or pictures" ***of himself*** which the defendant tried to argue extended to photographs he had taken ***of others***. *Id.* at*7. This Court explained that "on its face" the release did not constitute a present transfer of rights ***with respect to photographs taken of others***—***not*** that a lack of a verb tense was outcome determinative. In *Playboy Enterprises, Inc. v. Dumas*, 831 F. Supp. 295 (S.D.N.Y. 1993) this Court found that "check legends" did not constitute valid transfers of copyright since, among other things, there was a "lack of evidence surrounding the agreements said to underlie [the] checks" containing legends that had "no language of present transfer" regarding the copyrights. *Id*. at 308-09. Here, there is no such "lack of evidence" regarding the parties' intent; there is no similarity between the

merely "stipulate the *conditions*" under which Plaintiffs may make a future grant. *See Omni*, 7 F.4th at 1151-52. Rather, the 1986 NITA Agreement ***effectuates the transfer of rights***—as evidenced by the fact that the Sound Recordings were exploited following its execution (up until Plaintiffs exercised their Section 203 rights). Further, in *Omni* the Court noted that "the identical phrase in two paragraphs of a provision of a contract should be read identically." *Id*. at 1153. Here, Paragraph H of the 1986 NITA Agreement begins by stating that "Artist shall be exclusive to Company." FAC, Ex. A, ¶ H. Thus, in the same way that "shall be" presently effected Plaintiffs' relationship to NITA it has to be understood to have operated to presently effect of the transfer of Plaintiffs' copyrights.

On the same day Plaintiffs executed the 1986 NITA Agreement, Plaintiffs signed the 1986 Inducement Letter in connection with an agreement between Azor and one of UMG's predecessors, NPR. The 1986 Inducement Letter, personally executed by both James and Denton, states: "***I hereby. . . grant to [NPR] all of the rights*** and remedies therein granted to [NPR] [.]" FAC, Ex. B, ¶ 1. This explicit grant of "***all of the rights***" ***includes*** copyrights in the Sound Recordings that they had the right to transfer as the "authors" and is terminable pursuant to Section 203. FAC, ¶ 51.

---

1986 NITA Agreement and "check legends[.]" UMG's reliance on a 1959 proceeding by the District of Maine involving a bankruptcy is also misguided. MOL,13, citing *Shiro v. Drew*, 174 F. Supp. 495 (D. Me. 1959). In *Shiro*, the court actually noted that "no particular words are required for an assignment" before explaining that "it frequently has been said that the test is whether or not the debtor would be authorized to pay the amount directly to the person claiming to be the assignee, ***without further action or consent*** by the assignor." *Id*. at 498 (emphasis added). The Court then found that an instrument stating that money advanced in the future "***will be repaid*** immediately ***upon receipt of*** [a company's] remittance" failed to constitute a present transfer because it was a statement about what would happen ***if*** certain conditions were met. *Id*. (emphases added).

In response, UMG pejoratively labels Plaintiffs' position as "desperate" before claiming this "newfound alleged grant" contained in a "customary inducement letter" "does [not] contain or refer to a grant of copyright rights." MOL, 7. UMG later claims the statement "*I hereby . . . grant to [NPR] all of the rights. . . therein granted to [NPR]*" is a "belt-and-suspenders 'grant' of 'all rights granted'" that *excludes* "copyrights" since, allegedly, at the time they executed the 1986 Inducement Letter Plaintiffs were not the "owners" or "authors" of the Sound Recordings. MOL, 6-7, 16-17. Rather, UMG would have this Court find—contrary to Plaintiffs' allegations and without any factual support—that the Sound Recordings were "works-made-for-hire" such that Azor and/or NPR should be considered "authors" for purposes of this Court's analysis. MOL, 16-17. UMG also contends (incorrectly) that *Waite II* somehow precludes reliance on an "inducement letter" as evidence of a terminable grant. *Id*. at 15. All of UMG's arguments fail.

