```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
CHERYL JAMES AND SANDRA DENTON, p/k/a     :
SALT-N-PEPA,                              :
                                          :
                           Plaintiffs,    :   25cv4182 (DLC)
              -v-                         :
                                          :   OPINION AND
UMG RECORDINGS, INC.,                     :      ORDER
                                          :
                           Defendant.     :
                                          :
----------------------------------------- X
```

APPEARANCES:

For plaintiffs Cheryl James and Sandra Denton, p/k/a Salt-N-Pepa:

Heidi G. Crikelair
Roy W. Arnold
David M. Perry
Jillian M. Taylor
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020

For defendant UMG Recordings, Inc.:

Richard S. Mandel
Thomas Kjellberg
Dasha Chestukhin
Cowan, Liebowitz & Latman, P.C.
114 West 47th Street
New York, NY 10036

DENISE COTE, District Judge:

Plaintiffs are a well-known rap and hip-hop group and have sued UMG Recordings, Inc. ("UMG") to regain their copyrights in and physical recordings of their music. UMG moves to dismiss

the claims for failure to state a claim.  For the following reasons, the motion is granted.

## Background

The following facts are alleged in the first amended complaint ("FAC") and its attachments.[1]  This Opinion summarizes only the facts necessary to decide this motion.

Plaintiffs Cheryl James and Sandra Denton, professionally known as the rap and hip-hop group Salt-N-Pepa (collectively, the "Plaintiffs"), are Grammy-winning artists who have enjoyed professional success over the last forty years.  Plaintiffs recorded and released their first song, "The Showstopper," in 1985.  The following year, on May 15, 1986, Plaintiffs entered into their first recording agreement with Noise In The Attic Productions, Inc. ("NITA") (the "1986 NITA Recording Agreement"), a company owned by their producer, Herb Azor.  The 1986 NITA Recording Agreement constituted the parties' agreement

> with respect to Company [NITA] providing
> Artist [Plaintiffs] with production services
> as well as with respect to Artist
> [Plaintiffs] rendering Artist's
> [Plaintiffs'] exclusive personal services to
> Company [NITA] as a recording artist, as

---

[1] In reviewing a motion to dismiss for failure to state a claim, the court "may consider documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020) (citation omitted).

2

>well as granting Company [NITA] certain exclusive rights with respect to Artist [Plaintiffs] pertaining to audio-visual exploitation.

It states, <u>inter alia</u>, under a section entitled "Company's Rights:"

>As between Company [NITA] and Artist [Plaintiffs], <u>Company [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings</u> recorded hereunder, <u>including</u> but not limited to the <u>worldwide sound copyrights</u> therein and the renewal rights thereto.

(Emphasis added.)

That same day, Azor entered into a distribution agreement with Next Plateau Records, Inc. ("Next Plateau Records") (the "1986 NPR Agreement"). Plaintiffs were not signatories to the 1986 NPR Agreement. In the 1986 NPR Agreement, Next Plateau Records engaged Azor to produce and deliver "Sides," or physical recordings embodying the performances of Plaintiffs. Regarding Sides that had already been recorded, it states:

>Upon execution of this agreement, Producer [Azor] shall deliver to Company [Next Plateau Records] the Sides embodying Artist's [Plaintiffs'] performances . . . .
>
><u>Producer [Azor] warrants and represents that Producer [Azor] is the sole and exclusive owner of such Sides</u> and all right, title and interest therein . . . .
>
>Producer [Azor] hereby sells, transfers and assigns to Company [Next Plateau Records],

3

>     for the world, all aforesaid right, title
>     and interest in and to such Sides including
>     without limitation the sound recording
>     copyright . . . .