First, the grant language can hardly be described as "newfound"—it has existed for almost forty years. Second, there is zero evidence that this is a "customary inducement letter." Indeed, while a "customary" inducement letter is designed solely to ensure performance in the event that the contracting party does not perform, the 1986 Inducement Letter is not so limited and, instead, contains a direct grant of rights from Plaintiffs to NPR that is not contingent on any act or failure to act by a third-party. Regardless, this Court cannot find it is "customary" without a factual record.

Third, Plaintiffs state: "*I hereby . . . grant [NPR] all of the rights and remedies therein granted to [NPR]*" in the 1986 NPR Agreement and "undertake to be bound thereby **as though I was a party to said agreement**." FAC, Ex. B, ¶ 1 (emphases added). This language is plain: Plaintiffs are personally granting NPR the copyrights in the Sound Recordings. However, for the avoidance of doubt as to the parties' intent, in the next paragraph, Plaintiffs each "grant [NPR] the right to use and publish. . . my name, likeness and all biographical material. . . ***for advertising or***

*trade purposes in connection with the sale and exploitation of __my__ __records__.*" *Id.*, ¶ 2 (emphasis added). It does not matter that the 1986 Inducement Letter uses the phrase "all of the rights" instead of the narrower word "copyrights" where, as noted *supra*, New York law does not require "a particular form of document, or the use of the word 'copyright,' where there is other clear evidence of the parties' intentions." *Stern*, 319 F Supp. at n.17.

Fourth, UMG's argument that Plaintiffs "had no rights in such sound recordings to grant" such that "their belt-and-suspenders' 'grant' of 'all rights granted' to Next Plateau . . . was not a terminable grant of copyright grants" (MOL, 16-17), is contrary to Paragraph 6 of the 1986 Inducement Letter (stating, "I . . . have the right to grant you all of the rights granted in [the 1986 NPR Agreement]") (FAC, Ex. B, ¶5), fundamentally incompatible with United States copyright law, and necessarily gives rise to factual issues that cannot be adjudicated at this time. "Under U.S. law, a contractual assignment, no matter how expansively phrased, is still subject to the termination right" that Section 203 provides to authors. *Ennio Morricone Music Inc. v. Bixio Music Grp. Ltd.*, 936 F.3d 69, 73 (2d Cir. 2019). "**The only exception . . . is if the work qualifies as a 'work made for hire' under 17 U.S.C. § 101, and the commissioner of the work is statutorily deemed the author from the work's conception: there is no other author, and there never was one.**" *Id.* (emphasis added). Thus, to find that Plaintiffs had no rights as "authors" with respect to the Sound Recordings at issue this Court would have to find that UMG carried its burden[6] of establishing that Azor and/or NPR were the "authors"—*i.e.*, this Court would have to find the Sound Recordings were "works-made-for-hire." *See Stern*, 319 F. Supp. 3d at 668 (explaining that employer of work

---

[6]    UMG bears the burden of proving there was a *bona fide* "work-made-for-hire" situation. *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) ("Because a 'work made for hire' is a statutory exception to the general rule of author-ownership of copyright, the party claiming the exception bears the burden of proving that the exception applies.").

for hire is the author instead of the creator).[7] For the reasons discussed *infra*, it would be premature

to do so on this record, particularly since the words "work-made-for-hire" ***do not even appear in***

***the 1986 NPR Agreement*** (or any other agreement at issue). *See* FAC ¶ 53.

Finally, UMG's view that this Court can (and should) disregard the 1986 Inducement Letter

based on *Waite II* and that "[t]his lawsuit involves the precise situation presented by *Waite*" is

incorrect. *See, e.g.*, MOL,10. The grant language at issue in *Waite II* contained "promise[s] of

future actions ***if certain contingencies*** came to pass." *Waite II*, 477 F. Supp. 3d at 272 (emphasis

added).[8] As discussed *supra*, this is different from the language Plaintiffs are relying upon in this

case. Moreover, there are numerous other key differences between the disputes, including that John

Waite had created various entities or "loan-out companies" through which he elected to transact

business, ***including signing agreements*** relevant to the copyright grants at issue in the case. *Waite*

at 441-42. Even though Mr. Waite and the loan-out companies were "perhaps [] distinct entities