(Emphasis added.)  As for Sides that will be recorded in the future, the 1986 NPR Agreement provides:

>     <u>All Sides recorded during the Term</u> shall be
>     recorded by Producer [Azor] on Company [Next
>     Plateau Record]'s behalf and all records
>     made therefrom, together with the
>     performances embodied therein, <u>shall, from
>     the inception of their creation, be entirely
>     the property of Company [Next Plateau
>     Records]</u> in perpetuity, . . . free of any
>     claim whatsoever by Producer [Azor], Artist
>     [Plaintiffs] . . . and Company [Next Plateau
>     Records] shall have the right to secure the
>     sound recording (P) copyright in and to the
>     Sides in Company [Next Plateau Records]'s
>     name as the owner and author thereof and to
>     secure any and all renewals of such
>     copyright.

(Emphasis added.)

The 1986 NPR Agreement set out the royalties that Next Plateau Records would pay Azor as producer.  Azor also represented that a "valid and enforceable agreement" existed between him and Plaintiffs "under the terms of which Artist [Plaintiffs] shall perform exclusively for Producer [Azor] as a recording artist."

There were two attachments to the 1986 NPR Agreement.  One was a co-publishing agreement between Next Plateau Music, Inc. and Azor in which Azor assigned 50% of his interests in the

copyrights in compositions owned by Azor and recorded pursuant to the 1986 NPR Agreement.

The second attachment was an inducement letter dated May 15, 1986, signed by each of the Plaintiffs, and addressed to Next Plateau Records (the "1986 Inducement Letter"). The Letter states:

> In order to induce you to enter into [the 1986 NPR Agreement] and to pay a good valuable consideration therefor, I hereby agree as follows:
>
> I [Plaintiffs] hereby specifically guarantee the performance by Producer [Azor] of all of the warranties and representations and covenants made in said agreement [the 1986 NPR Agreement]. I hereby <u>make all of the warranties and representations made to you</u> in said agreement [the 1986 NPR Agreement], <u>grant you</u> [Next Plateau Records] <u>all of the rights and remedies therein granted to you</u> [Next Plateau Records] and agree to perform all of the obligations therein undertaken to be performed for you [Next Plateau Records] and undertake to be bound thereby as though I was a party to said agreement [the 1986 NPR Agreement].

(Emphasis added.) In the letter, Plaintiffs also agreed to "look solely to" Azor for payment for any services they rendered in accordance with the 1986 NPR Agreement.

Plaintiffs then recorded many popular and critically acclaimed albums, singles, and remixes pursuant to the terms of the 1986 agreements. On July 1, 1992, Plaintiffs and NITA entered into an agreement with London Records for exclusive

5

recording services (the "1992 London Records Agreement").  In the 1992 London Records Agreement, the parties "hereto acknowledge and agree" that:

> Producer [NITA] warrants and represents to London that subsequent to the complete execution of the [1986 NPR Agreement], Herb Azor and Hugh Azor assigned their rights and obligations under [that agreement] to Producer [NITA].
>
> [A]ll of NP [Next Plateau Records]'s rights and obligations under the [1986 NPR Agreement], as amended and in full force as of the date hereof, . . . <u>have been assigned by NP [Next Plateau Records] to London</u> by assignment . . . of even date herewith.

(Emphasis added.)  That same day, Plaintiffs entered into a letter agreement with NITA (the "1992 NITA Agreement") acknowledging that there were two albums left to be recorded under the terms of the 1986 NITA Recording Agreement and the 1986 NPR Agreement.  UMG is the successor-in-interest to both Next Plateau Records and London Records.

On March 22, 2022, Plaintiffs sought to exercise their right to terminate a prior copyright grant pursuant to § 203 of the Copyright Act by serving their Notice of Termination on UMG and filing it with the U.S. Copyright Office.  After a representative from the Copyright Office requested an amendment to specify the effective dates of termination for each sound recording on May 10, Plaintiffs submitted and served an Amended

6

Notice of Termination on May 13. In the Amended Notice, the earliest termination date (applying to a subset of sound recordings) was listed as May 15, 2024.