---

[7]    The fact that UMG is making a premature "work-made-for-hire" argument is underscored by its reliance on *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013). In *Marvel*, the Second Circuit analyzed whether drawings made by Kirby for Marvel Comics were "works-made-for-hire." *Id*. at 124. After finding Marvel had "satisfied the instance and expense test" giving rise to a "presumption [] that the works in question were 'works made for hire'" the Second Circuit explained plaintiffs could not successfully rely on a single assignment (which "also averred that all of his work was for hire") and/or on checks issued to Kirby by Marvel containing a "legend with assignment, instead of work-for-hire, language" to overcome the presumption. *Id*. at 143. Rather, the Court said "[i]t is all too likely that, if the parties thought about it at all, Kirby's assignments at the time he was paid or later were redundancies insisted upon by Marvel to protect its rights[.]" *Id*. Here, there has been no finding that UMG is entitled to a "presumption" as to whether the Sound Recordings are "works-made-for-hire" nor could there be any such finding on this record.

[8]    Judge Kaplan explained the artists had "agreed to ensure that the recording companies maintained the privileges and benefits as set forth in the original agreements ***in the event that*** the [third parties] were no longer entitled to the artists' services" and said there was no "allegation that [the artists had] made any ***direct grant of their copyrights*** at the time the inducement letters were signed." *Waite II*, 477 F. Supp. at 272 (emphasis added). Here, Plaintiffs ***directly granted copyrights*** in the Sound Recordings at the time of executing the relevant agreements.

only in a formal legal sense" this Court explained it was required to respect the corporate structure and find that the third-parties—not the artists—had executed the grants at issue. *Id*. at 441-42.[9] Here, in stark contrast, both the 1986 NITA Agreement and the 1986 Inducement Letter were ***personally executed by James and Denton***. UMG's reliance on *Waite* and *Waite II* is misguided at best and, given its status as a defendant in the case and resulting knowledge of the underlying facts and arguments, disingenuous at worst.[10]

### B.    Defendant Cannot Establish the Sound Recordings Were "Works-Made-for-Hire" on this Motion.

"The Copyright Act of 1976 provides that copyright ownership 'vests initially in the author or authors of the work'" and, generally, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). "The Act carves out an important exception, however, for 'works made for hire'" and provides that in those cases "'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." *Id*. Section 101 defines a "work-made-for-hire" as:

    (1)    A work prepared by an employee within the scope of his or her employment; or

    (2)    A work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional

---

[9]    Another artist, Joe Ely, who had contracted through a third-party company was similarly unable to point to any direct grant language from him to the recording company. *See Waite II*, 477 F. Supp. 3d at 271-72.

[10]    Even if this Court finds *UMG's* interpretation reasonable this Court cannot "choose between two differing reasonable interpretations" on this Motion. *See Locus Techs. v. Honeywell Intl Inc.*, 632 F. Supp. 3d 341, 353 (S.D.N.Y. 2022) ("In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions.").

> text, as a test, as answer material for a test, or as an atlas, if
> the parties expressly agree in a written instrument signed by
> them that the work shall be considered a work made for hire.

17 U.S.C. § 101. Subsection (2) enumerates nine separate specific categories of artistic creations

that may be deemed a "work made for hire" if the parties agree to that effect, in writing. *Id.*

§ 101(2). "Sound recordings" are noticeably absent from that list. As a result, "[s]ound recordings

are not a work for hire under the second part of the statute because they do not fit within any of

the nine enumerated categories[.]" *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999); *see*

*also Reid*, 490 U.S. at 738 (explaining that subsection (2) "[q]uite clearly" did not apply in that

case since "[s]culpture does not fit within any of the nine categories"). Thus, for the Sound

Recordings to be considered "works made for hire," UMG must establish that the Sound

Recordings were "work[s] prepared by an employee within the scope of his or her employment."[11]

Here, there is no language in any of the relevant agreements stating that any of the Sound

Recordings were "works-made-for-hire."[12] And UMG does not claim that Plaintiffs were

employees of UMG or any of its predecessors.[13] Nor is such a claim even possible on the record

---

[11] UMG contends (without citation) that "the works at issue are works made for hire under each of the above formulations in section 101[.]" MOL, 3. UMG does not offer, however, any explanation or support for the position that "sound recordings" are encompassed by subsection (2) of Section 101.