On June 27, 2022, UMG sent a counter-notice to Plaintiffs contending that their Notice of Termination was "invalid and ineffective" because, among other reasons, Plaintiffs had not made a grant of sound recordings to UMG's predecessors and, in the alternative, the sound recordings should be considered "works made for hire." On May 15, 2024, the earliest termination date Plaintiffs alleged in their Amended Notice of Termination, UMG took down dozens of Plaintiffs' sound recordings from streaming platforms and distribution channels, halting their commercial exploitation.

On July 12, 2024, Plaintiffs and UMG entered into a § 203 Exploitation Agreement in which UMG agreed to continue exploitation of the sound recordings appearing on Plaintiffs' first two albums, Hot, Cool & Vicious (1986 & 1987) and A Salt With a Deadly Pepa (1988), while the parties attempted to resolve their dispute. On September 12, 2024, Plaintiffs responded to UMG's June 27, 2022 counter-notice, claiming that it "was based on incomplete information" and failed to properly consider the 1986 NITA Recording Agreement.

7

On April 1, 2025, Plaintiffs terminated the § 203 Exploitation Agreement. On April 10, UMG responded that it "continu[es] to dispute the validity and effectiveness" of Plaintiffs' Notice of Termination and is "ceasing all U.S. exploitation of the Sound Recordings at this time." Plaintiffs' sound recordings remain unavailable in the United States.

On May 19, 2025, Plaintiffs filed this action against UMG. UMG filed a motion to dismiss on July 17, at which point Plaintiffs were given the opportunity to amend their complaint and were warned that it was unlikely they would have a further opportunity to amend.

On August 8, Plaintiffs filed the FAC, bringing two claims. Plaintiffs first seek a declaratory judgment that:

> their Notices of Termination are valid, the dates of termination are effective, their termination rights for the sound recordings have vested or will vest in the near future, any such vesting must be immediately acknowledged by Defendant through a prompt transfer of all rights in the sound recordings to Plaintiffs, and Defendant's disregard of the rights of Plaintiffs violates the Copyright Act.

Plaintiffs also bring a common-law conversion claim for damages, contending that UMG "intentionally and substantially interfered with Plaintiffs' possession of their Master Tapes." UMG renewed its motion to dismiss on August 22. The renewed motion to dismiss became fully submitted on September 19.

8

**Discussion**

To defeat a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94 (2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Iqbal, 556 U.S. at 678). In determining if a claim is sufficiently plausible to withstand dismissal, a court "must accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Doe, 100 F.4th at 94 (citation omitted).

I.   Declaratory Judgment Claim

Recording artists often transfer copyright ownership in their sound recordings to recording companies, publishers, and others in exchange for promotion and commercialization. When some songs later become "hits," the companies then enjoy most of the economic returns. Recognizing that these copyright transfers are often negotiated in this way due to "the unequal bargaining position" between artists and recording companies and

"the impossibility of determining a work's value until it has been exploited," Congress passed § 203 of the Copyright Act of 1976.  H.R. Rep. 94-1476 (1976).  The Copyright Act defines a "transfer of copyright ownership" as "an assignment . . . or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright."  17 U.S.C. § 101.  And § 204(a) specifies the required form of a copyright transfer: It must be made in writing and signed by the owner of the rights conveyed.  17 U.S.C. § 204(a).

Section 203 provides artists an opportunity to terminate prior grants transferring a license or copyright (executed on or after January 1, 1978) thirty-five years after the grant was executed.  17 U.S.C. § 203(a).  Termination is available for all transfers "executed by the author" except those related to "works made for hire."  Id.  To terminate a prior transfer, an artist must serve a notice to the copyright owner stating an "effective date of termination" and file that notice with the Copyright Office as well.  Id. § 203(a)(4).  Upon that effective date, the prior grant transferring the copyright is terminated and the copyright reverts to the author.  Id. § 203(b).  Section 203(b) carves out an exception for "derivative works," which, if prepared prior to the effective date of termination, "may

continue to be utilized under the terms of the grant after its termination." Id. § 203(b)(1).