[12] Even in situations, unlike here, where contracts explicitly characterize works as "made for hire" the Second Circuit has instructed: "Courts . . . have focused on the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *See, e.g.*, *Donaldson Pub. Co. v. Bregman, Vocco Conn, Inc.*, 375 F.2d 639, 640-42 (2d Cir. 1967) (holding that a composer's work was *not* created as a work for hire for defendant even though his contract with defendant provided him with a drawing account during his "employment").

[13] Indeed, the ***only*** reference to employment in the Motion involves UMG asserting (incorrectly) that the 1986 Inducement Letter involved a "warranty and representation that Plaintiffs were employed by Producer under a valid and enforceable agreement[.]" MOL,7. No such language of "employment" appears anywhere in the 1986 Inducement Letter.

before this Court. Instead, UMG weakly argues that language in the 1986 NITA Agreement about NITA being the "sole and exclusive owner" is the sort of language that "is **almost invariably** found where the parties' intent is to create a work made for hire." MOL,14 (emphasis added). Tellingly, however, UMG fails to cite to a single case for the proposition that such language is sufficient, much less dispositive on a motion to dismiss.[14] Similarly, UMG points to no support for its argument, discussed *supra*, that this Court can find based on the record before it that Azor and/or NPR should be deemed to be the "authors" of any of the Sound Recordings at issue in the 1986 NPR Agreement. MOL, 6-7, 16-17.

Ultimately, determining whether works are "works-made-for-hire" pursuant to Section 101(1), requires conducting a multi-factorial analysis that can only be undertaken after fact discovery. *Reid*, 490 U.S. at 751 (explaining that there are numerous factors that must be considered; these are referred to as the "*Reid* Factors"). It would be inappropriate and premature

---

[14]  Cases cited by UMG in support of this argument are readily distinguishable and involve situations where agreements clearly addressed employment relationships and/or at a minimum explicitly used the words "work-made-for-hire." MOL,14 *citing Caffey v. Cook*, 409 F. Supp. 2d 484 (S.D.N.Y. 2006) (where defendants were hired to perform in a show pursuant to agreements which did not give "defendants any rights to their creative contributions" and explicitly stated that the "services" and "vocal arrangements" were "work-made-for-hire"); *MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*, No. CV 03-8103 SJO, 2004 US Dist LEXIS 29562, at *3-4 (C.D. Cal. Feb. 11, 2004) (denying a temporary restraining order in a trademark dispute involving a writer who worked on a screenplay purchased by MGM pursuant to an agreement containing "work-made-for-hire" language with respect to the writer's "work and services on the [] screenplay"); *Niss v. Columbia Pictures Indus., Inc.*, No. 97 CIV. 4636 (LAP), 2000 WL 1862814, at*9-10 (S.D.N.Y. Dec. 20, 2000), *aff'd*, 25 F. App'x 76 (2d Cir. 2002) (analyzing ownership of a story outline, screenplay, and film; including the "work-made-for hire" language in the agreements, and the fact that the employer, MGM, had paid for the work at issue and was a "motivating factor" in the development of the work and/or retained control over the work at issue). This is in stark contrast to the situation here where (i) none of the relevant agreements contain any language about "work made for hire"; (ii) there is no evidence of any employer/employee relationship between UMG (or its predecessor) and Plaintiffs; and (iii) UMG has failed to put forward any evidence under the *Reid* Factors discussed *infra* because it cannot do so on a motion to dismiss.

to decide on a Rule 12(b)(6) motion prior to the development of *any* factual record regarding the parties' relationship and/or the creation of the works at issue whether the Sound Recordings were, in fact, "works-made-for-hire." *Marvel Characters*, 310 F.3d at 292 (explaining that "[i]t will be up to a jury to determine whether [the individual] was the author of the Works and, therefore, whether he can exercise § 304(c)'s termination right") (citing *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 110 (2d Cir. 2002) (authorship is a jury question when genuinely disputed)).