UMG contends that Plaintiffs' claim for a declaratory judgment based on a violation of § 203 should be dismissed. UMG asserts that the FAC fails to plead that Plaintiffs previously owned and transferred the copyrights at issue. UMG claims that the 1986 agreements on which Plaintiffs rely do not establish that they ever owned the copyrights to their sound recordings, let alone transferred them to anyone else. Instead, UMG contends, these documents reflect that NITA was the exclusive owner of the rights and transferred them to UMG's predecessors. UMG also contends that, even if the FAC plausibly alleged Plaintiffs' ownership and transfer of the copyrights and that their Notice of Termination is valid, the sound recordings for Plaintiffs' remixes are "derivative works" that UMG may continue to utilize after termination. This Opinion holds that this first argument is correct, so it is not necessary to reach the second argument regarding remixes.

Because only an author who executed a grant may terminate it, 17 U.S.C. § 203(a), the key inquiry here is whether Plaintiffs, in any of the 1986 agreements, asserted their ownership of the copyrights and transferred that ownership to a predecessor of UMG. The parties agree that New York law applies

11

to the interpretation of the 1986 agreements, which is sufficient to apply that law under New York choice-of-law rules. See Ins. Co. of the State of Pennsylvania v. Equitas Ins. Ltd., 68 F.4th 774, 779 n.2 (2d Cir. 2023). Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." Donohue v. Cuomo, 184 N.E.3d 860, 866 (N.Y. 2022) (citation omitted). As for assignments (like a transfer of copyright ownership) in particular, "[i]t is sufficient if the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee." Deutsche Bank Nat'l Tr. Co. v. Romano, 48 N.Y.S.3d 237, 240 (N.Y. App. Div. 2017) (citation omitted). Additionally, it is well-established under New York law that contracts "executed at about the same time and covering the same subject matter are to be interpreted together, even if one does not incorporate the terms of the other by reference." P.S. Finance, LLC v. Eureka Woodworks, Inc., 184 N.Y.S.3d 114, 130 n.8 (N.Y. App. Div. 2023); see also Nau v. Vulcan Rail & Constr. Co., 36 N.E.2d 106, 110 (N.Y. 1941) ("All three instruments were executed at substantially the same time,

related to the same subject-matter, were contemporaneous writings and must be read together as one.").

Even viewed in the light most favorable to Plaintiffs, the 1986 agreements do not indicate that Plaintiffs ever owned the copyrights to the sound recordings or that they granted a transfer of those rights to anyone else.  It was only Azor and NITA that granted a transfer of rights in 1986 to Next Plateau Records.  The 1986 NITA Agreement stated that NITA "shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings . . . , including but not limited to the worldwide sound copyrights therein."  And the 1986 NPR Agreement (to which Plaintiffs were not a party) confirmed NITA's ownership of all preexisting and future recordings before effecting a transfer of "all aforesaid right, title and interest in and to such Sides including without limitation the sound recording copyright" from NITA to Next Plateau Records.  None of the agreements characterize Plaintiffs as the owner of the copyrights, let alone effect a transfer by Plaintiffs of copyrights.

The absence of a contract evidencing a transfer of rights by Plaintiffs is not surprising.  As UMG notes, the "shall be the sole and exclusive owner" language in the 1986 NITA Recording Agreement indicates that the sound recordings are

13

likely works made for hire, which are excluded from § 203's termination mechanism.  Although this Opinion does not reach the issue of whether the recordings were, in fact, works made for hire, such a classification is consistent with the copyright registrations for each of the sound recordings listed in Plaintiffs' Notice of Termination.  The copyright registrations all list the author of the sound recording (and, thus, the copyright owner) as "Next Plateau Records, Inc., employer for hire" "London Records, employer for hire" or "UMG Recordings Inc., employer for hire."[2]

Relying on two documents that they executed in 1986, Plaintiffs make two arguments in response.  They first contend that the language from the 1986 NITA Recording Agreement, which they executed with their producer Azor, effected a present transfer of their rights.  But this argument fails for the reasons described above -- the document does not represent that Plaintiffs owned the copyrights at the time of contract and were transferring those rights to Azor.  Read in the context of the

---

[2] These facts are taken from public records that are properly subject to judicial notice under Federal Rule of Evidence 201(b).  See Bellin v. Zucker, 6 F.4th 463, 471 n.10, 473 (2d Cir. 2021); see also Fed R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

entire document and together with the other documents executed that same day, Plaintiffs were acknowledging that NITA would be the sole copyright owner of any master recordings created pursuant to their agreement.