### C.  Defendant Cannot Establish that Any of the Sound Recordings are "Derivative Works" on this Motion.

"Copyright protection extends to 'original works of authorship fixed in any tangible medium of expression' such as 'musical works, including any accompanying words.'" *We Shall Overcome Found. v. The Richmond Org.*, No. 16cv2725, 2017 WL 3981311, at *12 (S.D.N.Y. Sept. 8, 2017) (Cote, J.). Here, UMG contends that certain Sound Recordings are derivative works exempt from Section 203's reach. *See* MOL, 18.

"Under the Copyright Act, a 'derivative work' is defined as a work based upon one or more preexisting works, such as a translation, musical arrangement . . . . sound recording . . . . or any other form in which a work may be recast, transformed, or adapted." *Agee v. Paramount Commc'ns, Inc.,* 59 F.3d 317, 324 (2d Cir. 1995). "[I]n the case of sound recordings, the Copyright Act imposes additional requirements before such a 'transformation' of a preexisting work is sufficient to create a derivative work." *Id*. More specifically, "[u]nder section 114(b), the use of a sound recording qualifies as a derivative work only if 'the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality.'" *Id*. But "[i]n order to qualify as a derivative work, a work 'must be independently copyrightable.'" *We Shall*

*Overcome*, 2017 WL 3981311, at *13. Put another way, "[f]or a musical composition to qualify as a derivative work,

> there must be something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where a major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune. It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material."

*Id*. at *13. Critically, "the [Copyright Act] requires that the originality of a derivative work be judged by an examination of the work 'as a whole.'" *Id*.

For all of these reasons, determining whether any musical work is, in fact, "sufficiently original to be a derivative work" is a fact intensive analysis that requires "findings of fact based upon a comparison of two works" before "apply[ing] the legal standard of originality to the facts[.]" *Woods v. Bourne Co.*, 60 F.3d 978, 991 (2d Cir. 1995).[15] This is evidenced by this Court's decision in *We Shall Overcome*, which reflects (on a summary judgment record after full discovery) a highly-detailed, measure-by-measure analysis of music and lyrics before finding that "the melody and lyrics of Verse 1/5 of the Song are not sufficiently original to qualify as a derivative work entitled to a copyright." *We Shall Overcome*, 2017 WL 3981311, at * 14.

In contrast, here, UMG just claims *without any evidence* that various sound recordings, including Plaintiffs' smash-hit "Push It," which contain the word "remix" in their titles are necessarily derivative works immune from Section 203. Respectfully, UMG's opinion is not the

---

[15] Input from an expert may be necessary to fully and accurately assess differences between musical compositions. *See Tempo Music, Inc. v. Famous Music Corp.*, 838 F. Supp. 162, 170 (S.D.N.Y. 1993) (declining to grant summary judgment and later noting that "the risk of copyright confusion seems particularly significant in music cases given that finders of fact often lack musical expertise").

end of the analysis. Nor is the fact that a sound recording may have been titled or characterized as a "remix." Indeed, even merely making changes to a sound recording does not necessarily render the resulting sound recording "derivative"—*i.e.*, independently copyrightable. *See, e.g.*, *We Shall Overcome*, 2017 WL 3981311, at *14 (explaining that "[a]s a matter of law, the alterations . . . are too trivial" and that "[a] person listening to Verse 1/5 of the Song would be hearing the same old song . . . . with only minor, trivial changes of the kind that any skilled musician would feel free to make").