Next, Plaintiffs claim that the 1986 Inducement Letter constitutes their direct grant of their rights to Next Plateau Records. They emphasize that their letter is addressed to Next Plateau Records and grants to Next Plateau Records "all of the rights and remedies" granted in the 1986 NPR Agreement, including the copyrights in their sound recordings. Reading the two documents in full, however, precludes Plaintiffs' interpretation. The complete sentence in the 1986 Inducement Letter reads as follows:

> I [Plaintiffs] hereby make all of the warranties and representations made to you in [the 1986 NPR Agreement], grant you all of the rights and remedies therein granted to you and agree to perform all of the obligations therein undertaken to be performed for you and undertake to be bound thereby as though I was a party to [the 1986 NPR Agreement].

In their 1986 Inducement Letter, therefore, Plaintiffs agreed to the representations in the 1986 NPR Agreement which included NITA's representation that it was "the sole and exclusive owner" of the copyrights, which it confirmed before transferring those copyrights to Next Plateau Records. Thus, the only copyright

15

transfer effectuated by these agreements was the one from NITA to Next Plateau Records.  And the statutory text in § 203 is clear: Plaintiffs can only terminate copyright transfers that they executed.  They cannot terminate a copyright grant executed by NITA.  As a result, Plaintiffs do not plausibly allege a claim for declaratory relief and Count One is dismissed in full.

## II. Conversion

Lastly, UMG contends that Plaintiffs' second claim for common-law conversion, in which Plaintiffs allege that UMG "intentionally and substantially interfered with Plaintiffs' possession of their Master Tapes," fails because Plaintiffs did not sufficiently allege their ownership of the Master Tapes.  UMG is correct.

"Under New York law, conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." V&A Collection, LLC v. Guzzini Properties Ltd., 46 F.4th 127, 133 (2d Cir. 2022) (citation omitted).  To state a claim of conversion, the plaintiff must allege that:

> (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.

Id. (citation omitted).  As such, a "key" element of conversion is "plaintiff's possessory right or interest in the property." Id. (citation omitted).

Plaintiffs fail to plausibly plead their ownership of the Master Tapes that form the basis for their conversion claims. None of the contracts identified by Plaintiffs indicate that they ever owned the Master Tapes.  First, the 1986 NITA Recording Agreement establishes that NITA, not Plaintiffs, was "the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings recorded hereunder." Second, in the 1986 NPR Agreement, ownership of the Master Tapes was transferred to Next Plateau Records.  After representing that he was the "sole and exclusive owner of such Sides and all right, title and interest therein," Azor transferred to Next Plateau Records "all of the [] right, title, and interest in and to" the "Sides embodying Artist's [Plaintiffs'] performances."[3] The transfer included the Sides that Plaintiffs had already recorded at the time of the agreement, as well as the Sides that they would record in the future.

---

[3] The 1986 NPR Agreement defines "Sides" as the "single-sided recording embodying the recorded performances of the Artist and intended for use in the manufacture and sale of phonograph records" and the FAC defines the "Master Tapes" as "the physical copies of the master sound recordings," so the Court understands them to be interchangeable.

17

The FAC alleges that Plaintiffs are "the true owners" of the Master Tapes, but such an allegation, standing alone without any factual details supporting this claim to ownership, is conclusory and need not be accepted as true. Thus, the FAC fails to plausibly allege a conversion claim.

## Conclusion

The defendant's August 22, 2025 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendant and close the case.

Dated:   New York, New York
         January 8, 2026

                                         _____
                                              DENISE COTE
                                         United States District Judge