Here, Plaintiffs reject UMG's contention that these are "derivative." FAC ¶ 58. Rather, Plaintiffs allege there is nothing original or unique about the "remixes"—they remain their "same old song[s]" and would not have been independently copyrightable by UMG. *See We Shall Overcome*, 2017 WL 3981311, at *14. Plaintiffs further allege that UMG, like other record companies, routinely labeled sound recordings as "remixes" to generate additional sales. FAC ¶ 58. In other words, using the word "remix" was a mere marketing or sales ploy.

UMG's argument that "copyright registrations" should be outcome determinative and/or that allegations made "upon information and belief" can be disregarded by this Court is incorrect. In the first instance, "copyright registration" is not outcome determinative. *See, e.g.*, *Techniques, Inc. v. Rohn*, 592 F. Supp 1195, 1197 (S.D.N.Y 1984) (explaining that "registration provides only prima facie evidence of validity"); *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) (noting that "[A] certificate of registration creates no irrebuttable presumption of copyright validity … [it] merely orders the burden of proof" and that "where other evidence in the record cases doubt on the question, validity will not be assumed"); *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010), *as amended* (Aug. 24, 2010) (explaining that "the Copyright Office's practice of summarily issuing

registrations. . . . counsels against placing too much weight on registrations as proof of a valid copyright"). Determining "originality and ownership [] require[s] discovery and a more developed record … [and should be decided] through summary judgment or at trial. *We Shall Overcome Found. v. The Richmond Org.*, 221 F. Supp. 3d 396, 407 (S.D.N.Y. 2016). Indeed, even the Copyright Office has been clear that registration alone is not sufficient. *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 224 F.Supp. 2d 567, 586 (S.D.N.Y. 2002)), *aff'd in part, vacated in part,* 380 F.3d 624 (2d Cir. 2004) ("The Copyright Office is an office of record and it does not have the authority to adjudicate adverse or conflicting claims submitted for registration … It is the responsibility of the parties involved in a dispute to pursue their rights in their work.").[16]

Further, as to allegations made "upon information and belief," the Second Circuit explained in *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010), that "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible[.]" *Id*. at 120; *see also Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018) (explaining that such allegations are appropriate where the facts are peculiarly within the possession and control of the defendant or where the "belief is based on factual information that makes the inference of culpability possible"). *Schneiderman*, cited by UMG, is instructive. In *Schneiderman*, appellants

---

[16]    Cases cited by UMG highlight that dismissal based on a copyright registration would be inappropriate at this stage. MOL, 20. Both *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 107-08 (2d Cir. 1998), *amended*, 169 F.3d 782 (2d Cir. 1998), and *Fonar Corporation v. Domenick*, 105 F.3d 99, 101 (2d Cir. 1997), are cases following a grant of summary judgment after all parties had the opportunity to take discovery and present evidence in support of their claims.

alleged "upon information and belief" that the Attorney General had previously **publicly disclosed** confidential information such that there was a risk it would happen again. 882 F.3d at 384. However, appellants failed to point to even one such public disclosure. *Id*. at 384-85. In reviewing these allegations, the Second Circuit explained, "[t]here [was] no reason Appellants could not find at least one inadvertent publication without any help from subpoenas, depositions, or interrogatories" since they "[were] . . . . alleging *public* disclosures, which by their very nature, would be easy to discover if they occurred." *Id*. at 385 (emphasis in original).

Here, Plaintiffs do not have access to UMG's internal decision-making process in connection with releasing sound recordings—*e.g.*, Plaintiffs do not (and could not) have in their possession, custody, and control all of UMG's internal communications and discussions regarding the re-release of "Push It." Nor do Plaintiffs have access to communications between or among Cameron Hall—the DJ credited in news articles with having given "Push It" airtime—and UMG. This information is under **UMG's** control. As a result, Plaintiffs have laid out facts "upon information and belief" which credibly support their view that the "remixes" are not derivative works, including alleging based on their knowledge and experience that labels routinely re-released sound recordings as "remixes" to increase sales and generate additional revenue. FAC ¶ 58. Moreover, while Plaintiffs are accomplished artists and performers, they do not hold themselves out as musicologists equipped to analyze sound recordings measure by measure for purposes of assessing whether they are "derivative" pursuant to Section 101. More importantly, Plaintiffs do not have access to any of the Master Tapes related to **any** of the Sound Recordings at issue, including either the original of "Push It" or what was re-released in 1987; again, these are

within the possession, custody, and control of UMG. FAC ¶ 99.[17] In Plaintiffs' opinion the "remixes" are the "same old songs" that they originally recorded and/or performed with some added musical flourishes of the sort that any "skilled musician" (or in the case of "Push-It" any "skilled DJ") would make—not unique, original works. *See We Shall Overcome*, 2017 WL 3981311, at *14. Additional discovery and potential expert analysis will be necessary with respect to UMG's position as this case progresses. It would be premature for this Court to decide at this stage that "Push It" or any other song is, in fact, "derivative" merely based on the word "remix" appearing in its title and, as a result, exempt from Section 203.

## V.     PLAINTIFFS STATE A PLAUSIBLE CLAIM FOR CONVERSION.

"Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 413 (S.D.N.Y. 2007), *aff'd*, 268 F. App'x 17 (2d Cir. 2008). To maintain a claim for conversion, a plaintiff must show "legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights." *Id.*

UMG argues Plaintiffs' conversion claim should be dismissed because Plaintiffs: (i) fail to allege legal ownership or a superior immediate right to possession of the Master Tapes; (ii) cannot show the Termination Notices voided UMG's possessory right in the Master Tapes (*i.e.*, Plaintiffs cannot show UMG exercised unauthorized dominion over the Master Tapes); and (iii) have not adequately pled demand. None of these arguments compel dismissal.

---

[17]     Indeed, since UMG has removed the Sound Recordings from streaming platforms, it is difficult to even locate electronic versions of the works at issue.

Plaintiffs have alleged legal ownership of the Master Tapes by virtue of being their true owners and creators. FAC ¶¶ 7, 99. *See Douglas v. Abrams Child. Books*, No. 13-CV-2613 (VSB), 2014 WL 12909009, at *6 (S.D.N.Y. Sept. 26, 2014) (concluding that the plaintiff, as the creator of a manuscript, was the legal owner of the work); *see also Sporn v. MCA Recs., Inc.*, 58 N.Y.2d 482, 489 (1983) (explaining that a claim sounded in conversion where the defendant infringed on the plaintiff's intangible property right to a musical performance by misappropriating a master recording—a tangible item of property capable of being physically taken). There can be no dispute that the Master Tapes, which Plaintiffs allege they created and have an ownership interest in, are tangible objects that are the physical embodiment of their performances. If possession of the Master Tapes did not revert back to Plaintiffs upon termination of the copyrights in the Sound Recordings, Plaintiffs would be deprived of the full enjoyment of their exclusive statutory rights, including their right to commercially exploit the Sound Recordings, which are uniquely embodied in the physical Master Tapes.[18]

UMG does not dispute receiving the Termination Notices which necessarily put UMG on notice that Plaintiffs were eliminating any right UMG had to exercise dominion over the physical embodiment of Plaintiffs' Sound Recordings. Yet, they have not returned the Master Tapes. *See Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 238-40 (S.D.N.Y. 2022) (concluding that defendants' alleged conversion of royalties arose from their refusal to honor notice of termination of copyright grant). There is no requirement that the word "demand" have been used by Plaintiffs.

---

[18] In contrast to other forms of intellectual property such as, for example, software code, where each copy has the same integrity, sound recordings are unique in that the original master recording of a copyrighted performance can never truly be recreated; as a practical matter, while artists could theoretically re-record performances once their Section 203 rights vested (assuming they are still living and/or could assemble the original team, room and equipment involved in recording), their voices would not sound the same decades later.

*See Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 588 (S.D.N.Y. 2015) (explaining "[a] demand need not use the specific word 'demand' so long as it clearly conveys the exclusive claim of ownership"); *see also Feld v. Feld*, 279 A.D.2d 393, 394-95 (2001) (explaining that a demand merely "consists of an assertion that one is the owner of the property and that the one upon whom the demand is made has no rights in it other than allowed by the demander"). Immediately upon receiving the Termination Notices, UMG was on notice that it needed to return the Master Tapes upon the effective date of termination. *See Feld*, 279 A.D. 2d at 394-95*; see also Champlin*, 604 F. Supp. 3d at 238-40.

Given UMG's recalcitrant refusal to honor Plaintiffs' statutory termination rights, any additional demand would have been futile and, as a result, is not necessary here. *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260 (2002) (pleading of a demand is not required where making a "demand would be futile because the circumstances show that the defendant knows it has no right to the goods"). UMG cannot now pretend otherwise. In response to the Termination Notices, UMG informed Plaintiffs that it takes the position that Plaintiffs have no rights in the Sound Recordings. FAC ¶¶ 5, 92. This necessarily meant that UMG took the position that Plaintiffs had no right to the Master Tapes containing the Sound Recordings notwithstanding Plaintiffs exercise of their statutory rights to terminate the copyright grants and the immediate vesting of those terminations upon the effective date. Moreover, Plaintiffs have alleged that UMG immediately "took down" and/or "ceased all exploitation" of the Sound Recordings in the United States as soon as it risked incurring copyright infringement liability. FAC ¶¶ 5, 93-96. Thus, Plaintiffs allege that UMG knows that it, in fact, does not have any right to possess or to exploit the Master Tapes but has refused to return the same to Plaintiffs. Plaintiffs must be permitted to

conduct discovery and to seek the return of the Master Tapes as well as money damages in connection with UMG's wrongful retention and possession of the Master Tapes.

## VI.    <u>CONCLUSION</u>

UMG asks the Court to ignore Congress's explicit grant of termination rights and prematurely resolve issues of fact in its favor. For the reasons set forth herein, this Court should reject UMG's effort to avoid scrutiny, deny UMG's Motion, order prompt discovery, and grant such further relief as is just and proper.[19]

<b>BLANK ROME LLP</b>

Dated: September 12, 2025

By: <u>*/s/ Heidi G. Crikelair*</u>
Heidi G. Crikelair
heidi.crikelair@blankrome.com
Roy W. Arnold (Pro Hac Vice)
roy.arnold@blankrome.com
David M. Perry (Pro Hac Vice)
david.perry@blankrome.com
Jillian M. Taylor (Pro Hac Vice)
jillian.taylor@blankrome.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

---

[19]  No stay of discovery is warranted or justified. "The mere filing of a motion to dismiss does not constitute 'good cause' for the issuance of a stay." *Abbott Lab'ys v. Adelphia Supply USA*, No. CV20155826CBAMDG, 2016 WL 4148323, at *1 (E.D.N.Y. Aug. 4, 2016).UMG claims that a stay will not result in any prejudice; but, as UMG itself concedes, the evidence in the case is already old. Discovery should commence as soon as possible so that Plaintiffs do not lose the opportunity to prove their case through the "the destruction or loss of relevant evidence." *Cf. Union v. Travelers Indem. Co.*, No. 89-CV-573, 1991 WL 64858, at *3, (N.D.N. Y Apr. 25, 1991) (holding that where stay of discovery may prevent defendants from establishing facts essential to defense, prejudice is established). This is not a case where the breadth of discovery is going to be expansive; it is not unduly burdensome to expect UMG search its own files and records (particularly when *UMG* is claiming works are derivative and/or "made-for-hire"). Finally, since UMG has ceased commercial exploitation of Plaintiffs' catalogue in the United States any delay in this matter is depriving Plaintiffs of revenue and causing their catalogue to lose value.

## <u>CERTIFICATE OF WORD COUNT AND SERVICE</u>

Heidi G. Crikelair, a member of this Court, hereby certifies pursuant to Local Rule 7.1(c) that the Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss the First Amended Complaint complies with the word count limitations in Local Civil Rule 7.1(c) and has a final word count of **8, 747** words and that the foregoing Memorandum in Opposition has been served upon Defendant's counsel via the Court's ECF system.

<em>/s/ Heidi G. Crikelair</em>